# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| JORDEAN LORAH | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 06-cv-00538 |
| | : |
| TETRA TECH, INC. | : |
| Defendant. | : |
| | : |

## TETRA TECH, INC.'S OPENING BRIEF IN SUPPORT OF ITS
## MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Of Counsel:
Sara A. Begley
Shannon Elise McClure
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
Telephone: (215) 851-8100

David Wilks (DE Bar ID No. 2793)
REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575

Attorneys for Defendant,
Tetra Tech, Inc.

Dated:  April 2, 2007

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDING ................................................. 1

II.   SUMMARY OF ARGUMENT ................................................................. 1

III.  STATEMENT OF FACTS AND THE ALLEGATIONS OF PLAINTIFF'S
      AMENDED COMPLAINT ...................................................................... 1

IV.   ARGUMENT .......................................................................................... 3

      A.    Legal Standard For A Motion To Dismiss Pursuant To Federal Rule
            Of Civil Procedure 12(b)(6).................................................................. 4

      B.    While a *Pro Se* Plaintiff's Complaint Is Construed Liberally, *Pro Se*
            Litigants Are Not Excused From Complying With The Federal Rules
            of Civil Procedure ............................................................................... 5

      C.    Plaintiff's Amended Complaint Fails To Adequately Allege Any
            Actionable Claim of Discrimination ....................................................... 6

            1.    The Amended Complaint Itself Establishes That Plaintiff Was
                  Employed By Synerfac, Not Tetra Tech ...................................... 6

            2.    Plaintiff's Amended Complaint Fails To State A Claim Under
                  the Age Discrimination in Employment Act ................................. 9

            3.    Plaintiff's Amended Complaint Fails to State a Claim Under
                  the Americans With Disabilities Act ......................................... 10

            4.    Plaintiff's Amended Complaint Fails to State a Title VII
                  Claim for Discrimination on the Basis of Sex ........................... 11

            5.    Plaintiff's Amended Complaint Fails to State a Claim for
                  Retaliation ............................................................................ 12

V.    CONCLUSION ..................................................................................... 13

# TABLE OF AUTHORITIES

## Cases

*ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855 (3d Cir. 1994) ........................................................ 4

*Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006) ............................... 12

*Cameron v. Infoconsulting Int'l LLC*, No. 04-4365, 2006 WL 1450842
(E.D. Pa. May 23, 2006) ........................................................................................ 6

*Cimino v. Borough of Dunmore*, No. 3:02CV1137, 2005 WL 3488419
(M.D. Pa. Dec. 21, 2005) ....................................................................................... 7

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 344 F. Supp. 2d 923
(D. Del. 2004) .................................................................................................... 4, 5

*Gagliardi v. Clark*, No. 06-20, 2006 WL 2847409 (W.D. Pa. Sept. 28, 2006) .............. 5-6

*Gaul v. Lucent Technologies Inc.*, 134 F.3d 576 (3d Cir. 1998) .................................. 10

*Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578 (3d Cir. 1996) .................................. 11

*Gonzalez v. Avon Prods., Inc.*, 609 F. Supp. 1555 (D. Del. 1985) ................................. 13

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997) ............................................................. 6

*Hudson v. Hernandez*, No. Civ. 04-162-KAJ, 2004 WL 2857373
(D. Del. Nov. 22, 2004) ........................................................................................ 5

*Jones v. School Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999) ............................. 11

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997) ............................... 12

*Keller v. Orix Credit Alliance*, 130 F.3d 1101 (3d Cir. 1997) ......................................... 9

*Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993) .......................................................... 4, 5

*Matrix Group, Inc. v. Ford Motor Credit Co.*, No. 04-CV-1552,
2004 U.S. Dist. LEXIS 23980 (E.D. Pa. Nov. 29, 2004) ...................................... 6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................................. 11

*McNeil v. United States*, 508 U.S. 106 (1993) ................................................................. 5

*Mohasco Corp. v. Silver*, 447 U.S. 807 (1980) ................................................................. 5

*Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)....................................12

*Morse v. Lower Merion School Dist.*, 132 F.3d 902 (3d Cir. 1997)...................................4

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ...............................................6

*NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117 (3d Cir. 1982) ......................................7

*Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173 (3d Cir. 1988) .............4

*Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192 (3d Cir. 1993) .......4

*Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133 (2000).....................................9

*Rodriguez v. Polo Ralph Lauren*, 77 F. Supp. 2d 643 (E.D. Pa. 1999) ..........................6, 8

*Showwalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 (3d Cir. 1999).....................9

*Slagle v. County of Clarion*, 435 F.3d 262 (3d Cir. 2006)................................................12

*U.S. ex rel Birnbaum v. Dolan*, 452 F.2d 1078 (3d Cir. 1971)...........................................5

*Ware v. Ball Plastic Container Corp.*, 432 F. Supp. 2d 434 (D. Del. 2006) ................7, 8

*Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207 (3d Cir. 2000)........................12

*Zarnoski v. Hearst Bus. Comm., Inc.*, No. 95-3854, 1996 WL 11301
   (E.D. Pa. Jan. 11, 1996) ...............................................................................................7

## **Other Authorities**

*Restatement (Second) of Torts* § 558 .............................................................................13

*Restatement (Second) of Torts* § 569 .............................................................................13

## **Rules**

Fed. R. Civ. P. 12.............................................................................................................4

## I.    NATURE AND STAGE OF PROCEEDING

This action was initiated by Plaintiff Jordean Lorah against Defendant Tetra Tech, Inc. Plaintiff's Amended Complaint (D.I. 17) seeks to assert claims for discrimination. Defendant Tetra Tech, Inc. was served with Plaintiff's Amended Complaint on March 13, 2007, and hereby seeks dismissal of Plaintiff's Amended Complaint.

## II.    SUMMARY OF ARGUMENT

Defendant Tetra Tech, Inc. ("Tetra Tech") has moved to dismiss Plaintiff's Amended Complaint because Plaintiff Jordean Lorah ("Lorah" or "Plaintiff") has failed to state any cognizable claim upon which relief may be granted. Plaintiff's Amended Complaint should be dismissed for several reasons:

(1)    Lorah was not an employee of Tetra Tech, but was employed by a temporary staffing agency, Synerfac.

(2)    Other than one reference to "Title VII Discrimination," Plaintiff's *pro se* Amended Complaint fails to articulate what claims she seeks to bring, leaving Tetra Tech to speculate as to Plaintiff's claims.

(3)    *Pro se* plaintiffs are not excused from the requirements of the Federal Rules of Civil Procedure.

(4)    Because Lorah has not articulated any cognizable claim against Tetra Tech, her Amended Complaint should be dismissed in its entirety.

## III.    STATEMENT OF FACTS AND THE ALLEGATIONS OF PLAINTIFF'S AMENDED COMPLAINT

Plaintiff's Amended Complaint is actually entitled "Motion Concerning the Discrimination Under Title VII." Amended Complaint (D.I. 17). Many of the allegations of the Amended Complaint have nothing to do with Tetra Tech whatsoever.

Plaintiff's Amended Complaint does not specify the nature of the claims she is asserting and only vaguely refers to "Title VII" discrimination.

According to the allegations of Lorah's Amended Complaint, she was placed at Tetra Tech by a temporary staffing employment agency, Synerfac. *Id.* ¶ 1. Plaintiff admits that she was not hired as an employee of Tetra Tech; rather, "Mr. Traynor told the Plaintiff, Jordean that he could not hire her through the company of Tetra Tech." *Id.* Plaintiff's Amended Complaint states that while "Erin Moran was a Tetra Tech, Inc. employee . . . the Plaintiff, Jordean was not." *Id.* ¶ 6. Plaintiff alleges that "she was employed with Synerfac located at 2 Read's Way in New Castle, Delaware." *Id.* ¶ 9.

Plaintiff was paid by Synerfac. Amended Complaint Attachs. 1 and 2 (D.I. 17-2 and 17-3). Plaintiff's benefits were provided and administered by Synerfac. Amended Complaint Attach. 1 (D.I. 17-2). Plaintiff's timesheets were submitted to Synerfac. Amended Complaint Attach. 1 (D.I. 17-2). Synerfac was the entity that controlled Plaintiff's pay rate and employment records. Amended Complaint Attachs. 1 and 2 (D.I. 17-2 and 17-3). Plaintiff was a party to an "Employment Agreement" with Synerfac, which states "[i]t is a sincere pleasure to welcome you as the newest member of the Synerfac Team" and set forth Plaintiff's hourly compensation, how employees of Synerfac should submit their timesheet, and explains Synerfac's benefits information. Amended Complaint Attach. 1 (D.I. 17-2).

Lorah began work for Synerfac at Tetra Tech on March 22, 2007. *Id.* Lorah contends that she was paid fourteen dollars per hour by Synerfac, which was less than another younger female, Erin Moran, earned per hour. *Id.* ¶ 2. Lorah also asserts that while younger employees who "were also working at agencies" "received their training,"

Lorah did not.  *Id.* ¶ 3.

During her March 14 interview, the supervisor allegedly "asked Lorah if she had a disability." *Id.* ¶ 1.  She responded by acknowledging that she had asthma. *Id.* ¶ 1. Plaintiff alleges that she also stated that "[i]t is illegal to employ someone through a marriage contract which would result in a divorce thus marking the employee contagious with an illness." *Id.* ¶ 4.

Lorah claims that she was harassed by a younger colleague Erin Moran and a male colleague Casey Grabowski, and that younger colleagues discussed her "as if she was contagious with an illness." *Id.* ¶ 4.  Lorah contends that on June 6, 2005, John Traynor asked Lorah to "get up from her desk for a younger male (name-AJ) who was hired." *Id.* ¶ 8.  Lorah contends that she had a meeting with Synerfac about "the harassment" and during that meeting, she mentioned that "she no longer had a desk/computer workstation to work at." *Id.*  "Not long after this meeting with Synerfac, on June 14, 2005, the Plaintiff, Jordean Lorah's contract ended." *Id.*  She was told that the ending of her contract was not related to her job performance. *Id.*

Lorah asserts that male employees who "were also working at agencies" "received their training," while Lorah did not. *Id.* ¶ 3.  Lorah contends that "[o]ften, Plaintiff had to correct her colleagues regarding her name which is not Jordan Lorah." *Id.* ¶ 6.  "Plaintiff also told her colleagues that she was not a man." *Id.*

## IV.    ARGUMENT

Tetra Tech respectfully submits that Plaintiff's Amended Complaint should be dismissed.  While Plaintiff's Amended Complaint should be construed liberally in light of her *pro se* status, Plaintiff is not excused from adhering to the Federal Rules of Civil Procedure.  Nor is Plaintiff excused from the basic requirement of pleading *each* of the

necessary elements of *each* cause of action. Plaintiff's Amended Complaint fails to plead the essential elements of any claim which Plaintiff may have intended to assert and should therefore be dismissed.

### A.     Legal Standard For A Motion To Dismiss Pursuant To Federal Rule Of Civil Procedure 12(b)(6)

The legal sufficiency of a Complaint is tested by a motion to dismiss. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6) must be granted if the plaintiff cannot prove any set of facts in support of the claim that would entitle the plaintiff to relief. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). A complaint may be dismissed when, taking all facts pleaded and all reasonable inferences therefrom in plaintiff's favor, the facts and inferences are nevertheless legally insufficient to support the relief sought. *Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988).

To survive a motion to dismiss, the complaint must provide adequate information to outline the essential legal elements of each of plaintiff's claims. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 344 F. Supp. 2d 923, 929 (D. Del. 2004). While a court should accept as true all factual allegations of the complaint in considering a Rule 12(b)(6) motion, the court should not credit bald and conclusory assertions or legal conclusions. *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

**B.**     **While a *Pro Se* Plaintiff's Complaint Is Construed Liberally, *Pro Se* Litigants Are Not Excused From Complying With The Federal Rules of Civil Procedure**

The United States Supreme Court has made clear that procedural rules will not be interpreted in a way that excuses mistakes by *pro se* litigants. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."). The Supreme Court has noted that "'in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" *Hudson v. Hernandez*, No. Civ. 04-162-KAJ, 2004 WL 2857373, at *1 (D. Del. Nov. 22, 2004) (a true and correct copy is attached as Exhibit 1) (citing *McNeil*, 506 U.S. at 133, and *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)). As the Third Circuit has recognized, although a *pro se* plaintiff's pleading must be read liberally, "[a]t some point, however, a complaint may be so vague that, despite a liberal reading, it must be dismissed for failure to state a claim upon which relief could be granted." *U.S. ex rel Birnbaum v. Dolan*, 452 F.2d 1078, 1079 (3d Cir. 1971) (affirming dismissal of *pro se* plaintiff's Amended Complaint for failure to allege facts sufficient to make out a civil rights claim).

Thus, while a court must liberally construe a complaint filed by a *pro se* plaintiff, it is also well established that a *pro se* litigant is not excused from adhering to the Federal Rules of Civil Procedure and is not excused from the basic requirement, articulated above, that her Amended Complaint must plead each of the necessary elements of *each* cause of action. *Kost*, 1 F.3d at 183; *Curay-Cramer*, 344 F. Supp. 2d at 929; *Gagliardi v. Clark*, No. 06-20, 2006 WL 2847409, at *3-*4 (W.D. Pa. Sept. 28, 2006) (a true and

correct copy is attached as Exhibit 2).

**C.    Plaintiff's Amended Complaint Fails To Adequately Allege Any Actionable Claim of Discrimination**

Plaintiff's Amended Complaint does not comply with the requirement that she plead the essential elements of each of her claims. Indeed, her Amended Complaint requires Tetra Tech to speculate regarding the nature of her claims. Accordingly, Plaintiff's Amended Complaint should be dismissed.

**1.    The Amended Complaint Itself Establishes That Plaintiff Was Employed By Synerfac, Not Tetra Tech**

The first element of a *prima facie* case for any type of employment discrimination claim is that the plaintiff was, in fact, employed by the entity against which the claim is being brought. *Matrix Group, Inc. v. Ford Motor Credit Co.*, No. 04-CV-1552, 2004 U.S. Dist. LEXIS 23980 (E.D. Pa. Nov. 29, 2004) (granting defendant's motion to dismiss on the basis of the absence of employer status and stating whether defendant is plaintiff's employer for purposes of a discrimination claim presents a "'threshold legal question'") (a true and correct copy is attached as Exhibit 3) (quoting *Rodriguez v. Polo Ralph Lauren*, 77 F. Supp. 2d 643, 645 (E.D. Pa. 1999)); *Cameron v. Infoconsulting Int'l LLC*, No. 04-4365, 2006 WL 1450842, at *4 (E.D. Pa. May 23, 2006) ("For liability to attach under Title VII, there must be an employment relationship between plaintiff and defendant.") (a true and correct copy is attached as Exhibit 4).

Ordinarily, whether an employment relationship exists would involve a factual inquiry about the level of control exerted by defendant over plaintiff. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24 (1992); *Graves v. Lowery*, 117 F.3d 723, 728 (3d Cir. 1997). However, as here, where there is a complete absence of any compensation paid by defendant to plaintiff, a court does not even engage in *any* analysis

– if the plaintiff has not received compensation from the defendant, "she cannot plausibly assert she was an employee." *Cimino v. Borough of Dunmore*, No. 3:02CV1137, 2005 WL 3488419, at *6 (M.D. Pa. Dec. 21, 2005) (stating that compensation is an "essential condition to the existence of the employee-employer relationship") (citations omitted) (a true and correct copy is attached as Exhibit 5). Synerfac, not Tetra Tech, is listed as her employer on Lorah's Form W-2. Amended Complaint Attach. 1 (D.I. 17-2). Synerfac, not Tetra Tech, paid Lorah's checks. Amended Complaint Attach. 2 (D.I. 17-3). Thus, it is clear that Lorah was employed by Synerfac, not Tetra Tech. That fact alone should end the court's inquiry and result in dismissal of Plaintiff's Complaint against Tetra Tech.

Even applying the control test, no factual inquiry is needed and Plaintiff's Amended Complaint is ripe for dismissal. Under the control test, a court evaluates "traditional agency law criteria for determining an employment relationship": the ability to set conditions of employment, such as hours, benefits, and compensation; the right to assign work projects; the right to discipline, hire and fire; the authority to promulgate work rules; method of payment; the provision of employee benefits; and control of employee records, such as payroll, insurance, taxes, timesheets, and the like. *Ware v. Ball Plastic Container Corp.*, 432 F. Supp. 2d 434, 439 (D. Del. 2006); *see also NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1124 (3d Cir. 1982); *Zarnoski v. Hearst Bus. Comm., Inc.*, No. 95-3854, 1996 WL 11301, at *8 (E.D. Pa. Jan. 11, 1996) (a true and correct copy is attached as Exhibit 6).

Here, Plaintiff's Amended Complaint establishes the following:

- Plaintiff did not consider herself an employee of Tetra Tech. Plaintiff's own complaint explicitly asserts that she was *not* an employee of Tetra Tech. Amended Complaint ¶ 1 (D.I. 17). Plaintiff's Amended Complaint states that while "Erin Moran was

a Tetra Tech, Inc. employee . . . the Plaintiff, Jordean was not." *Id.* ¶ 6. Plaintiff alleges that "she was employed with Synerfac located at 2 Read's Way in New Castle, Delaware." *Id.* ¶ 9.

- Plaintiff was paid by Synerfac. Amended Complaint Attachs. 1 and 2 (D.I. 17-2 and 17-3).

- Plaintiff's benefits were provided and administered by Synerfac. Amended Complaint Attach. 1 (D.I. 17-2).

- Plaintiff's timesheets were submitted to Synerfac. Amended Complaint Attach. 1 (D.I. 17-2).

- Synerfac was the entity who controlled Plaintiff's pay rate and employment records. Amended Complaint Attachs. 1 and 2 (D.I. 17-2 and 17-3).

- Plaintiff was a party to an "Employment Agreement" with Synerfac, which states "[i]t is a sincere pleasure to welcome you as the newest member of the Synerfac Team" and set forth Plaintiff's hourly compensation, how employees of Synerfac should submit their timesheets, and explains Synerfac's benefits information. Amended Complaint Attach. 1 (D.I. 17-2).

Plaintiff has not alleged any facts suggesting that Tetra Tech controlled or supervised her daily activities. *See Ware*, 432 F. Supp. 2d at 439 (granting motion to dismiss Title VII claim because, applying the *Darden* control test, plaintiff was not employed by defendant); *Rodriguez*, 77 F. Supp. 2d at 647-48 (finding that security guard was employee of security company and not employed by the defendant at whose location the guard was assigned to work, because security company paid the guard and provided his benefits).

Because Tetra Tech was not Lorah's employer, Tetra Tech cannot, as a matter of law, be liable for any conceivable claim set forth in Plaintiff's Amended Complaint. For each of the following sections addressing Plaintiff's allegations of discrimination, an employment relationship with Tetra Tech is essential to state a claim. Plaintiff has not only failed to alleged an employment relationship, but has specifically denied that one

ever existed. Thus, her claims should be dismissed.

### 2.    Plaintiff's Amended Complaint Fails To State A Claim Under the Age Discrimination in Employment Act

In the context of an claim under the Age Discrimination in Employment Act ("ADEA"), a plaintiff must put forth proof that: (1) the plaintiff is at least forty years old; (2) the plaintiff was qualified for the position; (3) despite the plaintiff's qualifications, the employer rejected his application for employment or took an adverse action that affected the terms and conditions of plaintiff's employment; and (4) the position was filled or the plaintiff was replaced by a person sufficiently younger to create an inference of age discrimination. *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 142 (2000); *Showwalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999); *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir. 1997).

Plaintiff has failed to plead that she was discriminated against in any way "because of" her age. She fails to assert that she was replaced by a person sufficiently younger to create an inference of discrimination. Plaintiff's Amended Complaint fails to make any allegation that she was qualified for the position she held, other than referencing the fact that she was assigned to Tetra Tech by Synerfac. Indeed, Plaintiff's Amended Complaint does not even allege what her job title was or job duties were, let alone that she was qualified to perform them. Plaintiff notes that she worked with "younger colleagues" and that she did not "receive her training." This is insufficient to state a claim. Plaintiff's Amended Complaint fails to state that she was entitled to the "training" in the first place; that the failure to provide her with training was "because of" her age; and she fails to allege that the position she was in was filled by a younger person. While she does allege that she "was asked to get up from her desk for a younger

male," she does not allege that the younger male was actually "replacing" her in any way. She does not allege what his job duties were or that he was hired to replace her. In short, Plaintiff's Amended Complaint fails to state a claim for age discrimination.

### 3. Plaintiff's Amended Complaint Fails to State a Claim Under the Americans With Disabilities Act

To state a claim of disability discrimination under the Americans With Disabilities Act ("ADA"), plaintiff must plead that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

Plaintiff has failed to plead essential allegations of her claim. While her Amended Complaint uses the phrase "disability" several times, she has not pled that she is a disabled person within the meaning of the ADA. In fact, elsewhere in her Amended Complaint, Plaintiff herself alleges that she is "physically and mentally fit." Amended Complaint at p. 2 (D.I. 17). These internally inconsistent allegations cannot be squared with the pursuit of a claim under the ADA.

As articulated *supra*, Plaintiff's Amended Complaint fails to make any allegation that she was qualified for the position she held. Indeed, Plaintiff's Amended Complaint does not even allege what her job title was or job duties were, let alone that she was qualified to perform them.

Plaintiff complains that she was asked about whether she had any disabilities in an interview with John Traynor and responded affirmatively that she had "asthma." Amended Complaint ¶ 1 (D.I. 17). Plaintiff then, in the very same paragraph, confirms

that despite her statement regarding asthma, she was successfully placed at Tetra Tech. *Id*. Hence, her own Amended Complaint defeats any claim that she was not hired or not placed on the basis of a disability. Finally, while she contends that "John Traynor knew [Plaintiff] had a disability," *id*. ¶ 10, she fails to plead that anyone at Tetra Tech took any adverse employment action as a result of any disability. Simply, Plaintiff has failed to state a claim under the ADA.

### 4.    Plaintiff's Amended Complaint Fails to State a Title VII Claim for Discrimination on the Basis of Sex

A *prima facie* case of sex discrimination under Title VII is established when a plaintiff has successfully shown (1) she is a member of a protected class, and (2) she is qualified for the position; (3) she was discharged from or denied the position, or suffered an adverse employment consequence; and (4) non-members of the protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999). As the Third Circuit has noted, the fourth prong of Plaintiff's *prima facie* burden should not be given short shrift: "Although often overlooked, the requirement that the adverse employment action occur 'under circumstances that give rise to an inference of unlawful discrimination' is a critical one . . . ." *Geraci v. Moody-Tottrup Int'l, Inc.*, 82 F.3d 578, 580-81 (3d Cir. 1996).

Here, Plaintiff has failed to explain or even reference her job title, duties or qualifications in her Amended Complaint. Plaintiff alleges that "younger male employees were hired before and after the Plaintiff." This is insufficient to state a claim – merely hiring male employees both before and after Plaintiff was placed at Tetra Tech is not tantamount to discrimination. Plaintiff has failed to assert that Tetra Tech took any

adverse action against her under circumstances giving rise to any inference of discrimination.[1]  Plaintiff's Title VII claim should be dismissed.

### 5.    Plaintiff's Amended Complaint Fails to State a Claim for Retaliation

In order to establish a *prima facie* claim of retaliation, the plaintiff must demonstrate:  (1) the employee engaged in protected activity; (2) subsequently or contemporaneously, the employer took an adverse employment action against the employee; and (3) there was a causal link between the protected conduct and the adverse employment action.  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Slagle v. County of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).  An "adverse employment action" is an action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Moore*, 461 F.3d at 341 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006)).  The plaintiff bears the burden of showing that his protected activity was the determinative or motivating reason for the employer's alleged retaliatory action.  *Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 221 (3d Cir. 2000).

Here, Plaintiff has alleged that she had a meeting "with Melissa, a recruiter of Synerfac about the harassment."  Amended Complaint ¶ 8 (D.I. 17).  It is unclear to what harassment Plaintiff refers.  She states that approximately ten days after this meeting, her contract ended.  She has not alleged that the end of her contract was in any way in

---

[1]    While Plaintiff complains about not "receiving training," this allegation relates to her age claims, if any, and not her sex discrimination claims – she notes that both male *and* female employees received training, meaning that females were not treated differently on the basis of sex.  Amended Complaint ¶ 10.

retaliation for the meeting.  Plaintiff has not linked the end of her contract in any way

with the meeting with Melissa – a non-Tetra Tech employee.  That failure to plead the

causation element is fatal to Plaintiff's retaliation claim.[2]

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, Tetra Tech respectfully requests that this Court

grant this Motion and dismiss Plaintiff's Amended Complaint with prejudice.

Respectfully submitted,

By: _____

David Wilks (DE Bar ID No. 2793)

Of Counsel:
Sara A. Begley
Shannon Elise McClure
REED SMITH LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103
Telephone: (215) 851-8100

REED SMITH LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone: (302) 778-7500
Facsimile: (302) 778-7575

Attorneys for Defendant,
Tetra Tech, Inc.

Dated:  April 2, 2007

---

2        Plaintiff's Amended Complaint at page 2 making a single reference to "defamation."  Clearly,
Plaintiff's Amended Complaint does not set forth any of the essential elements of a claim for defamation
under Delaware law: (1) a false statement; (2) which is defamatory; (3) which is of and concerning the
plaintiff; (4) which was made in an unprivileged publication to a third party; and (5) the making of which
was a consequence of fault amounting at least to negligence on the publisher's part. *Gonzalez v. Avon
Prods., Inc.*, 609 F. Supp. 1555, 1558 (D. Del. 1985); *Restatement (Second) of Torts* §§ 558, 569.

# EXHIBIT 1



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2857373 (D.Del.)
**(Cite as: 2004 WL 2857373 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
William H. HUDSON, Plaintiff,
v.
Diane HERNANDEZ, Defendant.
**No. Civ. 04-162-KAJ.**

Nov. 22, 2004.
William H. Hudson, Wilmington, DE, pro se.

MEMORANDUM ORDER

JORDAN, J.

*1 The plaintiff, William H. Hudson ("Hudson") filed this civil rights action on March 16, 2004. Currently pending before the Court are Hudson's response to the Court's Order to Show Cause, and his "Motion for Appointment of Counsel." (D.I.s 17, 18)

On May 5, 2004, the Court issued a Service Order directing the United States Marshal ("the Marshal") to serve the Complaint. On June 15, 2004, the Court issued a Superceding Service Order, directing the Marshal to serve the Complaint, the Amended Complaint and the Second Amended Complaint. (D.I.12) On June 21, 2004, the Marshal served the Complaint, along with the amendments on the defendant, Diane Hernandez ("Hernandez"). (D.I.14) The Marshal filed the completed USM Form 285 on June 29, 2004. Hernandez's answer was due on August 17, 2004. On October 14, 2004, this Court issued an Order to Show Cause to Hudson because Hernandez had not filed an Answer, and no action had been taken in the case. (D.I.16)

On November 5, 2004, Hudson filed a Motion for Appointment of Counsel stating that "[t]he Court has already approved the plaintiff [sic] application to file the matter in forma pauperis [sic]." (D.I.18) Hudson, a *pro se* litigant proceeding *in forma pauperis,* has no constitutional or statutory right to appointed counsel. *See Ray v. Robinson,* 640 F.2d 474, 477 (3d Cir.1981). It is within this Court's discretion, however, to seek representation by counsel for

Hudson, but this effort is made only "upon a showing of special circumstances indicating the likelihood of substantial prejudice to [Hudson] resulting from [Hudson's] probable inability without such assistance to present the facts and legal issues to the court in a complex but arguably meritorious case." *Smith-Bey v. Petsock,* 741 F.2d 22, 26 (3d Cir.1984); *accord Tabron v. Grace,* 6 F.3d 147, 155 (3d Cir.1993)(representation by counsel may be appropriate under certain circumstances, after a finding that a plaintiff's claim has arguable merit in fact and law). Here, Hudson alleges that Hernandez violated his constitutional rights by failing to provide him with medical treatment for an injury to his hand, and by failing to provide him with high blood pressure medication. (D.I.s 1, 6 and 11) Having reviewed Hudson's allegations, the Court finds that they are not of such a complex nature that representation by counsel is warranted at this time. The various papers and pleadings submitted by Hudson reflect an ability to coherently present his arguments regarding the merits of his Complaint.

On November 5, 2004, Hudson also filed a response to the Order to Show Cause. Although *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," ' *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), the Court must hold the *pro se* litigant to the same procedural requirements as licensed attorneys. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). The Supreme Court has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Id.* Furthermore, the Court noted that "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* (citing *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)). Hudson clearly states that he failed to take any action after Hernandez was served because he "was not clear how to proceed." (D.I.17) Hudson's *pro se* status does not relieve him of the "procedural rules in ordinary civil litigation;"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2857373 (D.Del.)
**(Cite as: 2004 WL 2857373 (D.Del.))**

Page 2

nevertheless, the Court will grant Hudson an additional 30 days in which to proceed with his case. In the absence of action by him, the Court shall dismiss his complaint without prejudice for failure to timely prosecute pursuant to D. Del. L.R. 41(1). *Id.*

**\*2** NOW THEREFORE, at Wilmington this 22nd day of November, 2004, IT IS HEREBY ORDERED that:

1. Hudson's Motion for Appointment of Counsel (D.I.18) is DENIED.

2. Hudson shall take appropriate action to prosecute this case or his complaint will be dismissed pursuant to D.Del.L.R. 41(1).

Not Reported in F.Supp.2d, 2004 WL 2857373 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv00162 (Docket) (Mar. 16, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.
John GAGLIARDI, Soon-Rye Vangelder, Plaintiffs,
v.
Richard CLARK, Borough Mgr.; Borough of
Jefferson Hills, a municipal
corporation; Borough of Jefferson Hills Sewer
Authority; Pennsylvania American
Water Company, a Pennsylvania business
corporation; all parties sued in both
their official and private capacities, Defendants.
**Civil Action No. 06-20.**

Sept. 28, 2006.
John Gagliardi, Jefferson Hills, PA, pro se.

Soon-Rye Vangelder, Clairton, PA, pro se.

John M. Giunta, Rawle & Henderson, Alan T. Silko,
Edward I. Levicoff, Levicoff, Silko & Deemer,
Pittsburgh, PA, for Defendants.

*MEMORANDUM ORDER*

CONTI, District Judge.

*1 Plaintiffs John Gagliardi ("Gagliardi") and Soon-Rye Vangelder ("Vangelder," and together with Gagliardi, "plaintiffs") filed this civil action alleging various federal constitutional claims under 42 U.S.C. § 1983, claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, claims under 18 U.S.C. § § 1001 and 1341, state constitutional claims under the Pennsylvania Constitution, and contract and tort claims governed by state law.

Pending before the court are motions filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by defendants Richard Clark, Borough Manager ("Clark"); the Borough of Jefferson Hills (the "borough"); the Borough of Jefferson Hills Sewer Authority (the "sewer authority") (collectively, the "borough defendants") (Doc. No. 3) and by defendant Pennsylvania American Water Company (the "water

company") (Doc. No. 10). Defendants seek to dismiss plaintiffs' complaint in its entirety for failure to state a claim. The court finds that with respect to the federal claims, plaintiffs have failed to state a claim upon which relief may be granted. The court will dismiss some of these claims without prejudice to plaintiffs' right to file an amended complaint within thirty (30) days of the entry of this order; provided, that plaintiffs can meet the standards of Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs if they file an amended complaint must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist and may not rely upon mere "bald assertions" or "legal conclusions." *See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir.1997)* ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."). The court will dismiss other claims with prejudice because leave to amend with respect to those claims would be futile. The court will not address the remaining state law claims at this time because the court declines to retain jurisdiction over those claims.

*Facts Accepted as True for the Purpose of Deciding the Motion*

Plaintiff Gagliardi is a Pennsylvania citizen whose address is located at 191 Wall Road in the USI Industrial Park which he operates in Jefferson Hills Borough, Allegheny County, Pennsylvania. Plaintiffs' Complaint ("Comp.") ¶ 1. [FN1] Plaintiff Vangelder is a permanent United States resident alien of Korean ancestry who resides at 191 Wall Road. *Id.* ¶ 2. Plaintiff Vangelder receives social security benefits for her disabled condition. *Id.* Defendant Clark is Manager for the borough, which is a municipal corporation and a political subdivision of the Commonwealth of Pennsylvania. *Id.* ¶ 3. Clark, as Manager for the borough, oversees the defendant sewer authority. *Id.* ¶ 4. The sewer authority is an administrative entity entirely directed by the Borough Municipal Corporation and thus subject to Clark's day-to-day managerial authority. *Id.* ¶ 19. Defendant water company is a private Pennsylvania business corporation. *Id.* ¶ 5.

> FN1. The complaint alleges that Gagliardi's address is at 191 Wall Road, but the complaint and the pleadings in the case do not make clear whether Gagliardi owns this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 2
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
(Cite as: 2006 WL 2847409 (W.D.Pa.))

property or the adjacent property at 141 Wall Road, or is otherwise responsible for these properties in some respect. Compl. ¶ 1 ("Gagliardi ... whose address is at 191 Wall Rd., in the USI Industrial Park which he operates...."); Compl. Exhibit ("Ex.")(Doc. No. 1- 1) at 16. Indeed, the ownership, subdivision, transfer, and tax liabilities of that property and the adjacent parcel of land appear to be the subject of litigation which was pending, and may be ongoing, in the Allegheny Court of Common Pleas at the time this civil action was commenced. *See* Compl. Ex. (Doc. No. 1-1) at 19-21, 22-28.

**\*2** On December 30, 2005, the Allegheny Court of Common Pleas issued a memorandum opinion and order overruling preliminary objections and directing defendants to answer in a case commenced by Gagliardi against Allegheny County, the borough, and the School District of West Jefferson Hills, Docket No. GD03-3504, concerning certain property descriptions and tax assessments involving the property at issue in this case and the adjacent parcel. *Id.* ¶ 12; Compl., Ex. (Doc. No. 1-1) at 19-21 ("State Memorandum Order"). The state trial court indicated that sorting out the property description would be "cumbersome," and thus the issues in that case would be best addressed through discovery rather than by preliminary objections. State Memorandum Order at 19- 21. Plaintiff alleges that within forty-eight hours of receiving the State Memorandum Order, the borough, acting through the sewer authority, caused water utility service to be terminated at 191 Wall Road without any warning or notice. *Id.* ¶ 13. [FN2]

> FN2. Plaintiffs allege that the water company was contractually obligated to follow the borough's directive. Compl. ¶ 28. The water company in its motion to dismiss agrees with this characterization, noting that it is contractually obligated pursuant to a contract between the water company and the borough which is recorded with and approved by the Pennsylvania Utility Commission pursuant to the laws of the Commonwealth of Pennsylvania. Water company's Mot. to. Dismiss at 2.

On Friday, January 6, 2006, Vangelder discovered that the water pressure flow was virtually non-existent in Gagliardi's apartment at 191 Wall Road. *Id.* ¶ 14. [FN3] After determining that the water flow problem was not attributable to problems at 191 Wall Road, plaintiffs notified the water company by

telephone about the lack of water pressure and flow. *Id.*

> FN3. Plaintiffs allege that prior to this incident water pressure and flow had been diminishing for months at 191 Wall Road to the extent that it would take half of an hour to refill a flushed toilet. *Id.* ¶ 14.

A water company employee arrived at the property at 191 Wall Road and discovered that the valve controlling water service to the property was almost completely closed. *Id.* ¶ 15. When that water company employee opened the main service valve, the water pressure and flow returned at full force and volume. *Id.* ¶ 16. [FN4] Plaintiffs, however, allege that within twenty minutes of reporting to the water company that he had re-opened the valve, the employee telephoned Gagliardi and notified Gagliardi that he had been ordered by the water company to shut off the water again. *Id.* ¶ 17.

> FN4. Plaintiffs allege that comparable full force and volume had not been seen for months at 191 Wall Road. *Id.* ¶ 16.

Gagliardi was alarmed and called the water company. *Id.* ¶ 18. Gagliardi learned that the sewer authority had ordered the water company to shut off the water flow. *Id.* The water company acknowledged to Gagliardi that it normally sent termination notices to its customers but that because the sewer authority had demanded that the water company immediately disconnect service the water company promptly complied without resorting to notice or other procedures. *Id.* ¶ 20. Plaintiffs allege that the crisis was timed to occur early on a Friday afternoon when borough officers, employees, and agents would not be available for meaningful contact by Gagliardi. *Id.* ¶ 21. Plaintiffs allege that Clark and the sewer authority historically have been aware of utility service issues at 191 Wall Road. *Id.* ¶ 22. Plaintiffs allege that Gagliardi learned from a person at the water company that same day that Clark personally had given the water company the order to turn off water service at 191 Wall Road and had ordered that the water service was to remain off. *Id.* ¶ 23.

**\*3** Plaintiffs allege that Gagliardi made several unsuccessful attempts to contact Clark by telephone concerning the shut-off order. *Id.* ¶ 24. Gagliardi similarly was unsuccessful in his attempts to speak to any other borough officials that day. *Id.* Gagliardi unsuccessfully attempted, for example, to reach the sewer authority manager, but was told the sewer

Slip Copy                                                                    Page 3
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

authority manager was on vacation in Florida. *Id.*

Plaintiffs allege that Vangelder is a totally innocent third party to the impasse between Gagliardi, the sewer authority, and the water company; that she is responsible for none of the legal disputes between Gagliardi, the borough, the sewer authority, and the water company; and that she has suffered a total loss of water usage which has compounded her physical ailments. *Id.* ¶ 25. Moreover, both Gagliardi and Vangelder have suffered compound physical ailments including severe headache pain and somatic discomfort and Gagliardi is an elderly person beset with a variety of cardiac, diabetic, and arthritic conditions which are aggravated when accompanied by a denial of access to water. *Id.* ¶ ¶ 25-26, 51.

### Standard of Review

A motion to dismiss tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits. Rather, when considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. V. Higgins,* 281 F.3d 383, 388 (3d Cir.2002). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost,* 1 F.3d at 183 (quoting 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § `1357 (2d. ed.1990)). A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom, there is no reasonable reading upon which the plaintiff may be entitled to relief. *Vallies v. Sky Bank,* 432 F.3d 493, 494 (3d Cir.2006). Moreover, the court is under a duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

While this court is mindful that *pro se* plaintiffs are not held to as high of a standard as litigants that are represented by counsel, a *pro se* plaintiff must still plead the essential elements of his or her claim and is not excused from conforming to the standard rules of civil procedure. *McNeil v. United States,* 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel...."); *Haines v. Kerner,* 404

U.S. 519, 520 (1972). Thus, plaintiffs, even though they are *pro se,* must set forth sufficient information that would allow the court to infer that, accepting plaintiffs' allegations as true, defendants violated plaintiffs' federal rights. *Kost* 1, F.3d at 183.

**\*4** The Federal Rules of Civil Procedure do not require the plaintiff to set out in his complaint the specific facts that entitle him to relief, but rather only a "short and plain statement of the claim." FED. RULE CIV. P. 8(a)(2). "Bald assertions" or "legal conclusions," however, are not required to be credited in making the determination as to whether or not there is a set of facts on which to determine that a claim has been stated. *See Morse,* 132 F.3d at 906 ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss .").

Where the plaintiff's complaint pleads facts beyond the requirements of Rule 8, his claim may be subject to dismissal if the specific facts alleged fail to provide relief under any viable legal theory. *Camero v. Kostos,* 253 F.Supp. 331, 338 (D.N.J.1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity). In addition, if the plaintiff's complaint does plead specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. *Id.; see ALA, Inc. V. CCAir, Inc.,* 29 F.3d 855, 859 (3d Cir.1994); 5 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed.2004). In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck--he has pleaded himself out of court." *Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996).

Exhibits may be considered in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment." 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382-92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider "documents which are attached to or submitted with the complaint, as well as legal arguments presented in memorandums or briefs and arguments of counsel," "documents whose contents are alleged in the complaint and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 4
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

whose authenticity no party questions, but which are not physically attached to the pleading," and "[d]ocuments that the defendant attaches to the plaintiff's complaint and are central to the claim." *Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002) ( "Although a district court may not consider matters extraneous to the pleadings, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.' ") (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)).

### Discussion
### *I. Federal Constitutional Claims Under 42 U.S.C. § 1983*

**\*5** Plaintiffs assert multiple constitutional claims against defendants for violations of 42 U.S.C. § 1983. Section 1983 imposes civil liability upon any person who, while acting under color of state law, deprives another individual of rights, privileges and immunities secured by the Constitution or federal law. *Doe v. Delie,* 257 F.3d 309, 314 (3d Cir.2001). Section 1983 "does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere." *Id.* (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). To prevail on a claim brought pursuant to section 1983, a plaintiff must show that (1) the defendant or defendants acted under color of law; and (2) their actions deprived the plaintiff of rights secured by the Constitution or federal statutes. *Anderson v. Davila,* 125 F.3d 148, 159 (3d Cir.1997) (citing *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993)). [FN5]

> FN5. Plaintiffs additionally allege violations of several rights secured by the Pennsylvania Constitution and group these claims along with their federal constitutional claims. Section 1983 provides a remedy for the violation of a *federal* constitutional or statutory rights. *See* 42 U.S.C. § 1983 ("Every person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...."); *see also Doe,* 257 F.3d at 314 (Section 1983 "provides a remedy for the violation of a federal constitutional or

statutory right conferred elsewhere"); *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006)("Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws.").

In this case, some defendants allege defendant-specific issues concerning the section 1983 claims. The water company, for example, argues that it is not a state actor and could not have acted under color of law and therefore plaintiffs cannot state a claim against it pursuant to section 1983. Clark argues that he is entitled to qualified immunity. The borough argues that it cannot be held liable under a theory of supervisory liability. The court first will address whether plaintiffs generally can state a claim under the various constitutional provisions asserted and the court only if necessary will reach defendant-specific issues such as state action and qualified immunity. [FN6]

> FN6. If the court does not reach these issues because the court dismisses all of plaintiffs' federal constitutional claims on other grounds, the court is in no way expressing an opinion as to whether these immunities and defenses apply and whether they are meritorious. The court, instead, is seeking to address the multitude of claims and issues raised by plaintiffs' complaint and defendants' motions in the most efficient manner possible.

### *A. The Procedural Due Process Claim*

Plaintiffs argue that defendants violated their rights to due process secured by the Fifth and the Fourteenth Amendments to the United States Constitution by shutting off their water service without fair notice and an opportunity to defend against the termination of water service. Compl. ¶ 34. Plaintiffs have plead facts showing that defendants are local government entities and officials and a private company. The Fifth Amendment's due process guarantee applies only to the actions of the federal government. Plaintiffs, therefore, cannot state a claim for a violation of procedural due process guaranteed by the Fifth Amendment. Plaintiffs' due process claim, however, can be analyzed pursuant to the Fourteenth Amendment. In response to this allegation of denial of procedural due process, both the borough defendants and the water company argue that plaintiffs cannot state a claim for failure to provide due process largely because plaintiffs failed

Slip Copy                                                                              Page 5
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

to avail themselves of processes available under the law or make a showing that they are patently inadequate.

The Fourteenth Amendment to the United States Constitution forbids a state from depriving persons of life, liberty, or property without due process of law. *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000)(citing U.S. CONST. amend. XIV, § 1). To state a claim under section 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 233-34 (3d Cir.2006) (citing *Alvin,* 227 F.3d at 116).

**\*6** The United States Court of Appeals for the Third Circuit has made clear that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin,* 227 F.3d at 116. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Id.* (quoting *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982)(internal quotations omitted) and citing *Bohn v. County of Dakota,* 772 F.2d 1433, 1441 (8th Cir.1985)). "A due process violation 'is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.' " *Id.* (quoting *Zinermon v. Burch,* 494 U.S. 113, 126 (1990)). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Id.* (citing *McDaniels v. Flick,* 59 F.3d 446, 460 (3d Cir.1995); *Dwyer v. Regan,* 777 F.2d 825, 834-35 (2d Cir.1985), modified on other grounds, 793 F.2d 457 (2d Cir.1986); *Riggins v. Board of Regents,* 790 F.2d 707, 711-12 (8th Cir.1986)); see *Hudson v. Palmer,* 468 U.S. 517, 533 (1984)(involved a prison inmate section 1983 lawsuit against a prison guard and held that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause if a meaningful postdeprivation remedy for the loss is available; extending a previous holding concerning negligent deprivations to intentional deprivations of property).

In *Alvin,* a tenured university professor and two pharmaceutical companies that he operated brought a civil action alleging, among other claims, violations of due process resulting from denial of the benefits of tenure--and ultimately severance of his tenure and transfer to another school within the university--as part of an effort to punish him for his entrepreneurial activity which competed with university-related commercial activities. *Alvin,* 227 F.3d at 110. The issues on appeal focused on the plaintiff's compliance with the university grievance process. *Id.* The plaintiff argued that he followed the grievance procedures laid out in the faculty handbook, but was never afforded a hearing. *Id.* The district court granted summary judgment in favor of defendants on the section 1983 procedural due process claim, concluding that the plaintiff had not demonstrated that he had been deprived of a property interest. *Id.* at 111.

The United States Court of Appeals for the Third Circuit did not reach that issue, but affirmed the district court's grant of summary judgment in favor of defendants, holding instead that the plaintiff could not make out a procedural due process violation because he had not taken advantage of the processes available to him, and had not shown them to be patently inadequate. *Id.* at 111, 116-19.

**\*7** The court of appeals explained that this requirement that a plaintiff take advantage of processes made available to assert a claim of denial of procedural due process should be distinguished from exhaustion requirements that exist in other contexts. *See id* . The plaintiff in *Alvin* appeared to the court of appeals to conflate the two, and contended, as an alternative to his claim that he did attempt to use the available procedures, that he need not go through the processes available because of the general rule that there is no exhaustion requirement for section 1983 claims. *Id.* (citing *Patsy v. Board of Regents of Florida,* 457 U.S. 496, 516 (1982); *Hohe v. Casey,* 956 F.2d 399, 408 (3d Cir.1992)). The court of appeals rejected this argument:

However, exhaustion *simpliciter* is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies. *Id.* (citing *Zinermon,* 494 U.S. at 126). The court of appeals held that applying these principles to the plaintiff's case in *Alvin,* and viewing the facts in the light most favorable to the plaintiff in that case, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 6
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

plaintiff did not avail himself of the procedures provided by the defendant university because he did not follow the university regulations regarding the use of the grievance procedure. *Id.*

In this case too, defendants argue that plaintiffs failed to avail themselves of the available post-deprivation administrative procedures. Defendants point out that the Pennsylvania legislature has provided a process for customers to follow concerning the termination of utility service. *See* 66 PA. CONS. STAT. § § 1401 *et seq.* Section 1410 provides for the filing of a complaint with the Public Utility Commission (the "PUC"). 66 PA. CONS. STAT. § 1410. Prior to filing a complaint, the statute requires the customers to first contact the public utility to resolve the problem. 66 PA. CONS. STAT. § 1410(1)("The commission shall accept complaints only from customers who affirm that they have first contacted the public utility for the purpose of resolving the problem about which the customer wishes to file a complaint. If the customer has not contacted the public utility, the commission shall direct the customer to the public utility.").

Plaintiffs plead facts showing that, in addition to numerous unsuccessful attempts to contact the borough and Clark directly, they did contact the water company by telephone about the termination of water service at issue in this case. Compl. ¶ 14. Plaintiffs, however, plead facts showing that they did not avail themselves of the full extent of the grievance procedures available under Pennsylvania law, and in particular that they did not file a complaint with PUC as contemplated by the statute. In their response in opposition to the borough defendants' motion to dismiss (Doc. No. 5), plaintiffs "denied that aggrieved persons must avail themselves of whatever administrative framework exists before complaining of a denial of procedural due process...." Pl.'s Resp. ¶ 3; *see also id.* at ¶ 21-22 (concerning plaintiffs' First Amendment claim: "Merely because the Defendants allege that a Pennsylvania Public Utilities Commission complaint could provide a suitable or meaningful post-deprivation remedy does not obligate your Plaintiffs to pursue an administrative remedy for a problem that is judicial in nature...."). [FN7]

> FN7. The court may consider the factual averments in plaintiffs' responses and the exhibits incorporated by plaintiffs by reference in deciding the motion to dismiss because "matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, [and] items appearing in the record of the case ... may be considered by the district court without converting the motion into one for summary judgment." 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 382-92 (3d ed.2004). Specifically, without converting the motion into a motion for summary judgment, the court may consider, among other things, "documents which are attached to or submitted with the complaint." *Pryor v. National Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002); *see U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir.2002).

**\*8** Plaintiffs further asserted that defendants were required to institute appropriate warning notices before utility services were terminated and that plaintiffs pleaded that they did not do so. *See* Compl. ¶ 20. The briefing on the motion to dismiss, however, includes at least two termination notices apparently sent to plaintiffs concerning the property at issue. *See* Plaintiffs' Praecipe for Inclusion of Pertinent Exhibits (Doc. No. 6), Ex. 6 (April 12, 2006 Notice); Water Company's Mem. In Support of Mot. (Doc. No. 15), Ex. A (April 19, 2005 Notice). One of these notices predates the January 6, 2006 termination of water service at issue in this lawsuit. Both of these notices explained a procedure to challenge the termination which contemplates grievance procedures including a hearing. *See id.* These notices identically related that water service will be terminated "because of non-payment of sewage fees pursuant to ordinance." *Id.* These exhibits, which can be considered in ruling on a motion to dismiss without converting it into a motion for summary judgment, demonstrate that plaintiffs had some notice prior to the termination that water service would be terminated.

Under the relevant jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies. The court, under *Alvin,* does not even reach the questions whether plaintiffs, who allege they were deprived of water service without due process of law, were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and whether (2) the procedures available to plaintiffs did not provide "due process of

Slip Copy                                                    Page 7
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
(Cite as: 2006 WL 2847409 (W.D.Pa.))

law. *See Alvin,* 227 F.3d at 111 (although district court granted summary judgment because it found that the plaintiff had not been deprived of a property interest, and focused largely on the question whether the alleged incidents comprised such a significant erosion of the incidents of his tenure that he was deprived of a property interest, the court of appeals did not reach "this difficult (and interesting) question, however, because, whether or not Alvin has alleged a property deprivation, he has failed to adduce evidence that the defendants infringed upon whatever property right he possessed without due process of law.")

In this case, plaintiffs do not seriously dispute the adequacy of the existing state-law remedies themselves. Plaintiffs do make vague allegations that there is a history of problems with utility service at the location in question, and in particular of problems between Gagliardi and some of the defendants. *See* Com pl. ¶ 21-22, 25. Plaintiffs further allege that the termination was done in part in retaliation for the discovery ruling in the state lawsuit, which could be understood as an oblique allegation that there is some bias or inadequacy in the proceedings as applied to plaintiffs. The court of appeals in *Alvin,* however, rejected a similar argument that futility of proceedings as applied to a particular plaintiff, or allegations of bias, generally relieve a plaintiff of the threshold requirement for making out a procedural due process claim that the plaintiff must first take advantage of existing processes. 227 F.3d at 118-19.

*9 When access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim.... However, since Alvin never invoked the second part of the processes available to him, which appear facially adequate, we will not hold that this step would have been unavailing (in procedure, if not in substance), absent concrete evidence supporting such a contention.

*Id.* at 118 (internal citations omitted). The court of appeals in *Alvin* discussed similar holdings in other decisions in which plaintiffs attempted to make a procedural due process claim charging that bias has infected a review of the deprivation without using all of the procedures available to them. *Id.* at 119. The court of appeals held, however, viewing the evidence in a light most favorable to Alvin, that "there is simply insufficient evidence that the formal hearing would not be held in a fair and impartial manner." *Id.* The court of appeals made clear:

The Constitution does not require perfection at every stage of a process; ... Alvin has not used all the processes available, and he cannot convert his

difficulties with quickly triggering the informal process into a contention that the entire process, which he has not yet used, is biased.

*Id.* (internal citations omitted). This argument, though not clearly articulated by plaintiffs, would also be unavailing in this case. [FN8]

> FN8. Although *Alvin* was resolved at the summary judgment stage and this case is being addressed at the motion to dismiss stage, the reasoning in *Alvin* still applies to plaintiffs in this case. *See Jefferson,* 90 F.3d at 1296 ("In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-- he has pleaded himself out of court.").

Plaintiffs here plead facts showing, similar to the plaintiff in *Alvin,* that they did not take advantage of the existing processes made available under state law to challenge the termination of water service. The court, therefore, finds that plaintiffs cannot state a procedural due process claim against any defendant. The court will dismiss this claim with prejudice.

**B. The Substantive Due Process Claim**

Plaintiffs allege that defendants violated Vangelder's substantive due process rights guaranteed by the Fourteenth Amendment because depriving her of water shocks the conscience. Compl. ¶ 39. Defendants argue in their motions to dismiss that plaintiffs cannot state a claim for a substantive due process violation because substantive due process protections apply to federal protected rights and the right to water is not such a right.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV. "To prevail on a substantive due process claim, a plaintiff must demonstrate that an arbitrary and capricious act deprived them of a protected property interest." *County Concrete Corp. v. Town of Roxbury,* 442 F.3d 159, 165 (3d Cir.2006)(quoting *Taylor Inv. Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292 (3d Cir.1993))(internal quotations omitted). "To prevail on a substantive due process claim challenging a state actor's conduct, 'a plaintiff must establish *as a threshold matter* that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.' " *Hill v. Borough of Kutztown,* 455 F.3d 225, 235 n. 12 (3d Cir.2006) (quoting *Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 139-40 (3d Cir.2000) (Alito, J.) (quotation

Slip Copy                                                                    Page 8
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

marks and citation omitted))(emphasis added).

**\*10** Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law. Rather, for a property interest to be protected for purposes of substantive due process, it must be "fundamental" under the United States Constitution.

*Id.* (citing *Nicholas*, 227 F.3d at 142-143) (internal citations omitted). The United States Court of Appeals for the Third Circuit has explicitly held that the provision of water and sewer services, whether by a municipality or private utility company, is not a federally protected right. *Ransom v. Marazzo*, 848 F.2d 398, 412 (3d Cir.1988). In *Ransom*, a class of Philadelphia residents to whom water and sewer service was denied unless they paid the delinquent service charges incurred, but not paid, by the prior customers of water services at their residences sued the City of Philadelphia for, among other things, a denial of due process. *Id.* at 400. The district court granted the City's motion to dismiss the plaintiff's amended complaint. *Id.* The court of appeals affirmed and held that the state and local policies of denying service until charges for services rendered are satisfied was constitutional. *Id.* at 401.

Concerning the plaintiffs' substantive due process claim at issue in that decision--"seeking nothing less than a ruling that the practice and policy of conditioning water and sewer service on the satisfaction of pre-existing charges result in an unconstitutional deprivation of property regardless of the procedural safeguards installed,"--the court of appeals rejected plaintiffs' reliance on a district court opinion affirmed without opinion, *Koger v. Guarino*, 412 F.Supp. 1375 (E.D.Pa.1976), *aff'd*, 549 F.2d 795 (3d Cir.1977), and determined that "[s]ubstantive due process refers to and protects federal rights." *Id.* at 411. **"The provision of water and sewer services, whether by a municipality or by a private utility company, is not,** however, a federally protected right." *Id.* at 412 (citing *Koger*, 412 F.Supp. at 1386) (emphasis added).

The legal fact that, once a municipality (or, for that matter, a private utility company) establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause ... merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections.... It does not transform that expectation into a substantive guarantee against the state in any circumstance.

*Id.* (internal citations omitted). The court of appeals

in *Ransom*, therefore, "reject[ed] the claim that conditioning the receipt of water and sewer service on the satisfaction of past due charges for services rendered to the applicant's residence raises the question of a substantive due process deprivation." *Id.*

This holding that there is no substantive guarantee to utility service that is enforceable under a claim brought pursuant to the Fourteenth Amendment's substantive due process guarantee equally applies here. FN9 The court, therefore, finds that plaintiffs cannot state a substantive due process claim against any defendant. The court will dismiss this claim with prejudice.

> FN9. Plaintiffs assert that denial of water service to Vangelder "shocks the conscience." Compl. ¶ 39. This language suggests that plaintiffs, who are *pro se,* may be seeking to assert a substantive due process claim under the "state-created danger doctrine" of substantive due process under which a plaintiff must prove "(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur." *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir.2005) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir.1995). Case law addressing state-created danger invokes the "shocks the conscience standard." Plaintiffs, however, have alleged no facts in support of that kind of claim and have made no arguments in support of that kind of claim. Indeed, plaintiffs pleaded some facts showing that they cannot state a claim under this doctrine.

### C. The Equal Protection Claim

**\*11** Plaintiffs allege that defendants have violated their rights under the Equal Protection Clause of the Fourteenth Amendment. Compl. ¶ 36. Defendants argue that plaintiffs cannot state a claim. "A plaintiff stating a claim under the Equal Protection Clause must allege that he has been treated differently because of his membership in a suspect class or his exercise of a fundamental right, or that he has been treated differently from similarly-situated others and

Slip Copy                                                                                                                                          Page 9
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

that this differential treatment was not rationally related to a legitimate state interest." _Young v. New Sewickley Twp.,_ 60 Fed.Appx. 263, 267 (3d Cir.2005)(unpublished)(citing _City of Cleburne v. Cleburne Living Center,_ 473 U.S. 432, (1985)).

As to Vangelder, plaintiffs allege that she is a resident alien of Korean ancestry. This assertion on its own, however, is not sufficient to state a claim under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs here have alleged nothing other than her status as a resident alien of Korean ancestry as a basis for her equal protection claim. "A § 1983 complaint need only satisfy the liberal notice pleading standard of Federal Rule of Civil Procedure 8(a)." Young, 60 Fed.Appx. at 265 (citing _Evancho v. Fisher,_ 423 F.3d 347, 353 (3d Cir.2005)). "Nonetheless, a district court is not required to credit a 'bald assertion' when deciding a motion to dismiss under this liberal notice pleading standard, and the plaintiff cannot use allegations of civil rights violations that amount to nothing more than 'conclusory, boilerplate language' to show that he may be entitled to relief under § 1983." _Id._ (citing _Evancho, 423 F.3d at 354-55). [FN10]_

> FN10. "[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." _Young v. New Sewickley Twp.,_ 60 Fed.Appx. 263, 267 (3d Cir.2005)(unpublished) (citing _Alston v. Parker,_ 363 F.3d 229, 235 (3d Cir.2004)). "Moreover, the district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend." _Id._ "Accordingly, even when a plaintiff does not seek to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he has leave to amend the complaint within a set period of time." _Id._ (citations omitted). "The district court may dismiss the action if the plaintiff does not submit an amended pleading within that time, or if the plaintiff files notice with the district court of his intent to stand on the complaint." _Id._ (citing _Shane v. Fauver,_ 213 F.3d 113, 116 (3d Cir.2000); _Borelli v. City of Reading,_ 532 F.2d 950, 951 n. 1 (3d Cir.1976)).

As to Gagliardi, in plaintiffs' response to borough defendants' motion to dismiss, plaintiffs argue that

the actions of the defendants were intended to impact Gagliardi as a "class of one." _See_ Pl.'s Resp. ¶ 11 (responding to municipal defendants' argument that plaintiffs have failed to identify a municipal policy or custom which resulted in the violation of rights under the supervisory liability standard set forth in _City of Canton v. Harris,_ 489 U.S. 378, 385 (1989)). [FN11] The "class of one" theory asserted but not argued in any detail by plaintiff was announced in _Village of Willowbrook v. Olech,_ 528 U.S. 562(2000) (per curiam). _Hill v. Borough of Kutztown,_ 455 F.3d 225, 238 (3d Cir.2006). "According to that theory, a plaintiff states a claim for violation of the Equal Protection clause when he 'alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " _Id._ (quoting _Olech, 528 U.S. at 564_).

> FN11. The Supreme Court _Canton_ announced the degree of fault required to hold a public entity liable under a theory of supervisory liability for failure to train public employees. _Canton,_489 U.S. at 388-92. The Supreme Court held that only where a public entity's failure to train its employees in a relevant respect reflects a deliberate indifference to the constitutional rights of its inhabitants can such a claim yield liability. _Canton,_489 U.S. at 392; _see Sample v. Diecks,_ 885 F.2d 1099 (3d Cir.1999)(interpreting _Canton)._ "We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to _deliberate indifference_ to the rights of persons with whom the police come into contact." _Canton,_ 498 at 388 (emphasis added).

The United States Court of Appeals recently in Hill discussed the "class of one" theory:

> Our court has not had the opportunity to consider the equal protection "class of one" theory at any length. From the text of _Olech_ itself, however, it is clear that, at the very least, to state a claim under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.

**\*12** _Id._ In _Hill,_ the court of appeals determined that the equal protection "class of one" claim by the plaintiff in that case, a professional engineer who worked as a borough manager until he alleged he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 10
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

constructively discharged and harassed by the mayor of Kutztown, failed because the plaintiff did not allege the existence of similarly situated individuals-- i.e., other borough managers--who the mayor treated differently than he treated the plaintiff. *Id.* (citing <u>Levenstein v. Salafsky, 414 F.3d 767, 776 (7th Cir.2005)</u>).

Similarly here, as to both the putative Korean ancestry claim and the "class of one" claim, plaintiffs have not alleged that similarly situated individuals were treated differently and that there was no rational basis for the difference in treatment. The court, therefore, finds that plaintiffs have failed to state an Equal Protection claim against all defendants. The court will dismiss these claims without prejudice to plaintiffs' ability to raise them in an amended complaint if plaintiffs can make more than bald conclusions. Plaintiffs are reminded that if they file an amended complaint, they are bound by the requirements of <u>Rule 8 of the Federal Rules of Civil Procedure</u> and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

### D. The Right to Petition First Amendment Claim

Plaintiffs allege that defendants obstructed plaintiffs' right to petition guaranteed by the First Amendment to the United States Constitution by not providing them with pretermination notice concerning the termination of utility service. Compl. ¶ 29. Defendants argue that under both forms of right to petition recognized by courts--interference with the access to the courts and retaliation for engaging in protected conduct--plaintiffs failed to state a claim. As to access to the courts, plaintiffs plead no facts showing that their access to the courts was denied. To the contrary, plaintiffs were able to bring this lawsuit without obstacle, and plaintiffs plead facts in their complaint showing that they are in the process, or were in the process, or seeking judicial redress in state court for related issues. Based upon these facts, plaintiffs cannot state a claim for violation of right to petition predicated on access to the courts.

As to retaliation, in the facts plead, and in their response to the borough defendants motion, plaintiffs suggest a claim for retaliation based upon the discovery ruling obtained in the state court action. *See* Compl. ¶ 12; Pl.'s Resp. ¶ 12 (responding to qualified immunity argument by Clark). As a threshold matter, the water company argues that it was not a party to the state court litigation and,

therefore, plaintiff cannot state a claim of retaliation against it based upon these facts. The borough, however, was a named defendant in the state court litigation.

**\*13** Retaliation for the exercise of constitutionally-protected rights is itself a violation of rights secured by the Constitution actionable under <u>section 1983</u>. <u>White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990)</u>. The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment Rights." <u>Anderson v. Davila, 125 F.3d 148, 159 (3d Cir.1997)</u> (citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)</u>). It is well established that a plaintiff's retaliation claim is subject to a three-step, burden shifting methodology. <u>Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002)</u> (citing *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 669, 675 (1996)).

First, a plaintiff must show that his conduct was constitutionally protected. Second, he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action. Finally, the defendant may defeat the plaintiff's case "by showing that it would have taken the same action even in the absence of the protected conduct."

*Id.* (quoting *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 669, 675 (1996)); *see* <u>Hill v. Borough of Kutztown 455 F.3d 225, 241 (3d Cir.2006)</u>; <u>Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir.2005)</u>("*Scranton* ").

In *Scranton,* the United States Court of Appeals for the Third Circuit addressed a lawsuit brought by police officers alleging that the city terminated them not because they failed to comply with a residency ordinance but because they exercised their First Amendment right to petition the government by previously suing the city. *Id .* at 125. In that case, as here, it cannot be seriously contested that the act in question--the filing of grievance lawsuit against government officials--is protected activity. The question whether this lawsuit was a "substantial or motivating factor" in the borough defendants' decision to direct the utility service be terminated, however, and whether defendants could show that they would have taken the same action even in the absence of Gagliardi's lawsuit and the discovery ruling, are case-specific, fact-specific issues. *See id.* at 125 n. 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                     Page 11
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

Plaintiffs have plead facts showing that they engaged in protected activity. They have asserted only the barest allegations in support of any retaliatory motive by the borough defendants. The court, however, at this early stage in the litigation, cannot determine as defendants would like that plaintiffs have failed to state a claim and amendments would be futile. The court, therefore, finds that plaintiffs have failed to state a First Amendment claim against all defendants based upon the facts alleged thus far. The court will dismiss this claim without prejudice to plaintiffs' rights to file an amended complaint that complies with Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs are reminded that if they file an amended complaint, they must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

**E. The Unreasonable Seizure Fourth Amendment Claim**

*14 Plaintiffs argue that by terminating water service, defendants violated plaintiffs' rights to be free from unreasonable seizures under the Fourth Amendment to the United States Constitution. "The Fourth Amendment, made applicable to the States by the Fourteenth [Amendment] ... provides in pertinent part that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....' " _Soldal v. Cook County, Ill._, 506 U.S. 56, 61 (1992) (quoting U.S. CONST. amend. XIV). "A 'seizure' of property, we have explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " _Id._ (quoting _United States v. Jacobsen_, 466 U.S. 109, 113 (1984)); see _Gardner v. McGroarty_, 68 Fed.Appx. 307, 311 (3d Cir.2003)(same)(unpublished). The Fourth Amendment protects the people from unreasonable searches and seizures of "their persons, houses, papers, and effects." _Id._ at 62 (quoting U.S. CONST. amend. XIV). It, however, "does not protect possessory interests in all _kinds_ of property." _Id._ at 63 n. 7 (citing _Oliver v. United States_, 466 U.S. 170, 176-77 (1984))(emphasis added).

Defendants argue that utility service cannot reasonably be construed as a personal effect, and contend that they can locate no decisions to the contrary. In their response to the borough defendants' motion, plaintiffs argue that defendants' view of the Fourth Amendment is too narrow, and that the Fourth Amendment secures the right of the people "to be

secure in their **persons**" and that the Bill of Rights, including the Fourth Amendment, is a "collection of declaratory and restrictive phrases enunciated to expressly limit the prerogatives of government oppressors, such as the Defendants and their corporate allies." See Pl.'s Resp. ¶ 29 (emphasis in original).

The court finds that, based upon the facts plead, even drawing all inferences in plaintiffs favor, plaintiffs have not stated a claim that their persons were seized, nor have they stated a claim that their personal effects were seized. As the Supreme Court made clear in _Soldal:_ The Fourth Amendment "does not protect possessory interests in all kinds of property." 506 U.S. at 63 n. 7 (citing _Oliver v. United States_, 466 U.S. 170, 176-77 (1984)). Access to utility service cannot reasonably be construed as a "personal effect" which is protected by the Fourth Amendment. The court has located no federal case law supporting such a view, although there are decisions in which plaintiffs challenged the termination of utility service subject to the procedural due process protections of the Fourteenth Amendment. _See, e.g., Ransom v. Marazzo_, 848 F.2d 398, 412 (3d Cir.1988); but see _Gardner v. McGroarty_, 68 Fed.Appx. 307, 311 (3d Cir.2003)(unpublished) (holding that the search and seizure of an apartment building without a warrant, the posting of it as unfit for habitation, the evacuation of the tenants, and the discontinuation of utility services did not constitute an unlawful search and seizure under the Fourth Amendment).

*15 The court, therefore, finds that based upon the facts plead by plaintiffs that plaintiffs cannot state a Fourth Amendment illegal seizure claim against any defendant. The court will dismiss this claim with prejudice.

**F. The Freedom of Contract and To Be Free From Impairment of Contracts Claim**

Plaintiffs allege that defendants violated plaintiffs' rights to freedom of contract and to be free from impairment of contracts secured by Article I, Section 10, Clause 1 of the United States Constitution, which provides in relevant part: "No State shall ... pass ... any ... law impairing the obligation of contracts...." U.S. CONST. art. I, § 10, cl. 1. Defendants argue that to assert a viable claim under the contracts clause, plaintiffs must allege that a change in the law operates as a substantial impairment of a contractual relationship. See _General Motors Corp. v. Romein_, 503 U.S. 181, 186 (1992). The Supreme Court explained contracts clause claims in _General Motors_

Slip Copy
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
(Cite as: 2006 WL 2847409 (W.D.Pa.))

Page 12

as follows:

Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship ."…. This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.

*Id.* (internal citations omitted). While "[g]overnment regulations that substantially diminish contractual rights may create an unconstitutional impairment of the contract," *Callaway Community Hosp. v. Sullivan,* 784 F.Supp. 693, 699 (W.D.Mo.1992) (citing *Thorpe v. Housing Auth. of Durham,* 393 U.S. 268, 278-79 (1969)), "[t]he contract clause does not bar all impairments of contract, but, instead, bars only unreasonable, significant impairments." *Id.* (citing *United States Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 21, 25 (1977)).

The analysis set forth in *Yellow Cab Co. v. City of Chicago,* 3 F.Supp.2d 919, 922-23 (N.D.Ill.1998), is instructive. "A contracting party may invoke the protections of the Contract Clause when there is an exercise of legislative power." *Id.* at 922 (citing *Arriaga v. Members of Bd. of Regents,* 825 F.Supp. 1, 4 (D.Mass.1992)). "By its terms, the Contract Clause applies only to state constitutions, constitutional amendments, statutes, ordinances or any instrumentality of state legislated or delegated authority." *Id.* (citations omitted). "However, courts generally recognize that the Contract Clause also applies to the actions of state subdivisions, including city councils." *Id.* (citing *Horwitz-Matthews, Inc. v. City of Chicago,* 78 F.3d 1248, 1251 (7th Cir.1996)). "Where a city 'acts through ordinances, then its contractual approvals and repudiations will be embodied in ordinances.' " *Id.* (quoting *Horwitz-Matthews,* 78 F.3d at 1251). "Consequently, a city ordinance may trigger the protections of the Contract Clause." *Id.*

**\*16** Unconstitutional impairment of contracts must be distinguished from ordinary breach of contract. "The protections of the Contract Clause, however, only apply to impairments of contract rights; the Contract Clause does not protect private parties from governmental breaches of contract." *Id.* "The Supreme Court has distinguished between an unconstitutional impairment of a contract obligation and a breach of contract for purposes of claims brought under the Contract Clause." *Id.* (citing *Hays v. Port of Seattle,* 251 U.S. 233, 237 (1920)). The Court recognized that "[t]he distinguishing characteristic between a constitutional impairment

and a contractual breach is whether the non-breaching party has an available remedy." *Id.* Therefore,

[i]f a state exercises legislative power in a way that eliminates the availability of a remedy or action for damages by the non-breaching party, the state has impaired the contract. In contrast, if some legislative action announces the state's refusal to perform its contractual obligation, the state has simply breached the contract.

*Id.* (noting that the United States Court of Appeals for the Seventh Circuit held that a state or local law unconstitutionally impairs a contract only when the law provides the state or one of its subdivisions with a complete defense to a breach of contract suit, thereby preventing the other party from obtaining damages for breach of contract).

Plaintiffs make some allegations suggesting a contract for utility service, and these allegations are sufficient to meet the liberal pleading requirements of Federal Rule of Civil Procedure 8 with respect to the existence of a contract. Plaintiffs, however, have not alleged (1) the existence of any ordinance passed by the borough defendants; (2) that any ordinance has impaired any contract that may exist; or (3) that any ordinance has *substantially* impaired any contract. With respect to the water company, plaintiffs cannot state a claim for impairment of contracts because the water company is a private company.

The court, therefore, finds that plaintiffs did not meet the pleading requirement of Rule 8 of the Federal Rules of Civil Procedure and failed to state an impairment of contracts claim against any defendant. The court will dismiss this claim without prejudice with respect to the borough defendants and with prejudice with respect to the water company. Plaintiffs are reminded that if they file an amended complaint with respect to the claims dismissed without prejudice, they are bound by the requirements of Rule 8 of the Federal Rules of Civil Procedure and must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist, and may not rely upon bald assertions or legal conclusions.

**G. The Reserved and Unenumerated Rights Under the Ninth Amendment Claim**

Plaintiffs allege that defendants violated their reserved and unenumerated rights under the Ninth Amendment to the United States Constitution. The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                       Page 13
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

construed to deny or disparage others retained by the people." U.S. CONST. amend. IX. Defendants argue plaintiffs cannot state a claim under the Ninth Amendment because the Ninth Amendment does not independently secure any substantive constitutional rights, but rather has been interpreted to be a rule of construction. *See Warcloud v. Horn,* 1998 WL 126917 (E.D.Pa.1998) ("The Ninth Amendment has never been recognized as independently securing any substantive constitutional rights." *Id.* (quoting *Robinson v. Vaughn,* 1993 WL 451495, at * 6 (E.D.Pa.1993)(quoting *Strandberg v. City of Helena,* 791 F .2d 744, 748-49 (9th Cir.1986))) (internal quotations omitted). Indeed, this court has previously held that the Ninth Amendment *"states but a rule of construction."* *Nicolette v. Caruso* 315 F.Supp.2d 710, 718 (W.D.Pa.,2003)(Conti, J.)(quoting THE CONSTITUTION OF THE UNITED STATES OF AMERICA: ANALYSIS AND INTERPRETATION 1412 (Johnny Killiam, ed., 1987) (emphasis added in original)). "As such, the Ninth Amendment standing alone does not confer substantive rights for purposes of pursuing a constitutional claim." *Id.* (citations omitted). "Specifically, section 1983 civil rights claims premised on the Ninth Amendment 'must fail because there are no constitutional rights secured by that amendment .' " *Id.* (quoting *Charles v. Brown,* 495 F.Supp. 862 (D.C.Ala.1980)).

*17 The court, therefore, finds that plaintiffs cannot state a Ninth Amendment claim against any defendant. The court will dismiss this claim with prejudice.

## II. Fair Debt Collection Act Claims Under 15 U.S.C. § 1692

The Fair Debt Collection Act ("FDCA"), 15 U.S.C. § 1692, "provides a remedy for consumers who have been subjected to abusive, deceptive or unfair debt collection practices by debt collectors." *Piper v. Portnoff Law Associates, Ltd.,* 396 F.3d 227, 232 (3d Cir.2005) (citing *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 400 (3d Cir.2000); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1167 (3d Cir.1987)). "The threshold requirement of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt.' " *Id.* (internal quotations omitted); *see* 15 U.S.C. § § 1692e-f.

A "debt" is defined under the FDCA as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). "Consumer" is defined as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). "Debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

Plaintiffs do not plead facts in their complaint showing that they owe a debt to the defendants or that the defendants acted as "debt collectors" under the meaning set forth in the statute. [FN12] This lawsuit is based upon the act of shutting off water service to plaintiffs, not upon efforts by the borough defendants or the water company to collect a debt.

> FN12. Indeed, supplemental filings demonstrate that plaintiffs dispute any arrearage on the account in question.

The court, therefore, finds that the facts plead show that plaintiffs cannot state a FDCA claim against any defendant. The court will dismiss this claim with prejudice.

## III. Federal Criminal Statutes for Mail Fraud and Federal Fraud and False Statements

The federal mail fraud statute provides for the imposition of criminal liability for using the mail to execute or attempt to execute a fraudulent scheme. *See* 18 U.S.C. § 1341. [FN13] The federal fraud and false statement statute, 18 U.S.C. § 1001, provides for the imposition of criminal liability for the knowing and willful making of material false, fictitious, or fraudulent statements or representations in any matter within the jurisdiction of the executive, legislative, or judicial branch of the federal government. *See* 18 U.S.C. § 1001. [FN14]

> FN13. Section 1341 provides: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 14
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. 18 U.S.C. § 1341.

FN14. Section 1001 provides:
(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.
(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.
(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to--

(1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or
(2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.
18 U.S.C. § 1001.

Defendants argue that it is well-established that there is no private cause of action under the federal criminal statutes for mail fraud or false statements. The plain text of these statutes reinforces this argument because nowhere does the text of either statute provide for a private cause of action. *See Clements v. Chapman,* 2006 WL 1739826, *3 (10th Cir.2006)(citing generally *Diamond v. Charles,* 476 U.S. 54, 64-65 (1986) (noting that private citizens cannot compel enforcement of criminal law). [FN15]

FN15. In *Clements,* the United States Court of Appeals made clear that "Section 1983 cannot 'fill the gap' for what is clearly absent from the federal criminal statutes cited by [the plaintiff], i.e., the existence of a private right of action to enforce those statutes ." *Id.* (citing *Blessing v. Freestone,* 520 U.S. 329, 340 (1997)).

**\*18** In plaintiffs' response to borough defendants' motion to dismiss, plaintiffs acknowledge that there is no private cause of action for enforcing these criminal statutes. *See* Pl.'s Resp. ¶ 29. Plaintiffs state instead that these two federal criminal statutes "are pleaded primarily to indicate the bad faith underlying the actions of the governmental Defendants and the individual offenses alleged do not themselves constitute sources for a private cause of action." *Id.*

The court, therefore, finds that based upon the facts plead by plaintiffs, plaintiffs cannot state a claim under these federal criminal statutes against any defendant. The court will dismiss these claims with prejudice.

***IV. State Law Claims Under the Pennsylvania Constitution, Contract and Tort Law***

Where, as here, dismissal of all federal claims is

Slip Copy                                                                                        Page 15
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**

warranted, this court may decline to exercise supplemental jurisdiction over pendant state law claims. *See* 28 U.S.C. 1367(c)(3); *Queen City Pizza,* 124 F.3d at 444; *Stechney v. Perry,* 101 F.3d 925, 939 (3d Cir.1996); *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.3d 1277, 1284-85 (3d Cir.1993). This case is at the motion to dismiss stage and significant resources of the parties and the judiciary have not yet been expended. Plaintiffs will have leave to file an amended complaint asserting federal claims that have been dismissed without prejudice so long as plaintiffs in good faith meet the pleading standard of Rule 8 of the Federal Rules of Civil Procedure with respect to those claims. Plaintiffs if they choose to file an amended complaint may avail themselves of this forum at that time, or plaintiffs may avail themselves of the appropriate state forum to resolve their state law claims.

Under these circumstances, the court can find no compelling reason to retain jurisdiction over plaintiffs' state law claims at this time and no prejudice to plaintiffs from their dismissal. The court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims--which include multiple claims under various sections of Article I of the Pennsylvania Constitution as well as other state law claims. Those claims are dismissed without prejudice. *See* 28 U.S.C. § 1367; *Queen City Pizza,* 124 F.3d at 444; *Stehney,* 101 F.3d at 939; *Growth Horizons,* 983 F.2d at 1284-85 (3d Cir.1993).

### Conclusion

**AND NOW,** this 28th day of September 2006, upon consideration of defendants' motions to dismiss plaintiffs' complaint (Doc. Nos.3, 10), IT IS HEREBY ORDERED defendants motions are GRANTED.

Plaintiffs' Fourteenth Amendment procedural due process claim and substantive due process claim, Fourth Amendment unreasonable seizure claim, Ninth Amendment reserved and unenumerated rights claim, FDCA claim, and federal criminal statutory claims for mail fraud and false statements are **DISMISSED WITH PREJUDICE** as to all defendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom of contract claim is **DISMISSED WITH PREJUDICE** as to the water company.

*19 Plaintiffs' Fourteenth Amendment equal protection claim, First Amendment right to petition claim, and Pennsylvania state law claims are

**DISMISSED WITHOUT PREJUDICE** as to all defendants.

Plaintiffs' Article I, Section 10, Clause 1 freedom of contract claims are **DISMISSED WITHOUT PREJUDICE** as to the borough defendants.

IT IS FURTHER ORDERED that plaintiffs shall have thirty (30) days from the date of the entry of this order to file an amended complaint making curative amendments; provided that plaintiffs can meet the standards of Rule 8 of the Federal Rules of Civil Procedure. Plaintiffs if they file an amended complaint must allege facts sufficient to outline the elements of their claims or to permit inferences to be drawn that these elements exist and may not rely upon mere bald assertions or legal conclusions. Plaintiffs are reminded of the requirements of Rule 11 of the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that all other pending motions, including plaintiffs' motion for joinder of additional parties (Doc. No. 11), plaintiffs' motion for declaratory relief (Doc. No. 17), plaintiffs' amended motion for joinder of additional parties (Doc. No. 20), and defendants' motion to strike motion for joinder and motion for declaratory relief (Doc. No. 23), are HEREBY DENIED AS MOOT.

Slip Copy, 2006 WL 2847409 (W.D.Pa.)

**Motions, Pleadings and Filings** (Back to top)

• 2006 WL 1813150 (Trial Motion, Memorandum and Affidavit) Plaintiffs Response in Opposition to Defendant Pennsylvania American Water Company's Motion to Dismiss (May 30, 2006)Original Image of this Document (PDF)

• 2006 WL 1813149 (Trial Motion, Memorandum and Affidavit) Plaintiff Motions for Joinder of Additional Parties Rule 17, 18, 19 and 20, F.R. Civ. P. (May 22, 2006)Original Image of this Document (PDF)

• 2006 WL 1813148 (Trial Motion, Memorandum and Affidavit) Pennsylvania American Water Company's Motion to Dismiss (May 2, 2006)Original Image of this Document (PDF)

• 2006 WL 1505479 (Trial Motion, Memorandum and Affidavit) Gagliardi's Response in Opposition to Defendants Richard Clark and Borough of Jefferson Hills Motion to Dismiss Rule 12(b)(6) (Mar. 31, 2006)Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 16
Slip Copy, 2006 WL 2847409 (W.D.Pa.)
**(Cite as: 2006 WL 2847409 (W.D.Pa.))**


• <u>2006 WL 506148</u> (Trial Motion, Memorandum and Affidavit) Brief in Support of Motion to Dismiss Pursuant to F.R.C.P. 12 (b)(6) (Jan. 30, 2006)Original Image of this Document (PDF)

• <u>2:06cv00020</u> (Docket) (Jan. 9, 2006)

• <u>2006 WL 506768</u> (Trial Pleading) Emergency Complaint (Jan. 7, 2006)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

LEXSEE 2004 US DIST LEXIS 23980

**MATRIX GROUP, INC. dba MATRIX SUZUKI, D & R AUTOMOTIVE, INC., MARION Q. CANTLO, and SHERMAN D. BROOKS, III, Plaintiffs, v. FORD MOTOR CREDIT COMPANY, PRIMUS AUTOMOTIVE FINANCIAL SERVICES dba AMERICAN SUZUKI AUTOMOTIVE CREDIT, and AMERICAN SUZUKI CORPORATION, Defendants.**

CIVIL ACTION NO. 04-CV-1552

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2004 U.S. Dist. LEXIS 23980*

**November 29, 2004, Decided
November 29, 2004, Filed, November 30, 2004, Entered**

**DISPOSITION:** Defendants' Amended Motion to Dismiss GRANTED.

**COUNSEL:** [*1] For Plaintiffs MATRIX GROUP, INC., D & R AUTOMOTIVE, MARION Q. CANTLO, and SHERMAN D. BROOKS: William J. Wheeler, William Wheeler & Associates, PC, Philadelphia, PA.

For Plaintiff MATRIX GROUP, INC.: Kevin H. Buraks, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, PA.

For Defendants FORD MOTOR CREDIT COMPANY and PRIMUS AUTOMOTIVE FINANCIAL SERVICES: Kevin H. Buraks and David E. Stern, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, PA.

For Defendant AMERICAN SUZUKI CORPORATION: Cathy Ann Chromulak, Chromulak & Associates, LLC, Canonsburg, PA.

**JUDGES:** Legrome D. Davis, J.

**OPINION BY:** Legrome D. Davis

**OPINION:**

### MEMORANDUM AND ORDER

LEGROME D. DAVIS, J. NOVEMBER 29, 2004

### I. INTRODUCTION

Presently before the Court is Defendants Ford Motor Credit Company and Primus Automotive Financial Services dba American Suzuki Automotive Credit's ("Moving Defendants") Amended Motion to Dismiss (Doc. No. 12) ("Defs.' Am. Mot."), filed September 16, 2004, and Plaintiff's Response in Opposition to Defendants' Amended Motion to Dismiss (Doc. No. 15), filed October 4, 2004. For the reasons set forth below, Moving Defendants' Amended Motion to Dismiss is GRANTED.

### II. FACTUAL [*2] BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs began operation of Matrix Group, Inc. dba Matrix Suzuki ("Matrix"), a new vehicle franchised dealership, and D&R Automotive, Inc. ("D&R"), a vehicle service repair business, in Newark, Delaware, in March of 2002. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss for Failure to State a Claim ("Pls.' Mem.," incorporated by reference into Pls.' Mem. of Law in Opp'n to Defs.' Am. Mot. to Dismiss for Failure to State a Claim ("Pls.' Am. Mem.")) at unnumbered 1. Plaintiff Mr. Brooks served as President of Matrix and D&R. Id. Plaintiff Mr. Cantlo served as Vice President of Matrix and D&R. Id. Both Mr. Brooks are Mr. Cantlo are African-American, as are the majority of shareholders in the two companies. Id. Matrix entered into a franchise agreement with Nonmoving Defendant American Suzuki

providing the dealership with the right to buy, and D&R with the right to service, new Suzuki motor vehicles. Pls.' Compl. P 9. In 2002, Moving Defendants contracted with Matrix to provide new and used vehicle inventory wholesale floorplan financing for the floorplanning of new vehicles, used vehicles, program cars, and demonstrators. Id. [*3] Messrs. Brooks and Cantlo signed personal guarantees to secure the financing. Id. In addition, Plaintiffs obtained a working capital loan guaranteed by the Small Business Administration ("SBA") and personally guaranteed by Mr. Cantlo. The loan was designated a "low doc" loan which is utilized by the SBA for the issuance of loans to minorities. Pls.' Mem. at unnumbered 2.

On or about July 18, 2002, Defendant Ford Motor Credit Company dba American Suzuki Automotive Credit filed suit against Matrix, D&R, and Messrs. Cantlo and Brooks, both in Delaware Superior Court for breach of the wholesale floorplan financing agreement and in Delaware Chancery Court for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction. Pls.' Am. Mem. at unnumbered 1-2. Because Plaintiffs could not afford to retain legal counsel, Moving Defendants obtained default judgments against Plaintiffs Brooks and Cantlo on January 30, 2004, and against Plaintiffs Matrix and D&R on July 28, 2004. Id. at unnumbered 2; Id. at Exh. D; Defs.' Am. Mot. at 5.

On April 8, 2004, Plaintiffs brought the instant action against Defendants, in which they contend that Defendants engaged in a series [*4] of racially-motivated discriminatory actions against Plaintiffs that ultimately resulted in the demise of the Matrix dealership. Pls.' Mem. at unnumbered 2. In their Complaint (Doc. No. 1), Plaintiffs allege that Moving Defendants racially discriminated against Plaintiffs, first, by requiring Matrix to possess substantially more working capital than was required of similarly-situated Caucasian dealerships (Pls.' Compl. Count I, PP 30-33) n1; second, by damaging Plaintiffs reputation by way of a racially derogatory statement made by an employee of Defendants during an audit by Defendants on or about April 12, 2002 (Id. Count II, PP 39-43) n2; and third, by increasing the working capital requirement (Id. Count IV, P 62). Plaintiffs assert that such conduct violates of *Title VII of the Civil Rights Act.* Id. PP 33, 48. Plaintiffs also allege that Moving Defendants breached the fiduciary duties of trust and loyalty owed to Plaintiffs by seizing possession of all keys for the vehicle inventory, maintaining control

over the keys during daily operation of the dealership, and taking the keys at approximately 4:30 p.m. every day, prohibiting Matrix from making sales and offering [*5] demonstration rides. Id. Count III, PP 50-53. Further, Plaintiffs allege that they were "damaged" by Moving Defendants' practice of demanding payment for vehicles sold by the dealership prior to the five day release period and refusing to "floorplan" trade-ins of new and used vehicles. Id. Count IV, PP 58-59. Finally, Plaintiffs allege that Moving Defendants: (1) breached their fiduciary duty and duty of confidentiality to Plaintiffs by disclosing the floorplan account status of Matrix to another unrelated dealership; (2) breached the floorplan contract and their fiduciary duty by prohibiting Plaintiffs from selling and buying vehicles at nearby auctions; (3) breached their fiduciary duty by increasing the working capital requirement; and (4) breached their fiduciary duty by requiring Matrix to prematurely pay off demonstrator vehicles on floorplan. Id. Count IV, PP 60-63. n3 Plaintiffs also allege a fifth Count against Nonmoving Defendant American Suzuki.

n1 Plaintiffs also allege in Count I that these actions were in breach of Defendants' fiduciary duty to Plaintiffs.

n2 Plaintiffs also allege in Count II that these actions were in breach of Defendants' fiduciary duties of trust and loyalty owed to Plaintiffs.

[*6]

n3 The Court notes that Plaintiffs' complaint fails to satisfy *Federal Rule of Civil Procedure 10(b),* which requires that "all averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances." *Fed. R. Civ. P. 10(b).* However, this Court declines to require the Plaintiffs to replead the complaint merely because the complaint contains a technical violation of *Rule 10(b)* because, as discussed below, each of Plaintiffs' counts fail to state a claim upon which relief can be granted. Therefore, this technical flaw is moot.

Moving Defendants, in their Amended Motion to

Dismiss, contend that Plaintiffs' claims as to the Moving Defendants must be dismissed in light of the prior Delaware litigation and because Plaintiffs' claims under the *Civil Rights Act* cannot be maintained.

## III. STANDARD OF REVIEW

Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff [*7] can prove no set of facts in support of the claim which would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; *Robb v. City of Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984)*. Such a motion tests the legal sufficiency of a claim while accepting the veracity of the claimant's allegations. See *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990)*; *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987)*; *Winterberg v. CNA Ins. Co., 868 F. Supp. 713, 718 (E.D. Pa. 1994)*, aff'd, *72 F.3d 318 (3d Cir. 1995)*. A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. See *Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179 (3d Cir. 1988)*.

## IV. DISCUSSION

### A. Res Judicata bars Litigation of Compulsory Counterclaims

Moving Defendants argue, in sum, that Plaintiffs are barred from bringing the instant action on claim preclusion, or res judicata, grounds because the Delaware state court actions constitute final decisions on [*8] the merits. According to Moving Defendants' argument, Plaintiffs failed to raise and therefore waived compulsory counterclaims they now seek to litigate before this Court. Defs.' Am. Mot. at 4-7.

Although two of Plaintiffs' claims for relief are brought under the *Civil Rights Act*, the effect of res judicata is nevertheless determined by reference to the law of Delaware. *Benoit v. GE Capital Mortg. Servs., 1995 U.S. Dist. LEXIS 4746, No. 94-6949, 1995 WL 216967, at *2 (E.D. Pa. Apr. 11, 1995)* (citing *Brady v. C.F. Schwartz Motor Co., 723 F. Supp. 1045, 1047 (D. Del. 1989)*). The Delaware Supreme Court has not addressed whether the procedural bar of res judicata extends to unraised compulsory counterclaims in cases where judgment was rendered by default. However, in determining how the Delaware Supreme Court would

decide, this Court is guided by lower Delaware state courts and other federal District Courts that have addressed this issue.

Delaware courts have held that res judicata permits "a final judgment upon the merits rendered by a court of competent jurisdiction [to] be raised as an absolute bar to the maintenance of a second suit in a different court upon the same [*9] matter by the same party or his privies." *Epstein v. Chatham Park, Inc., 52 Del. 56, 153 A.2d 180, 184, 2 Storey 56 (Del. Super. Ct. 1959)*. This "absolute bar" is equally applicable where judgment is obtained upon default, *State v. National Automobile Ins. Co., 290 A.2d 675, 676 (Del. Ch. 1972)* ("a judgment by a court of competent jurisdiction is res judicata even if it is obtained upon default."), and embraces, not only those claims brought by a plaintiff, but also compulsory counterclaims that were or should have been raised by the defendant. *Bank of Delaware v. Summers, 1979 Del. C.P. LEXIS 7, 1979 WL 149969 at *1-*2 (Del. Com. Pl. 1979)* ("Even where default judgment has been taken, the defendant will be barred from subsequently asserting a compulsory counterclaim.") (citing *Firemen's Ins. Co. of Newark v. L.P. Steuart & Bro., Inc., 158 A.2d 675 (D.C. 1960)*). Moreover, according to Federal Practice & Procedure,

> Consent and default judgments present a special problem with regard to the effect of failing to plead a *Rule 13(a)* [compulsory] counterclaim. . . .Typically, courts have given default judgments full effect and have held that a counterclaim [*10] omitted from an action that terminates in a default judgment will be barred from any subsequent suits.

6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1417 (2004) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 160 (2d Cir. 1992)*; *Carteret Savs. & Loan Ass'n v. Jackson, 812 F.2d 36 (1st Cir. 1987)*; *Firemen's Ins. Co. v. L. P. Steuart & Bro., Inc., 158 A.2d 675 (D.C. 1960)*).

Therefore, in keeping with the majority of other courts to address this issue, including a Delaware court, this Court concludes that under Delaware law, the prior default judgments should be given full effect and that any omitted compulsory counterclaims are barred from this subsequent suit.

The remaining issue, then, is whether the claims brought by Plaintiff in the instant action were compulsory, and therefore barred, counterclaims; or permissive, and therefore cognizable, counterclaims.

Delaware Superior Court Rule 13(a) provides, in relevant part, "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing [*11] party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." "Courts generally have agreed that [the words 'transaction or occurrence'] should be interpreted liberally in order . . . to carry out the philosophy of Rule 13(a)." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1410 (2004). Wright and Miller identify that philosophy as "to enable the court to settle all related claims in one action, thereby avoiding a wasteful multiplicity of litigation on claims arising from a single transaction or occurrence." Id. at § 1409.

The litigation brought by Moving Defendants in the Delaware state courts was essentially a contract claim for replevin, Pls.' Am. Mem. at unnumbered 1, based upon the contract, which defined the scope of the relationship between Plaintiffs and the Moving Defendants. Moving Defendants' claimed that Plaintiffs had defaulted under the terms of the agreement, the determination of which would have required reading and interpreting the terms of the agreement between Plaintiffs and Defendants. Therefore, any counterclaim possessed by Plaintiffs arising before [*12] entry of the default judgment that would have required reading and interpreting the agreement was part of the same controversy and therefore compulsory. Applying the principle that Rule 13(a) should be liberally construed, 6 Wright, Miller & Kane, supra § 1410, when one party to a contract puts provisions of it at issue, here Plaintiffs' duty to pay Defendants when Plaintiffs sold a vehicle and the ramifications if it did not, all actions taken pursuant to that contractual relationship become part of the relevant transaction or occurrence. Many of the allegations made by Plaintiffs regarding actions taken by Defendants are within the scope of their contractual relationship. Specifically, given that the dealership operated for only a few months in 2002 and default judgment was not entered until 2004, all of the allegations contained in Counts III and IV described relevant actions taken by Defendants pursuant to their contractual relationship with Plaintiffs. n4 Therefore, Counts III and IV of Plaintiffs'

Complaint are DISMISSED as barred for failure to raise as a compulsory counterclaim in a prior action with res judicata effect.

n4 Count III alleges that Moving Defendants breached the fiduciary duties of trust and loyalty owed to Plaintiffs by seizing possession of all keys for the vehicle inventory, maintaining control over the keys during daily operation of the dealership, and taking the keys at approximately 4:30 p.m. every day, prohibiting Matrix from making sales and offering demonstration rides. Pls.' Compl., Count III, PP 50-53. Count IV alleges that: (1) Defendants racially discriminated against Plaintiff by increasing the working capital requirement; (2) Plaintiffs were "damaged" by Moving Defendants' practice of demanding payment for vehicles sold by the dealership prior to the five day release period and refusing to "floorplan" trade-ins of new and used vehicles; (3) Defendants breached their fiduciary duty and duty of confidentiality to Plaintiffs by disclosing the floorplan account status of Matrix to another unrelated dealership; (4) Defendants breached the floorplan contract and their fiduciary duty by prohibiting Plaintiffs from selling and buying vehicles at nearby auctions; (5) Defendants breached their fiduciary duty by increasing the working capital requirement; and (6) Defendants breached their fiduciary duty by requiring Matrix to prematurely pay off demonstrator vehicles on floorplan. Id. Count IV, PP 58-63.

[*13]

## B. Breach of Fiduciary Duty Claims

Plaintiffs assert a total of seven claims of breach of fiduciary duty in Counts I (Pls.' Compl. P 34), II (Id. P 44), III (Id. P 53), and IV (Id. PP 60, 61, 62, 63) of their Complaint. To the extent they were not dismissed above (Section IV.A, supra), such claims cannot be maintained because Plaintiffs have not, and cannot, establish that a fiduciary relationship exists with the Moving Defendants. According to the Restatement of Torts, "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Restatement (Second) of Torts § 874* (2004). An arm's length business relationship, such as the one that existed

between Plaintiffs and Defendants, does not give rise to such a duty. Such a duty clearly cannot arise between two contracting parties who stand on equal footing in the eyes of the law. Therefore, Plaintiffs' claims in Counts I through IV for breach of fiduciary duty are DISMISSED.

### C. Civil Rights Claims

Finally, Plaintiffs assert in Counts I and II (as well [*14] as one part of Count IV, dismissed above) that Defendants' actions violated *Title VII of the Civil Rights Act* (1) by requiring Plaintiffs to posses substantially more working capital than Caucasian-operated dealerships (Pls.' Compl. PP 30-32); (2) by the making of a racially derogatory statement by one of Defendants' employees (Id. PP 41, 48); and (3) to the extent that Plaintiffs' claim of "racial discrimination" is brought under Title VII, for unreasonably increasing the working capital requirement of Matrix (Id. P 62) (This allegation, made in Count IV is included for the purposes of completeness. As previously discussed, Count IV was dismissed above. See supra Section IV.A).

*Title VII of the Civil Rights Act* protects individuals from discriminatory treatment by employers. Therefore, "the threshold legal question in considering the liability under Title VII is whether defendant is plaintiff's employer." *Rodriguez v. Lauren, 77 F. Supp. 2d 643, 645 (E.D. Pa. 1999)*. Plaintiffs cite American Jurisprudence as their sole legal support for the contention that an employee/employer relationship exists. Plaintiffs assert that a franchisor (here, Defendants) [*15] could be considered the employers of its franchisees (here,

Plaintiffs). However, no case held this to be true. Furthermore, Moving Defendants are not franchisors, but financial credit companies, with whom Plaintiffs stood on equal footing. Therefore, because no employment relationship existed between Plaintiffs and Defendants, and because one could not be imputed under a franchisor-franchisee relationship, Counts I and II for violation of Title VII of the Civil Rights Act, *42 U.S.C. §§ 2000(e) et seq.*, are hereby DISMISSED.

### V. CONCLUSION

In summary, Platintiffs' Complaint fails to state claims against Moving Defendants upon which relief can be granted. An appropriate order follows.

### ORDER

**AND NOW**, this 29th day of November, 2004, upon consideration of the Amended Motion to Dismiss (Doc. No. 12), filed September 16, 2004 by Defendants Ford Motor Credit Company and Primus Automotive Financial Services dba American Suzuki Automotive Credit ("Moving Defendants"), and Plaintiffs' Response in Opposition to Defendants' Amended Motion to Dismiss (Doc. No. 15), filed October 4, 2004, **IT IS HEREBY ORDERED** that Moving Defendants' Amended [*16] Motion to Dismiss is GRANTED. It is **FURTHER ORDERED** that Nonmoving Defendant American Suzuki shall enter a pleading responsive to Plaintiffs' complaint on or before Tuesday, December 7, 2004.

**Legrome D. Davis, J.**

# EXHIBIT 4



Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
**(Cite as: 2006 WL 1450842 (E.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Thurmond CAMERON
v.
INFOCONSULTING INTERNATIONAL, LLC, and
Verizon Pennsylvania Inc.
**Civil Action No. 04-4365.**

May 23, 2006.
David M. Koller, Patrick J. McDonnell, McDonnell
& Associates, King of Prussia, PA, for Thurmond
Cameron.

Damian Christian Shammas, Mary B. Rogers, Pitney
Hardin LLP, Florham Park, NJ, Jennifer T. Keegan,
Montgomery McCracken Walker & Rhoads, Cherry
Hill, NJ, for Infoconsulting International, LLC, and
Verizon Pennsylvania Inc.

*MEMORANDUM*

O'NEILL, J.

**\*1** Plaintiff, Thurmond Cameron, filed a complaint
on September 15, 2004 alleging that defendants,
Infoconsulting International, Inc. and Verizon
Pennsylvania, Inc., violated Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e et seq., by
terminating his employment with Infoconsulting on
September 16, 2002 on the basis of race.
Additionally, plaintiff alleges that Infoconsulting
breached his employment contract and Verizon
tortiously interfered with its contractual relationship
with Infoconsulting in violation of Pennsylvania law.
Before me now are Verizon's motion for summary
judgment, plaintiff's response, and Verizon's reply
thereto. FN1

> FN1. Infoconsulting has failed to file an
> answer to Cameron's Complaint. Cameron
> has not attempted to default Infoconsulting,
> deposed any representative from
> Infoconsulting, or served Infoconsulting
> with any discovery requests. I will therefore
> dismiss Cameron's claims against

Infoconsulting without prejudice for lack of
prosecution.

*BACKGROUND*

*I. Verizon*

Verizon is a Pennsylvania corporation with its
principal place of business in Pennsylvania that
provides telecommunication services. Verizon
entered into a contractual agreement, titled
"Statement of Work" (SOW), with Infosys
Technology, an Indian based company, in which
Infosys agreed to perform the software maintenance,
enhancement, and support of Verizon's billing
system.

*II. The Statement of Work*

The SOW detailed the specific duties, obligations,
and budget for Infosys. Although most of the work
would be completed in India, the SOW provided that:
(1) there would be offices for the Infosys staff at
Verizon's facility in Philadelphia; (2) Verizon would
supply Infosys with any software applications it
needed to complete the work; (3) the work was to be
done by Infosys consistent with Verizon's policies;
(4) Infosys was required to prepare its own "Detailed
Workplan" that "identifies each deliverable to be
accomplished during the project that meets
Verizon/Infosys agreed milestone delivery dates";
and (5) Infosys could incur expenses and charge
Verizon up to $3,587,344 to complete the billing
software enhancement. Although Verizon estimated
that Infosys would need twelve staff positions for the
month of September in order to complete the work on
time and stay on budget, Infosys was responsible for
staffing the required number of employees to
complete the project. In his July 7, 2005 deposition,
Joseph Gravante, Verizon's manager of the Infosys
project, testified that "under the statement of work
[Verizon] cannot interfere with who Infosys hires and
fires." However, Infosys was required to obtain
Verizon's written approval before hiring any
consultant for the project.

*III. Infoconsulting*

In order to staff the project, Infosys hired
Infoconsulting, a New Jersey head hunting agency
with its principal place of business in New Jersey.
Infoconsulting selected candidates from resumes,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
**(Cite as: 2006 WL 1450842 (E.D.Pa.))**

recommended the selected candidates to Infosys, and scheduled phone interviews between Infosys and the selected candidates. If Infosys determined that a candidate should be hired, Infoconsulting executed an employment contract between itself and that candidate specifying that Infoconsulting was the employer and that the candidate would be working for a client of Infoconsulting.

### IV. Cameron

**\*2** On August 26, 2002, Infoconsulting called Thurmond Cameron regarding a position with Infosys. Cameron, an African-American male, is a software consultant by trade. He worked for Verizon and its predecessor, Bell of Pennsylvania, Inc., for twenty-seven years. Cameron voluntarily retired from Verizon in 1999. Thereafter, Cameron sought work elsewhere by posting his resume on the Internet. Cameron expressed his interest in the position and had a telephone interview scheduled with representatives from Infosys. Infosys found Cameron to be suitable for the position and told Infoconsulting that it would like to bring Cameron on for the Verizon project. Thereafter, Infoconsulting contacted Cameron and offered him the position. Cameron accepted and set up a meeting with Infoconsulting to go over the details of his employment. At the meeting, Cameron signed an employment contract with Infoconsulting.

### V. The Employment Contract

The employment contract between Infoconsulting and Cameron specified that Cameron was an at will employee. Cameron's job description stated that his "responsibilities will be to provide the Client with computer programming and analysis under the direction of Infoconsulting and/or the Client to whom you are assigned." The term "client" is not defined in the employment contract. However, Infoconsulting identified the "client" in the cover letter of the employment contract when it stated that Cameron was being offered "a position as a Software consultant contingent upon your acceptance to the project described to you by one of our Clients." Additionally, the policy for accessing Infosys' computer resources for software consultants was included in the employment contract as an appendix. Verizon was not mentioned in the Infoconsulting employment contract.

The employment contract specified that: (1) Cameron was an at will employee; (2) the length of Cameron's employment was for the "length of the current project on which [Cameron] is working, plus any extensions made by the Client to whom you are assigned or reassigned by Infoconsulting"; (3) Infoconsulting was responsible for paying Cameron's salary; (4) Cameron's salary was based upon an eight hour day; (5) Cameron's work product remained the property of both Infoconsulting and its client; (6) Cameron was "exclusively employed by [Infoconsulting] for the period of the current project"; and (7) Cameron was not permitted to work for or solicit business from any client of Infoconsulting for one year after the completion of the project.

### VI. The Termination

During the meeting where Cameron signed his employment contract, Infoconsulting told him that he should report to Nagaraj Anatharaman, the project manager for Infosys, at Verizon's offices in Philadelphia when he arrived for his first day of work on September 16, 2002. Upon entering the building, Cameron could not find Anatharaman but was signed into the building by a Verizon employee. Cameron was told a cubicle was set up for him and was directed to the location. The cubicle was empty, except for a desk, telephone, and computer terminal.

**\*3** Verizon claims that it had no knowledge of Infosys' hiring of Cameron until he showed up to work on September 16, 2002. On the morning of September 16, Gravante was informed that Infosys hired Cameron and that he was in the building. Gravante went to speak with Anatharaman to find out for which position Cameron was hired. Gravante stated that he did this because he knew the SOW was a "firm fixed price contract based on the number of resources with a set amount of money that goes against it" and that "all of [the] positions were filled." After speaking with his supervisor Gravante told Anatharaman that the SOW budget did not allow for another employee and that Infosys had to terminate him or pay for his salary out of Infosys' own funds.

Anatharaman then met Cameron at the cubicle. Cameron claims that Anatharaman was going to issue him a log on ID for the computer terminal, but was not able to because Anatharaman's cell phone rang. After answering the phone, Anatharaman handed the phone to Cameron. The president of Infoconsulting was on the phone and informed Cameron that his services were no longer necessary. Verizon asserts that no one has been hired to fill the position Infosys hired Cameron.

### VII. Testimony of Deborah Bey

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Deborah Bey, a current Verizon employee working for the company on a contractual basis, testified during her October 20, 2005 deposition that she believes that she has witnessed racial discrimination. She noted three African-Americans that she thought Verizon discriminated against. First, she claims that an African-American employee who was a "great programmer" was fired while other white employees were retained who "couldn't code anything compared to what he could do." The second person that she claims was discriminated against was a Verizon employee who voluntarily left the company and subsequently sought a contractual position with Verizon but was unable to obtain a position. The third person that Bey claimed was discriminated against was fired and then failed to be rehired when she sought a contract position with Verizon.

### STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2005). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions ... which it believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial ." Fed.R.Civ.P. 56(e) (2005).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to an issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." Id. In making this determination, I must view the facts in the light most favorable to the non-moving party, and that non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989).

### DISCUSSION

### I. EMPLOYMENT DISCRIMINATION

*4 Title VII provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, plaintiff "must prove a prima facie case by showing that [he] is a member of a protected class, qualified for the job from which [he] was discharged, and that others, not in the protected class, were treated more favorably." Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir.2005) citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). "Once a plaintiff under Title VII establishes a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision." Goosby v. Jonhson & Jonshon Med., Inc., 228 F.3d 313, 319 (3d Cir.2000). If defendant is able to provide a legitimate reason for the discharge, plaintiff "must show that the reasons asserted are a pretext for discrimination." Hugh, 418 F.3d at 267-68. However, it is plain that Title VII liability can be found only against an employer. See 42 U.S.C. § 2000e-2(a)(1).

### A. Employment Relationship

For liability to attach under Title VII, there must be an employment relationship between plaintiff and defendant. See Ziegler v. Anesthesia Assocs. of Lancaster, Ltd., 74 Fed. App'x 197, 201 (3d Cir.2003) (affirming the district court's dismissal of a physician's discrimination claim by holding that shareholders were "not employees for purposes of Title VII"); Graves v. Lowery, 117 F.3d 723, 729 (1997) (holding that a dismissal is not proper if there exist facts to suggest an employment relationship); Cimino v.. Borough of Dunmore, No. 02-1137, 2005 WL 3488419, *8 (M.D.Pa.2005) (granting summary judgment for defendant where no reasonable jury could conclude defendant was plaintiff's employer); Rodriguez v. Lauren, 77 F.Supp.2d 643, 645 (E.D.Pa.1996) ("A threshold legal question in considering liability under Title VII is whether the defendant is plaintiff's employer"). Cameron argues that Verizon was his de facto employer because a master-servant relationship developed between the two as a result of Verizon's control over the work he was to do pursuant to the SOW.

### 1. Contractual Analysis

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
(Cite as: 2006 WL 1450842 (E.D.Pa.))

Initially, it is necessary to determine whether Verizon was Cameron's employer under the terms of the employment contract. The employment contract demonstrated that Cameron had an employment relationship with Infoconsulting and its "Client." *See Graves,* 117 F.3d at 727 (recognizing that entities "may share co-employer or joint employer status" when both entities determine the conditions of employment). Cameron claims that there is a genuine issue of material fact as to whether Verizon is the client of Infoconsulting. Verizon, on the other hand, claims that the client was Infosys.

**\*5** I find that Infosys, not Verizon, was the "client" of Infoconsulting for three reasons. First, in the cover letter to the employment contract, Infoconsulting wrote that the position it was offering was "contingent upon your acceptance to the project described to you by one of our Clients." Prior to signing the contract, Cameron had a telephone interview with Infosys in which Cameron first learned of the project. Cameron never spoke to any Verizon representative about his employment with the specific project prior to the first day of his employment. Second, the appendix to the employment contract provided the explanation of accessing the computer resources of Infosys. By contrast, Verizon is not mentioned in the employment contract. Third, Verizon also claims, and Cameron does not dispute, that it never has had a contractual relationship with Infoconsulting. There is no genuine issue of material fact as to whether Verizon was the client of Infoconsulting or whether there was an employment contract between Verizon and Cameron.

*2. Master-Servant Relationship*

Nevertheless, "the proper inquiry under Title VII for determining employer status looks to the nature of the relationship regardless of whether that party may or may no be technically described as an employer." Id, at 728. Therefore, although Cameron was not technically an employee of Verizon pursuant to the employment contract, I must determine whether or not there was a master-servant relationship between Verizon and Cameron. "The precise contours of an employment relationship can only be established by a careful factual inquiry." *Id.* at 729. The Supreme Court adopted traditional agency law criteria for identifying a master-servant relationship "in interpreting the meaning of 'employee' in a statute that does not helpfully define it ." *Rodriguez,* 77 F.Supp.2d at 646 *citing Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322-323.

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the mehtod of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323-24 (explaining that the inquiry is guided by the common-law agency test to determine if a master-servant relationship exists).

Cameron argues that a master-servant relationship existed because: (1) Verizon controlled the manner and means of the work to be performed under the SOW; (2) Cameron learned the skills required to perform the work under the SOW while an employee at Verizon; (3) Verizon provided the software that was the source of work under the SOW; (4) Cameron was to work at Verizon's office; (5) Cameron did not control his work hours; (6) Cameron had no authority to hire or pay for assistants; and (7) the work to be performed was part of Verizon's regular business as a telecommunications company.

**\*6** However, Cameron mischaracterizes the extent of control Verizon had over him. While the SOW between Verizon and Infosys provided expansive details on what work was to be done, Infosys was ultimately responsible for determining the method by which work was to be done because it created its own detailed work plans. Since Infosys ultimately was responsible for determining the manner by which work was to be done, Infosys maintained control over Cameron's work product, not Verizon. Cameron asserts that he had no control over when to report to work; however, Verizon did not maintain any control over this aspect of Cameron's employment either. Cameron's tenure on the project was specifically outlined and controlled by the employment contract. Again, Infosys, not Verizon, was associated with Cameron's employment contract with Infoconsulting. Although Cameron had no role in hiring or paying assistants, Verizon did not control this aspect of Cameron's employment. Infosys was granted the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
(Cite as: 2006 WL 1450842 (E.D.Pa.))

Page 5

ability to decide whom to hire for the project pursuant to the SOW. Thus, it was Infosys, not Verizon, that controlled this aspect of Cameron's employment relationship.

Cameron also focuses on his previous employment with Verizon as a relevant inquiry to his recent relationship with Verizon. Although Cameron learned the skills necessary to perform the work under the SOW when he was working at Verizon, these skills were learned during his tenure between 1972-1999. The billing project for which he was hired was not related to his previous employment with Verizon. His voluntary resignation terminated any previous master-servant relationship with Verizon and the recent hiring created an altogether different type of relationship. Similarly, the length of Cameron's prior employment relationship with Verizon is not relevant because it ended with his retirement and the analysis focuses on the current project for which he was hired. Here, the length of time Cameron spent employed for the billing project lasted less than half of a day.

While the evidence demonstrates that the work was to be done at Verizon's facility and the instrumentalities, such as the application software, layered software, and any Verizon-specific development software/tools, were to be supplied by Verizon, Verizon did not pay, provide benefits, or withhold taxes from Cameron since Infoconsulting controlled those aspects of Cameron's employment. Verizon did not hire Cameron, nor was it able to fire Cameron, since only Infoconsulting and Infosys controlled those aspects of Cameron's employment. With such an attenuated relationship between Verizon and Cameron, Verizon cannot be found to be was Cameron's employer under the *Darden* analysis.

I find this case analagous to two other cases. In *Cimino v. Borough of Dunmore,* the District Court for the Middle District of Pennsylvania granted summary judgment for a municipal defendant on plaintiff janitor's Title VII claim because it held that an employment relationship did not exist between janitor and the Borough where the Borough did not pay the janitor's salary; it was paid by an independent contractor. No. 02-1137, 2005 WL 3488419, *8 (M.D.Pa.2005). The Borough hired Dustbusters, an independent contractor, to clean its police station. *Id.* In turn, Dustbusters hired plaintiff. *Id.* at 1 A dispatcher for the Borough Police allegedly verbally and sexually harassed plaintiff. *Id.* at 2. The Court did not apply the *Darden* factors because it stated that it needed to analyze those factors "only in situations

that plausibly approximate an employment relationship." *Id.* at 6 *quoting O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir.1997). The Court held that where "plaintiff receives no compensation from the defendant, she cannot plausibly argue that she was an employee and the court need not engage in an analysis of the defendant's level of control over the plaintiff." *Cimino,* at 6 *citing O'Conner,* 126 F.3d at 115. Like plaintiff in *Cimino,* Cameron worked at Verizon's facility but was not paid by Verizon; rather, he was hired by an independent contractor to complete work for Verizon.

*7 In *Rodriguez v. Lauren, supra,* this Court granted defendant's motion for summary judgment because it held that a master-servant relationship did not exist between a security guard, hired by an independent contractor, and defendant, a clothing retail store. 77 F.Supp.2d 643, 647-48 (E.D.Pa.1996). The security guard was under contract with a security agency that was hired by defendant to supply guards at its store. Plaintiff alleged that the store's Loss Prevention Manager urged the security agency to fire him and replace him with white male guards because of racial motivations. Applying the *Darden* factors, the Court held that the clothing store was not plaintiff's employer because it was the security agency that hired plaintiff and it was the responsibility of the security agency to pay, provide uniforms, provide insurance, and supervise and withhold taxes from plaintiff. *Id.* at 647-48. Additionally, the Court noted that the store lacked the ability to assign additional projects to plaintiff. Like plaintiff in *Rodriguez,* Cameron was hired by an independent contractor that was responsible for paying him, providing his benefits, and withholding his taxes. Additionally, Verizon did not have the ability to assign Cameron additional projects since that was at the discretion of Infosys. Like in *Cimino* and *Rodriguez,* the undisputed facts in this case demonstrate that the Cameron was not an employee of Verizon.

*B. Title VII Prima Facie Case*

Even if Verizon had a master-servant relationship with Cameron, he cannot carry his rebuttal burden of proof under *McDonnell Douglas,* 411 U.S. at 802-05. Plaintiff bears "the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802. "A prima facie case consists of the showing that the plaintiff is (1) in a protected class, (2) qualified for the job he was discharged from, and (3) that others not in the protected class were treated more favorably." *Hugh,* 418 F.3d at 267 *citing McDonnell Douglas,* 411 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 802-03.

Once a prima facie case has been established, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Hugh,* 418 F.3d at 802. "This burden is 'relatively light,' and the employer need only introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Tomasso v. Boeing Co., ---F.3d ----, No. 04-4657, 2006 WL 1008839, *3 (3d. Cir.2006)* (internal quotations omitted). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d. Cir.1994) (emphasis in original) *citing Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 254, 256 (1981). "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Fuentes,* 32 F.3d at 763.

**\*8** Verizon does not dispute that Cameron, an African-American, is in a protected class. However, Verizon disputes that he was qualified because of his twenty-seven years of experience working for Verizon and its predecessor prior to being hired for the specific project and Cameron's claims that Verizon hired more white men on a contractual basis than it did African-Americans.

*1. Qualified for the Position*

Verizon's claim that Cameron was unqualified for the position because he never worked on the billing system's specific computer software and would not have been a useful worker in three to six months. However, Cameron's prior experience with the company and his prior experience with computer software for other billing systems creates a genuine issue of material fact as to whether he was qualified. Moreover, the technical representatives from Infosys, the contractors charged with staffing and undertaking this project, deemed Cameron qualified for the position and decided to hire him even though he never worked on the specific billing system before. Viewing the facts in the light most favorable to plaintiff, I find that Cameron has satisfied his burden

of showing he was qualified for the position.

*2. Treated Others More Favorably*

Cameron claims that Verizon has a history of not rehiring former African-American employees on a contractual basis. Deborah Bey, a current employee of Verizon, testified that she witnessed Verizon treating African-Americans differently than others. Bey testified in her deposition to three examples in which she believed that Verizon dismissed or disparately treated African-American employees but hired less qualified white males. While Verizon claims that it has not treated African-American employees any differently than any other employee, it says that these "claim[s] bring speculation to an artform." Verizon asserts that it has not discriminated against African-Americans by pointing out that Bey is an African-American woman who obtained two separate jobs with Verizon as a contractor after voluntarily resigning.

Viewing the facts in the light most favorable for Cameron, I find Bey's allegations sufficient to satisfy Cameron's prima facie burden for disparate treatment. *See Burdine,* 450 U.S. at 267 ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

*C. Legitimate, Nondiscriminatory Reason*

Having satisfied his initial burden, the burden of proof then shifts to Verizon to proffer a legitimate reason for telling the Infosys project manager that he had to fire Cameron or pay the salary from Infosys' own funds. *See McDonnell Douglas,* 411 U.S. at 802. Verizon asserts that the SOW budget did not permit the hiring of another employee. The SOW specified that the budget may not exceed $3,587,344 and estimated the number of employees needed to complete the project within the budget. Verizon claims that the budget could not absorb another employee's salary. Verizon offered Infosys the option to retain Cameron's services if Infosys thought that Cameron was necessary to complete the project effectively but stated that his salary was not to be paid with funds pursuant to the SOW budget. In other words, Verizon asserts that it only informed Infosys of its obligations under the SOW. Moreover, Verizon claims that the position Cameron was hired for has not, and will not be, filled because there are not sufficient funds in the budget. I find Verizon's legitimate, nondiscriminatory reason sufficient to satisfy its burden of proof.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
**(Cite as: 2006 WL 1450842 (E.D.Pa.))**

*D. Refuting Verizon's Legitimate Reason*

**\*9** The burden thus shifts back to Cameron to "prove by a preponderance of the evidence that the employer's explanation is pretext for discrimination." *Fuentes,* 32 F.3d at 763. "Plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." *Id .* at 764. Plaintiff "has the burden of casting doubt on an employer's articulated reasons for an employment decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 527 (3d Cir.1992).

"Prong one of the Fuentes test focuses on whether the plaintiff submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated, legitimate reason." *Menta v. Cmty. Coll. of Beaver County,* --- F.Supp.2d ----, No. 03-1283, 2006 WL 895072, \*7 (W.D.Pa.2006). To discredit the employer's proffered reason, plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765 (emphasis in original). Plaintiff "must present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision. *Tomasso,* at \*3 (emphasis in original). If a plaintiff proffers sufficient evident to discredit defendant's reasons, plaintiff "need not also come forward with additional evidence of discrimination beyond his or her prima facie case." *Fuentes,* 32 F.3d at 764.

In this case, Cameron argues that Verizon's proffered reason is a fabrication and attempts to discredit that reason through a string of rhetorical questions that focus on why Infoconsulting hired Cameron and why Infosys was expecting Cameron to show up at Verizon's facility on September 16, 2002. However, Cameron does not assert any evidence to suggests that Verizon's rationale for its actions is a cover up for discriminatory motivations.

In the alternative, "[p]laintiff may [also] avoid summary judgment by pointing to 'some' evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were ... either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* at 765. "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers,* 142 F.3d 639, 644-45 (3d Cir.1998) (emphasis added). "For example, the plaintiff may show that the employer has previously discriminated against [him], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Id.*

**\*10** Cameron argues that Verizon discriminated against other African-Americans who tried to obtain a contractual position after voluntarily retiring. Although, Cameron argues that few minorities have been hired by Verizon and that white employees are more successful at obtaining contracts with Verizon, he does support these allegations with any evidence other than Bey's testimony that she believed that she witnessed Verizon discriminating against African-Americans in the past.

The Court of Appeals rejected a similar attempt to show an employer's past discrimination in *Ezold,* 983 F.2d at 542. In Ezold, plaintiff tried to show pretext by offering evidence that only five of a law firm's 107 partners were women. *Id.* The Court of Appeals affirmed the district court's holding that the "statistical evidence" was not probative because plaintiff's "[r]aw numerical comparisons ... [were] not accompanied by any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period. The district court in *Hopkins* recognized the weakness of this type of evidence: '[Plaintiff's] proof lacked sufficient data on the number of qualified women available for partnership and failed to take into account that the present pool of partners have been selected over a long span of years during which the pool of available qualified women has changed.' " *Id.* at 542-543 quoting *Hopkins v. Pricewaterhouse,* 618 F.Supp. 1109, 1116 (D.D.C.1985).

Neither Cameron's assertions nor Bey's testimony offer any context for their claims that fewer minorities were successful at obtaining a Verizon contract position. They do not even go so far as to offer "raw number comparisons," but offer a belief on their own subjective observations. Cameron does not state how many minorities have attempted to obtain contract positions, nor does he show how many

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)
**(Cite as: 2006 WL 1450842 (E.D.Pa.))**

Page 8

minorities were successful versus unsuccessful at obtaining contract positions. I agree with the Court of Appeals for the Sixth Circuit that "[i]f he wanted to introduce true statistical evidence, he could have obtained the company records during the course of discovery." *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 268 (6th Cir.1986). Bey testified that she thought that African-Americans were treated unfairly; however, she was only able to offer a vague description of each scenario that she says she believed to be unfair treatment. The first event she described involved one African-American male who was fired during the first round of job eliminations while some other white employees were not. She testified that she thought he was a "great programmer" and one of her mentors while the white employees were "not the performers that he was." However, there was nothing else offered than her subjective opinion of the employees' talents and a summary of the employee pool. The second event Bey described involved an African-American employee who asked for a pay raise, subsequently was told the company could not accommodate her, left the company voluntarily, and then tried to come back but was not hired by Verizon. When asked why she thought that there was racism in that instance, Bey replied, "Because she's a black woman." The third event Bey described lacks any content regarding why there could have been discrimination.

*11 However, a "discrimination plaintiff who offers such evidence must account for the qualified applicant pool ...; mere summary of the demographic composition of the applicant pool is insufficient" to show that discrimination was more likely than not a reason for the employer's actions. *Haley v. City of Plainfield,* No. 05-2236., 2006 WL 267208, *3 (3d Cir.2006) *citing* *Ezold,* 983 F.2d at 542-43. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [racial] discrimination." *Chappell,* 803 F.2d at 268 *citing* *Elliott v. Group Med. & Surgical Serv.,* 714 F.2d 556, 567 (5th Cir .1983). Cameron and Bey's testimony only offers believes, conjectures, and speculations without sufficient context to support an inference of discrimination. "Such an inference may be acceptable at the prima facie stage of the analysis ... where the inquiry is based on a few generalized factors ... but not necessarily at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." *Simpson,* 142 F.3d at 646 (referring to allegations where plaintiff "singles out one white person who was treated more favorably when there were other white persons who were treated less favorably that

other black persons.").

As discussed above, the evidence demonstrates that Verizon was willing to keep Cameron working on the project if Infosys paid him out of its own funds. If Verizon was attempting to discriminate against Cameron, it would not have offered Infosys the option of retaining his services. Cameron has not produced any evidence to suggest otherwise. Cameron and Bey's testimony lacks sufficient probative force to support an inference that discrimination was more likely than not Verizon's motivating factor when it told Infosys it had to either pay for Cameron itself or let him go.

Cameron has failed to show any incoherencies, inconsistencies, or contradictions with Verizon's actions and its proffered reason. Nor has Cameron shown any probative evidence with which a reasonable factfinder could conclude that discrimination was more likely than not a motivating factor behind Verizon's actions. I will therefore grant Verizon's motion for summary judgment on Cameron's Title VII claim.

**IX. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

Cameron claims that Verizon tortiously interfered with his contractual relationship with Infoconsulting in violation of Pennsylvania common-law. To establish a claim of tortious interference with contract, Cameron must show the following four elements:

(1) the existence of a contractual, or prospective contractual relationship between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

*12 (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Remick v. Manfredy,* 238 F.3d 248, 264 (3d Cir.2001) *quoting* *Pelagatti v. Cohen,* 536 A.2d 1337, 1343 (Pa.1988). There is no dispute that Cameron had an existing contract with the third party, Infoconsulting. Additionally, there is no dispute that Cameron's services were terminated and that he suffered actual damages from the termination. There is, however, a dispute as to whether the purpose of Verizon's actions were intended to harm Cameron's relationship with Infoconsulting and if Verizon's actions were justified.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)

**(Cite as: 2006 WL 1450842 (E.D.Pa.))**

Cameron's sole contention that Verizon tortiously interfered with his contractual relationship with Infoconsulting is that Verizon's actions were motivated by racial prejudice. As explained above, Cameron has not established a basis for a reasonable fact finder to conclude that Verizon's actions were more likely than not motivated by a discriminatory intent. Accordingly, I hold that Verizon did not tortiously interfere with Cameron's contractual relationship with Infoconsulting. Verzion's motion for summary judgment with respect to Cameron's tortious interference with contract claim will be granted.

An appropriate order follows.

*ORDER*

AND NOW, this 23nd day of May 2006, upon consideration of defendant's motion for summary judgment, plaintiff's response, and defendant's reply thereto, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendant's motion for summary judgment is GRANTED, and judgment is entered in favor of defendant, Verizon Pennsylvania, on all claims, and against plaintiff, Thurmond Cameron.

It is further ORDERED that plaintiff's claims against defendant Infoconsulting International, LLC, are DISMISSED without prejudice for lack of prosecution. The Clerk of Court is directed to close this case statistically.

Not Reported in F.Supp.2d, 2006 WL 1450842 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1030580 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of the Motion of Verizon Pennsylvania Inc. for Summary Judgment (Mar. 2, 2006)Original Image of this Document (PDF)

• 2006 WL 737130 (Trial Motion, Memorandum and Affidavit) Order (Feb. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 431087 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of Verizon Pennsylvania Inc. for Summary Judgment (Jan. 27, 2006)Original Image of this Document (PDF)

• 2004 WL 3658924 (Trial Pleading) Aaswer (Nov. 19, 2004)Original Image of this Document (PDF)

• 2:04cv04365 (Docket) (Sep. 15, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Diane CIMINO, Plaintiff
v.
BOROUGH OF DUNMORE; Dustbusters Cleaning
Team, Inc.; Robert Dee; Mary Rice;
Salvatore Mecca, Other Unknown Employees/Agents
of Borough of Dunmore,
Defendants
**No. 3:02CV1137.**

Dec. 21, 2005.

Cynthia L. Pollick, The Employment Law Firm,
Pittston, PA, Michael J. Kenny, Scranton, PA, for
Plaintiff.

Eugene F. Hickey, II, Cipriani & Werner, Edwin A.
Abrahamsen, Abrahamsen, Moran & Conaboy, P.C.,
Robert J. Murphy, Scranton, PA, for Defendants.

*MEMORANDUM*

MUNLEY, J.

*1 Presently before the court for disposition are
Defendant Robert Dee's Motion for Summary
Judgment and a Motion for Summary Judgment filed
jointly by Defendants Borough of Dunmore,
Salvatore Mecca, Mary Rice, and Other Unknown
Agents of the Borough of Dunmore (collectively "the
Borough Defendants"). These matters have been fully
briefed and argued and are ripe for disposition. For
the following reasons, we will deny Dee's motion in
its entirety and grant the Borough Defendants' motion
in part and deny it in part.

I. Factual Background

Plaintiff Diane Cimino ("Cimino") began working as
a janitor for Defendant Dustbusters Inc., in March
1998. (Defs.' Statement of Facts, Ex. E, Michelle
Nardozzi Dep. 14:21-15:2) ("Nardozzi Dep."), (Defs.'
Statement of Facts, Ex. D, Cimino Dep. 11:5-8)
("Cimino Dep.") Dustbusters assigned her to work for

the Borough of Dunmore in April 1998, (Nardozzi
Dep. 15:1-2), where she cleaned both the Borough of
Dunmore building and the Dunmore police station.
(Cimino Dep. 12:5-13) She also cleaned for other
Dustbusters clients. (Cimino Dep. 11:11-12:4)

Dustbusters was established in 1987 by Vanessa
Miles, the company president, and Michelle
Nardozzi, the vice president. (Nardozzi Dep. 5-6)
Dustbusters began sending its employees to clean the
Dunmore Borough building and the Dunmore police
station in 1993. (Nardozzi Dep. 10: 6-8) At that time,
Nardozzi and Miles performed a walk through of the
Borough facilities, where a Borough representative
explained what areas they wanted cleaned, and
Nardozzi and Miles then determined how to clean the
premises. (Nardozzi Dep. 16:3-14) No Borough
representative directed how Dustbusters would clean.
(Nardozzi Dep. 16: 3-7) When Cimino started,
Nardozzi and Miles explained how she should clean.
(Cimino Dep. 20:14-16) No borough employee or
representative directed Cimino's cleaning
performance. (Cimino Dep. 19:25-20:10) If the
Borough wanted to alter Cimino's cleaning duties, it
had to contact Dustbusters, or Cimino would have to
obtain Dustbusters' authorization before complying
with the request. (Nardozzi Dep. 39:8-12)
Dustbusters made the decisions about which cleaning
employees would service which clients, but in the
event that a client was displeased with a particular
employee, Dustbusters would replace that employee
with another to avoid losing the client. (Nardozzi
Dep. 13: 6-9, 14: 3-9) Cimino received her cleaning
supplies from Dustbusters, and when she needed
more, would contact Nardozzi or Miles. (Cimino
Dep. 96:15-17, 97:16-19) Cimino was paid an hourly
rate by Dustbusters and received no compensation
from the Borough (Cimino Dep. 16:7-19) Dustbusters
would bill the Borough every week. (Nardozzi Dep.
10:19- 11:14)

The Borough determined when Dustbusters should
send someone to clean. (Nardozzi Dep. 37:8-20) In
the event that the Borough needed a change in
schedule, they would not contact Cimino, but instead
would inform Dustbusters, who would then contact
Cimino. (Nardozzi Dep. 17:5-18:5) Similarly, if
Cimino could not work because she was sick, she
would contact Dustbusters, not the Borough. (Cimino
Dep. 172:4-8) On the days that Cimino was
scheduled to clean, she was able to determine her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
(Cite as: 2005 WL 3488419 (M.D.Pa.))

own start time based on the convenience of the Borough. (Nardozzi Dep. 72:15-18; Cimino Dep. 24:15-19) She had to arrive at the police station before the last police dispatcher left for the day because she needed a Borough employee provide her access to the facilities. (Cimino Dep. 24:17-19) Generally she would arrive between three thirty and three forty-five p.m. because the dispatchers would leave at four. (Cimino Dep. 24:20-24) After the dispatchers left, she was the only person left in the building. (Cimino.Dep.107:10-12)

**\*2** Defendant Robert Dee, a dispatcher for the Borough Police, began verbally harassing Cimino a few months after she began cleaning the police station. (Cimino Dep. 40:4) He would verbally harass her every time she saw him, which was possibly once a month. (Cimino Dep. 35:18-36:6) At first, he told Cimino that she "had nice breasts or a nice ass" and that she "had a nice body." (Cimino Dep. 32:12-21) Then he told her, "he wanted to make love to [her], he wanted to fuck [her] and he wanted to eat [her] on the table right there" every time he saw her. (Cimino Dep. 39:2-9) His harassment became physical. (Cimino Dep. 40:3-9) Dee hugged Cimino on "a few occasions ... [t]hroughout the police station." (Cimino Dep. 67:10-19) He also grabbed her buttocks and breasts and he would kiss her. (Cimino Dep. 141:17-142:6) Cimino testified that he would "maul me and touch me all over." (Cimino Dep. 50:2-3)

On September 11, 2000, Chief Mecca entered the police station after hours. (Mecca Dep. 29:21-30:6, 67:13-23) He usually left work at three p.m., (Mecca Dep. 33:18) but on that day returned to pick up a item that he had forgotten. (Mecca Dep. 29:21-30:7) While in his office, he viewed a surveillance monitor and saw Dee with his arms around Cimino. (Mecca Dep. 30:1-7) Then, after Dee left the building, Mecca claims he approached Cimino and "asked her if anybody was bothering her. She said no. I said, are you sure, nobody here is bothering you? No. Nobody is bothering you whatsoever? No. Okay." (Mecca Dep. 30:21-31:2) Mecca believed that the embrace he saw was consensual because of Cimino's response to his questioning. (Mecca Dep. 35: 17-18, 145:5-14) Cimino denies that this conversation took place. (Cimino Dep. 129:23-130:6)

Mecca did, however, order Captain Patrick Reese to review the recorded surveillance from that day. (Mecca Dep. 31:19-24, Reese Dep. I 35:9-36:5) The recording system, however, had malfunctioned and failed to record the incident that Mecca saw on the monitor. (Mecca Dep. 32:4-11, Reese Dep. I 35-36)

Mecca then instructed Reese to record and review the surveillance to monitor the situation when Dee and Cimino worked together. (Mecca Dep. 34:15-16, Reese Dep. I 41: 23-24) On September 26, 2000, Reese reviewed the tape from the day before, and saw Dee embrace Cimino for about eight seconds, and Cimino then broke the embrace. (Reese Dep. I 54:1-25) Dee then left the room, reentered, and embraced Cimino again. (Reese Dep. I at 55:2-4) Once again Cimino broke the embrace. (Reese.Dep.I.55:4-6) After reviewing that tape, Reese contacted Mecca. (Reese. Dep. I 55:6-7) Mecca then reviewed the tape. (Reese Dep. I 56:7- 9, Mecca Dep. 71:18-20). Mecca agrees that the tape showed an embrace that Cimino broke. (Mecca Dep. 71:10-25)

On October 24, Reese reviewed the tape from October 23 and saw Dee inappropriately grab Cimino's buttocks. (Reese. Dep. I 67:18-68:13) Mecca also viewed the tape showing Dee grabbing for Cimino's buttocks. (Mecca Dep. 72:2- 14) Reese next uncovered unusual behavior on November 6, 2000 (Reese. Dep. I 70: 25-71:6) That recording showed, "Cimino entering the men's locker room, which is located off of the patrol room. Several seconds later Robert Dee enters the locker room. Both of these individuals were in the locker room alone for approximately ten seconds. Robert Dee then exits the locker room." (Reese Dep. I 71: 1-6)

**\*3** At no point in the investigation did Mecca instruct Reese to question Dee about the situation (Reese Dep. II 6:17-21), and at no point during the investigation did Mecca approach Dee about his harassment. (Mecca Dep. 74:18- 19) Furthermore, after Mecca allegedly approached Cimino on September 11, 2000, he admits he neither spoke to her again regarding the harassment nor instructed Reese to do so. (Mecca Dep. 74:15-17, Reese Dep. I 75:1-17) Reese never approached Cimino, (Reese Dep. I 75:8-25) and he did not approach Dee to ask if he was having a consensual affair. (Reese Dep. I 73:8-18) Similarly, Reese reported his findings solely to Mecca and did not inform anyone else of the investigation. (Reese. Dep. I 72:1-7) Neither Reese nor Mecca informed Dustbusters or any other Borough official or employee about their investigation or Dee's behavior. (*Id.* at 72: 1-7, 84: 16-18; Mecca Dep. 74:3-10, 122:1-4, 84-85)

Cimino first informed a Borough employee of Dee's behavior on the day before Thanksgiving, November 22, 2000. (Cimino Dep. 45-46) She went to Heil's bar that evening with her husband and encountered Dunmore Police Captain Tom Bradley. (*Id.*) She was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 3
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
(Cite as: 2005 WL 3488419 (M.D.Pa.))

previously acquainted with Bradley and Bradley's wife, and had cleaned Bradley's home on a few occasions. (*Id.* at 46:1-6) She told Bradley that "Bobby Dee is bothering me, harassing me." (*Id.* at 46:19- 23) Bradley responded that he would speak with her at another time. (*Id.* at 46:23-25)

On November 26, 2000, Bradley brought Cimino's complaints to Mecca's attention. (Mecca Dep. 75: 20-25) Mecca informed Reese and the Borough Mayor of the complaint, but did not tell anyone else. (*Id.* at 76:1-5, 77:13-17) Mecca directed Bradley to give a statement to Reese. (*Id.* at 76:24-77:2) Mecca ordered Reese to interview Cimino. (Reese Dep. II 16:15-17) Reese took a written statement from Cimino on December 11, 2000. (*Id.* at 9:3-7, Cimino Dep. 77:12-16) On December 12, 2000, Borough Manager Mary Rice and Mecca discussed the allegations, (Rice.Dep.14:18-20) and Rice reported it to the Borough Council. (*Id.* at 15:23-16:11) The Borough Council, Rice, and Mecca then met to discuss the situation. (*Id.* at 16:9-13) Rice first learned of Cimino's complaints from Mecca that day, (*Id.* at 14:12-20), but had been aware of Mecca's ongoing investigation before Cimino verbally complained of the harassment. (*Id.* at 39:1-6). Additionally, Rice, Mecca, and the Borough Solicitor met with Dee on December 12. (Mecca Dep. 91:4-9)

On December 11 or 12, at some point after Cimino gave her statement to Reese, she also complained to Nardozzi. (Cimino Dep. 84:23-85:8, Nardozzi 26:2-5) Cimino had not previously informed Nardozzi or Miles of Dee's behavior. (Cimino Dep. 85:9-13, 102:24-103:1) In response, Nardozzi informed her that she would no longer clean the police station. (Cimino Dep. 85:22-86:3) Afterwards, Nardozzi spoke with Pat Reese and Mary Rice. (Nardozzi Dep. 28:12-14). Nardozzi explained that Cimino had a complaint, and Dustbusters intended to remove her from the borough building, and Rice agreed. (Nardozzi Dep. 30:3-19)

*4 On December 14, the Borough held an executive session to discuss the allegations. (Rice Dep. 26:3-7) Rice, the Mayor, Council Members, and Borough Solicitor were present. (Rice.Dep.26:11-13) The Borough assigned Mecca to investigate the incident. (Rice Dep. 27:7) The Borough suspended Dee as a result of the incident. (Mecca Dep. 107:21-23)

Cimino was removed from cleaning the police station, but continued to clean the Borough building. (Nardozzi Dep. 22:12-19) After Cimino worked two nights at he Borough building, Nardozzi removed her

completely from cleaning the Borough because of the proximity of the two buildings. (Nardozzi Dep. 23:5-12) Rice believes she had input in the decision to completely remove Cimino from the buildings. (Rice 62:18-23) After Cimino left the borough buildings to clean other facilities, her superiors at Dustbusters began to ignore her and refused to say hello. (Cimino Dep. 13:10-15) The Dustbusters women would not look at her and refused to answer her phone calls. (Cimino Dep. 188:21-189:9) Thus, she felt it would be best for her to leave Dustbusters under these conditions, and she stopped working for Dustbusters. (Cimino Dep. 13:10-15)

II. Procedural Background

On July 2, 2002, Cimino filed a ten count Complaint against the Borough, Dustbusters, Dee, Rice, and Mecca. Count I advances a claim for sexual discrimination pursuant to Title VII, 42 U.S.C. § § 2000e-2000e-17 against the Borough and Dustbusters. Count II is a 42 U.S.C. § 1983 claim against the Borough, Dee, Rice, and Mecca for constitutional violations. Count III is a 42 U.S.C. § 1985(3) claim against Dustbusters, the Borough, Dee, Rice, and Mecca for conspiracy to deprive Cimino of the equal protection of the law. Count IV asserts that the Borough, Dustbusters, Dee, Rice, and Mecca violated the Pennsylvania Human Relations Act ("PHRA"), 42 PA. CONS.STAT. ANN. § § 951-63. Count V is a PHRA retaliation claim against the Borough, Dustbusters, Dee, Rice, and Mecca. Count VI is a negligent supervision claim against the Borough, Rice, and Mecca. Count VII is a negligent retention claim against the Borough, Rice, and Mecca. Count VIII is a battery claim against Dee. Count IX is an assault claim against Dee. Finally, Count X is an intentional infliction of emotional distress claim against Dee.

On August 29, 2003, we dismissed numerous claims pursuant to Federal Rule of Civil Procedure 12(b)(6). We granted the Borough's motion to dismiss Count VI, negligent supervision, and Count VII, negligent retention, because the Borough was entitled to official immunity. We denied Rice and Mecca's motion to dismiss these same claims. Additionally, we granted Dustbusters' motion to dismiss the hostile work environment claims in Count I and IV. We denied Dustbusters' motion to dismiss the retaliation claims in Count I and V, and the conspiracy claim in Count III.

III. Jurisdiction

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

As this case is brought pursuant to 42 U.S.C. § 1983 for constitutional violations we have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

IV. Standard

**\*5** Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Knabe v. Boury*, 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing Fed. R. Civ. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324.

V. Discussion

The Borough Defendants have filed a joint motion for summary judgment, Dee has separately moved for summary judgment, and Dustbusters currently has no motions pending before the Court. Therefore, we will

consider the Borough Defendants' joint motion and Dee's motion seperately.

A. The Borough Defendants' Motion

The Borough Defendants seek to dismiss all claims pending against them. At present, Cimino has a Title VII claim against the Borough, 42 U.S.C. § 1983 and 42 U.S.C. § 1985 claims against Rice, Mecca, and the Borough, and negligent supervision and retention claims against Rice and Mecca.

1. Title VII

The Borough Defendants argue that Cimino was not an employee of the Borough, and was an employee of Dustbusters only, and therefore her Title VII claims must fail. Cimino responds that the Borough was her co-employer.

Under Title VII, it is "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Courts should not seek to determine whether the plaintiff is technically an employee of the defendant, but instead must discern "the level of control an organization asserts over an individual's access to employment and the organization's power to deny such access." *Graves v. Lowery*, 117 F.3d 723, 728 (3d Cir.1997) (citing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1342 (D.C.Cir.1973)). [FN1] "[T]he precise contours of an employment relationship can only be established by a careful factual inquiry." *Id.* at 729 (citation omitted).

> FN1. The Borough Defendants attack the plaintiffs claims pursuant to both Title VII and the PHRA. We will not engage in a separate analysis of the PHRA claims because the PHRA and Title VII are to be interpreted consistently. *Doe v. Kohn Nast & Graf*, 862 F.Supp. 1310, 1323 (E.D.Pa.1994).

**\*6** Our careful factual inquiry is guided by the factors enunciated in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 322-24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). There, the Court held that when a statute containing the term "employee" does not define the term, or defines it in a completely circular fashion, the court should apply the common

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

law definition. *Id.* [FN2] The *Darden* level of control inquiry allows courts to distinguish whether the plaintiff is an employee or independent contractor of the defendant. *O'Connor v. Davis,* 126 F.2d 112, 115 (2d Cir.1997).

> FN2. While the Supreme Court formulated this test in the ERISA context, it also applies in the Title VII context. *See, e.g., Alberty-Velez v. Corporación De Puerto Rico Para La Difusión Pública,* 361 F.3d 1, 11 (1st Cir.2004) (applying the *Darden* rationale to Title VII because Title VII and ERISA contain the same definition of "employee").

However, we must navigate this distinction "only in situations that plausibly approximate an employment relationship." *Id.* (quoting *Graves v. Women's Prof'l Rodeo Assoc.,* 907 F.2d 71, 74 (8th Cir.1990)). Where the plaintiff received no compensation from the defendant, she cannot plausibly assert she was an employee. *Id* .

> Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, it is an essential condition to the existence of the employer-employee relationship.'
> *Id.* at 115-16 (quoting *Graves,* 907 F.2d at 73).

Thus, where a plaintiff receives no compensation from the defendant, she cannot plausibly argue that she was an employee and the court need not engage in an analysis of the defendant's level of control over the plaintiff. *Id.* In *O'Connor,* the plaintiff worked as an intern for the defendant mental hospital to satisfy the field work component of her major for college graduation. *Id.* at 113. As compensation for her time, her college paid her federal work study funds. *Id.* She filed a Title VII suit against the hospital alleging gender discrimination. *Id.* at 114. The district court granted summary judgment for the hospital because it was not the plaintiff's employer for the purposes of Title VII. *Id.* The Second Circuit affirmed, reasoning " 'a title VII plaintiff is only an employee if the defendant both pays him and controls his work." *Id.* at 116. Thus, since the plaintiff was neither hired nor paid by the defendant, her relationship with the defendant did not fall within the contours of the "conventional master-servant relationship." *Id.* at 115. The court found, "it is uncontested that O'Connor received from [the hospital] no salary or other wages, and no employee benefits such as health

care, vacation, or sick pay, nor was she promised any such compensation." *Id.; see also Kemether v. Pennsylvania Interscholastic Athletic Assoc.,* 15 F.Supp.2d 740, 745 (E.D.Pa.1998) (holding that a basketball referee was not an employee of the athletic association because she received no compensation or benefits from the association, but instead was paid by the individual schools).

*\*7* The present situation is analogous to *O'Connor* and *Kemether* because Cimino received no direct or indirect compensation from the Borough, and instead was paid by a third party, Dusbusters. (Cimino Dep. 16; Nardozzi Dep. 80:10-14). Cimino's argument that she was the Borough's employee would require this Court to stretch the definition of employee to include individuals not hired or paid by the alleged employer. We find that the "preliminary question of remuneration is dispositive in this case," *O'Connor,* 126 F.3d at 116, and Cimino has not created a genuine issue of material fact that the Borough was her employer.

Furthermore, our analysis of the common law agency test establishes that the Borough did not control the methods or means of Cimino's employment. The *Darden* Court explained the relevant factors.

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
> *Darden,* 503 U.S. at 323-24 (quoting *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)).

When the Borough hired Dustbusters, the Borough directed what needed to be cleaned, but Dustbusters determined how to clean the building. (Nardozzi Dep. 38-39; 78:17-20) Dustbusters provided Cimino with the initial and replacement cleaning supplies.

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

(Cimino Dep. 96:15-17) The Borough could not assign additional tasks to Cimino absent Dustbusters' approval. (Nardozzi Dep. 39:8- 12) Furthermore, the Borough did not pay Cimino (Cimino Dep. 16); it had to contact Dustbusters, not Cimino, to change the cleaning schedule (Nardozzi Dep. 18:1-5); Dustbusters determined who would clean the Borough (Nardozzi Dep. 13:6-9); the Borough had no input into Dustbusters' selection of Cimino's replacement (Nardozzi Dep. 34:1-19); Cimno was hired by Dustbusters and assigned to work for the Borough (Nardozzi Dep. 15:1-2); and finally, the Borough did not terminate Cimino, she was reassigned by Dustbusters and continued to work after she left the Borough. (Cimino Dep. 113:24-115:9).

Cimino argues that _Graves v. Lowery,_ 117 F.3d 723 (3d Cir.1997) establishes that the Borough was her co-employer along with Dustbusters. We disagree, and find _Graves_ distinguishable. There, the court analyzed whether Pennsylvania county court clerks, who were formally considered state employees, could pursue Title VII claims for employment discrimination against their county. _Id._ at 724. Although the county paid the clerks, it argued that it was not their employer because they served at the discretion of a state district justice, who had an inherent right to hire, discharge, and supervise the employees. _Id._ at 727. The court stated "the precise contours of an employment relationship can only be established by a careful factual inquiry." _Id._ at 279. It then found that the clerks alleged sufficient facts to establish that the county was their co-employer because they were paid by the county and were covered by county personnel policies, including holidays, vacation time, maternity leave, and sick leave. _Id. at 727 & n. 8._ Furthermore, the clerks were covered by the county's sexual harassment policy, they were subject to termination by the county, and two of the clerks in question were hired by the county. _Id._

**\*8** We find _Graves_ easily distinguishable. Significantly, unlike the clerks in _Graves,_ Cimino was not paid by her alleged co-employer. Cimino was paid an hourly rate by Dustbusters and received no compensation from the Borough. (Cimino Dep. 16; Nardozzi Dep. 80:10-14) Furthermore, Cimino has produced no evidence that she was subject to Borough personnel policies such as sick leave, maternity leave, or vacation time. If Cimino could not work because she was sick, she would contact Dustbusters, not the Borough. (Cimino Dep. 172:4-7) Dustbusters would then send another employee to

clean the Borough and the Borough had no choice of replacement. (Nardozzi Dep. 79:19-80:5)    [FN3] Moreover, the Borough did not hire or fire her. Dustbusters hired her in March 1998 and assigned her to shifts at the Borough a month later. (Nardozzi Dep. 15:1-2) The Borough never terminated her employment, Dustbusters reassigned her to other locations, including a doctor's office and a bank. (Cimino Dep. 86- 88)  [FN4]

> FN3. Cimino's brief argues that the Borough subjected Cimino to its rules, regulations, and policies, including its sexual harassment policy. This argument, however, is not supported by the record. Cimino cites to pages 97 and 98 of Nardozzi's deposition, wherein Nardozzi stated that she would expect sexual harassment laws to protect her cleaning employees when they were on site. (Nardozzi Dep. 97:22-98:2). This says nothing regarding the existence of any Borough policies or rules covering Cimino. Cimino also cites to Rice's deposition at page 29 for the proposition that the Borough discrimination policy applied to Cimino. There, Rice stated that she expected that federal discrimination laws would protect everyone on Borough premises. (Rice Dep. 29:8-18). Neither Rice nor Nardozzi, nor any other witness testified that the Borough had a policy or rule that applied to Cimino. Rather, Rice and Nardozzi assumed that discrimination laws would protect her.

> FN4. The parties dispute whether the Borough had input into whether Cimino would be removed from the Borough building after she made her sexual harassment accusations. We find this fact immaterial. The relevant inquiry is whether the Borough could terminate Cimino's employment, and it could not. She continued in the same employment after she was removed from the Borough building. To the extent that the Borough may have asserted influence over Cimino's removal, it was solely as a customer of Dustbusters, not as Cimino's employer. That Dustbusters may pay heed to the complaints of its customers does not render all of its customers co-employers of its employees.

Given the above factors, no reasonable jury could conclude the Borough was Cimino's employer. The Borough did not hire her, pay her, or terminate her

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

employment. The minimal control that it asserted over Cimino was purely as a customer of Dustbusters, not as Cimino's employer. Therefore, we will dismiss Counts I, IV, and V against the Borough.

### 2. Section 1983

Section 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress....

42 U.S.C. § 1983.

Thus, to establish a claim under § 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the complainant of rights secured under the Constitution or federal law. *Sameric Corp. of Delaware, Inc. v. City of Philadelphia,* 142 F.3d 582, 590 (3d Cir.1998).

To bring a claim under § 1983 for sexual harassment that amounts to a denial of equal protection, Cimino must prove the existence of purposeful discrimination. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990) (citing *Baston v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). She must show that she was treated differently from individuals similarly situated because of her gender. *Id.* (citations omitted). Defendants Mecca, Rice, and the Borough seek summary judgment on the § 1983 claim because they argue they did not personally contribute to the sexual harassment. First we will address Mecca and Rice's supervisory liability, and then we will address whether the Borough may be held liable as a municipality.

#### a. Rice and Mecca

*9 Rice and Mecca argue that they have no liability because supervisory liability in § 1983 claims cannot be based solely upon the doctrine of *respondeat superior,* and a defendant must have personal involvement in the alleged wrongs. *Robinson v. Pittsburgh,* 120 F.3d 1286, 1294 (3d Cir.1997) (citing *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). We find a genuine issue of material fact with regard to whether Rice and Mecca had sufficient personal involvement.

Supervisory liability may be shown "through allegations of personal direction or of actual knowledge and acquiescence." *Id.* (citations omitted). "When a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." *Id.*

Rice and Mecca argue that Cimino failed to produce evidence that they had knowledge of and acquiesced to the harassment. Specifically, Rice argues that she took immediate action upon learning of the sexual harassment, and Mecca argues that he did not know because Cimino denied that Dee harassed her. We find these arguments unsupported by the facts.

On September 11, 2000, Chief Mecca witnessed Dee place his arms around Cimino. (Mecca Dep. 20, 67:13-23) Mecca claims that he then confronted Cimino, and she denied that anybody in the police station was "bothering" her." (Mecca Dep. 30:23-31:1-2) Cimino denies that this conversation took place. (Cimino Dep. 47:10-24, 129:23-130:6) Mecca subsequently reviewed videotape on September 26, 2000 that showed Dee embrace Cimino twice, and Cimino break the embraces. (Mecca Dep. 71) Mecca reviewed a surveillance tape from October 23, 2000 that showed Dee reaching for Cimino's buttocks in an attempt to grab her inappropriately. (Mecca Dep. 72) Mecca failed to take any action regarding these incidents. He never approached Dee about possible harassment (Mecca Dep. 74:18-19), and he never approached Cimino. (Cimino Dep. 47:10-24, 129:23-130:6) Mecca never informed Dustbusters or any other borough official of the investigation or the results until Cimino complained to Captain Bradley. (Mecca Dep. 74:3-10, 84-54, 122:1-4)

Mecca's investigation provided ample evidence that Dee was sexually harassing Cimino, and a reasonable jury could find that Mecca's failure to act demonstrates he acquiesced in the behavior. Despite his power to control the situation, Mecca took no steps to intervene.

Rice testified inconsistently about when she learned about the harassment. She repeatedly testified that she learned of the harassment on December 12, 2002. However, on one occasion, she admitted that she

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

Page 8

knew that Mecca was investigating complaints of sexual harassment even before Cimino verbally complained. (Rice.Dep.39:1-16) The investigation uncovered videotape evidence that Dee was harassing Cimino. Rice testified that she took action only after the verbal complaint (Rice.Dep.14) Thus, a reasonable jury could conclude that she knew of the harassment while it was on-going, but failed to act to prevent it. Therefore, we find a genuine issue of material fact regarding whether Rice knew of and acquiesced to Dee's harassment.

**\*10** Thus, this matter presents factual and credibility issues that are inappropriate for resolution at the summary judgment stage, and can be resolved only by a jury at trial. Accordingly, we will deny Mecca and Rice's motion for summary judgment on the § 1983 count. [FN5]

> FN5. Mecca and Rice also argue that the section 1983 claims should be dismissed based on qualified immunity. "A public official's actions are protected by qualified immunity if s/he can show that the 'offending' conduct did not violate 'clearly established statutory or constitutional rights which a reasonable person should have known." *Andrews v. Philadelphia*, 895 F.2d at 479. We find they are not entitled to qualified immunity. Qualified immunity does not protect defendants that "treat[ ], or allow[ ] their subordinates to treat, female employees differently on the basis of gender in their work environment." *Id.*

**b. The Borough**

The Borough cannot be held liable as a municipality for the constitutional torts of its employees based solely on the doctrine of *respondeat superior. Robinson,* 120 F.3d at 1295 (citing *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Municipal liability attaches only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury' complained of." *Id.* (quoting *Monell,* 436 U.S. at 694). A plaintiff can demonstrate that a municipality's course of conduct amounts to government policy when "a decisionmaker possessing final authority to establish municipal policy with respect to the action 'issues an official proclamation, policy, or edict.' " *Andrews,* 895 F.2d at 1480 (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89

L.Ed.2d 452 (1986)).

In *Andrews,* the court found that a police commissioner's acquiescence to his subordinate's decisions were sufficient to establish municipal liability. *Id.* at 481. A police captain ignored foul language and pornographic materials in the workplace, ignored female employees' reports of stolen files although male employees never had similar problems, and he cautioned a female complaining of improper behavior that she should expect it. *Id. at 1479.* The court found that the municipality could be liable if the police commissioner "knowingly acquiesced" to the Captain's decisions. *Id. at 1481.* "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

We find that Mecca was a policymaker and a reasonable jury could conclude that he was motivated by sexual animus in acquiescing to Dee's sexual harassment. As Police Chief, Mecca compiled the employee handbook for the police department, including rules, regulations, and standard operating procedures. (Mecca Dep. 46:18-20). When he became chief, he revised the standard operating procedures. (*Id.* at 47:10-18). He distributed the revised procedures to all borough officers. (*Id.* at 50:7-9). He also had the authority to initiate an investigation into potential sexual harassment after witnessing Cimino and Dee embrace on September 11, 2000. (Mecca Dep. 30:19-25). Thus, he was a policymaker.

Second, for the reasons discussed previously regarding Mecca's supervisory liability, we also find that a reasonable jury could conclude that Mecca acquiesced in Dee's behavior and the basis for it. Therefore, we will deny the Borough's motion for summary judgment on Cimino's § 1983 claim.

**3. Section 1985**

**\*11** In order to prove that a defendant violated Section 1985, a plaintiff must show that he:
  (1) conspired,
  (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws,
  (3) that the conspirators did, or caused to be done, any act in furtherance of the object of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

Page 9

conspiracy, and
(4) that plaintiff was
(a) injured in his person or property, or
(b) deprived of having and exercising any right or privilege of a citizen of the United States.
*Gobla v. Crestwood School,* 609 F.Supp. 972, 979 (M.D.Pa.1985) (citing *Great American Fed. Savings & Loan Association v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)).

A conspiracy is "an agreement by two or more persons." BLACKS LAW DICTIONARY (8th ed.2004). Mecca, Rice, and the Borough argue that we should dismiss this claim because Cimino has produced insufficient evidence that two or more persons agreed to take action against her. Specifically, they argue that the Borough Defendants and Dustbusters never agreed to take action against Cimino, and there can be no conspiracy solely among the Borough Defendants because a corporation cannot conspire with its officers and directors. We find that Cimino has presented evidence that Dustbusters and Rice agreed to take action against Cimino, and thus the defendants' argument has no merit. Rice and Nardozzi spoke following Cimino's complaints and agreed to remove Cimino from the Borough. (Nardozzi Dep. 29:24-30:7). Additionally, Rice had input into the decision to remove Cimino. (Rice Dep. 62:21-23). Therefore, contrary to the Borough Defendants' argument, there is a genuine issue of material fact that Dustbusters and the Borough defendants agreed to take action against Cimino. *See Robison v. Canterbury Village, Inc.,* 848 F.2d 424, 431 (3d Cir.1988) ( "[A] section 1985(3) conspiracy between a corporation and one of its officers may be maintained if the officer is acting in a personal, as opposed to official, capacity, or if independent third parties are alleged to have joined the conspiracy."). Therefore, we find a genuine issue of material fact that two or more persons entered into an agreement and we will deny summary judgment.

4. Negligent Retention/Supervision

Rice and Mecca argue that they are entitled to official immunity on Cimino's common law claims because she cannot demonstrate that their actions constituted willful misconduct. [FN6] Rice and Mecca argue that we should grant summary judgment because they are entitled to official immunity under the Pennsylvania Tort Claims Act ("PTCA"), 42 PA. CONS.STAT. ANN. § § 8542-50. A local agency is generally immune from state law liability, with a few specifically enumerated exceptions not applicable here. 42 PA. CONS.STAT. ANN. § 8542. An employee of a local agency is liable for acts within the scope of his duties to the same extent as his employer. 42 PA. CONS.STAT. ANN. § 8545. An employee is not immune, however, from damages caused by an "act of crime, actual fraud, actual malice or willful misconduct." 42 PA. CONS.STAT. ANN. § 8542(a)(2).

FN6. Rice also argues that she cannot be held liable for negligent supervision or retention because she was not Dee's direct supervisor. Pennsylvania Courts have adopted *Restatement (Second) of Torts § 317* to guide the evaluation of negligent retention and supervision claims. *See Schofield v. Trustees of the University of Pennsylvania,* 894 F.Supp. 194, 196 (E.D.Pa.1995) (citing *Dempsey v. Walso Bureau, Inc.,* 246 A.2d 419, 421 (Pa.1968)); *Cox v. Roxborough Mem. Hosp.,* 708 A.2d 490, 496 (Pa.Super.Ct.1998).
A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should have reason to know of the necessity and opportunity for exercising such control.
Restatement (Second) of Torts § 317.
The central issue is whether "the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control over his employee." *Schofield,* 894 F.Supp. at 196 (quoting *Dempsey,* 246 A.2d at 422). First, Rice argues that she is not liable because she was not Dee's direct supervisor. Rice, however, supervised Mecca, who was Dee's direct supervisor. (Rice Dep. 10:23-11:5). "For liability purposes, a subagent is treated as an agent, and a subservant is treated as a servant." *Kemether v. Pennsylvania Interscholastic Athletic Association, Inc.. ,* 15 F.Supp.2d 740, 751 (E.D.Pa.1998).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
**(Cite as: 2005 WL 3488419 (M.D.Pa.))**

Therefore, Rice may be liable even though she did not directly supervise Dee.

**\*12** Cimino argues a reasonable jury could find that Rice and Mecca's actions fall under the willful misconduct exception. We agree. Mecca was aware of the harassment on September 11, 2000, and took no action to prevent Dee's behavior until after Cimino complained to Captain Bradley in late November. Similarly, Rice testified that she was aware of the investigation before Cimino complained, yet took no remedial steps until Cimino spoke with Captain Bradley.

In *DiSalvio v. Lower Merion High School District,* 158 F.Supp.2d 553 (E.D.Pa.2001) the court addressed whether the supervisors of a high school football coach engaged in "willful misconduct" when they ignored the coach's sexual harassment of a student manager. The court found that the immunity did not apply because the plaintiff "alleged facts sufficient to give rise to the reasonable inference that these Defendants were on notice about the harassment and knew or should have known that their nonfeasance would allow the harassment to continue or worsen." *Id.* at 564. Here, Cimino has presented sufficient evidence to create a genuine issue of material fact that Rice and Mecca were on notice of the harassment and knew that their failure to intervene would allow the harassment to continue or worsen. Accordingly, we will deny summary judgment on Cimino's negligent supervision and retention claims.

Therefore, in sum, we will grant the Borough Defendants' Motion for Summary Judgment on Cimino's Title VII and PHRA claims because the Borough was not her employer, but we will deny the Motion in all other respects.

**B. Dee Motion**

Dee raises three issues on summary judgment. First he argues that Cimino has failed to create a genuine issue of material fact on her § 1983 sexual harassment claim. Second, he argues that we should dismiss Cimino's claims for lost wages. Finally, he argues that we should grant summary judgment on Cimino's claim for punitive damages because the PHRA does not provide for such a recovery. [FN7] We will address these issues seperately.

FN7. Dee additionally argues that we should dismiss Cimino's PHRA claim against him because the PHRA does not provide for

individual liability. Cimino agrees and has withdrawn her PHRA claim against Dee. Cimino has also withdrawn her Count X claim for intentional infliction of emotional distress.

1. Sexual Harassment

Dee argues that Cimino cannot establish a § 1983 sexual harassment claim because the alleged harassment was neither gender based nor pervasive and severe.

We find Dee's arguments without merit. Cimino testified that Dee repeatedly touched her in a sexual manner, and used sexual language towards her. Every time Dee would work with Cimino, he commented on her breasts and buttocks. (Cimino Dep. 35:12-21) Dee told Cimino he wanted to make love to her, he wanted to "fuck" her, and he wanted to "eat [her] on the table right there." (Cimino Dep. 39:2-4) The harassment continued over a year and a half. (Cimino Dep. 191:17-20) For a while, the harassment escalated to physical touching, and Cimino testified that Dee would "maul" her, touch her all over her body, and try to kiss her. (Cimino Dep. 50:1-5) Dee touched her buttocks. (Cimino Dep. 55:20-21) Dee touched her in a harassing manner every time he saw her from the summer of 1998 until Cimino reported the behavior to Captain Bradley in 2000. (Cimino Dep. 142:13-19)

**\*13** Furthermore, based on the Court's review of the videotapes of Dee's behavior, a reasonable jury could interpret the videotape as depicting Dee sexually touching Cimino against her will. Therefore, we find a genuine issue of material fact that Dee's behavior constituted gender biased discrimination and was sufficiently pervasive and severe to alter the conditions of Cimino's employment.

2. Lost Wages

Dee's argument that Plaintiff cannot recover lost wages against him because she was not constructively discharged is equally meritless. A § 1983 plaintiff can recover lost wages as part of the actual damages caused by a constitutional violation. *See Brooks v. Andolina,* 826 F.2d 1266, 1269-70 (3d Cir.1987). Cimino has produced evidence that as a result of Dee's harassment, she was transferred out of the Borough, thus diminishing her wages. Therefore, we will deny Dee's motion for summary judgment on Cimino's claims for lost wages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)
(Cite as: 2005 WL 3488419 (M.D.Pa.))

### 3. Punitive Damages

Dee requests that we grant summary judgment on the issue of punitive damages because they are not available under the PHRA. This is irrelevant. Cimino has withdrawn her PHRA claim against Dee, but continues to seek punitive damages against him in Count II pursuant to § 1983, Count III pursuant to § 1985, Count VIII for Battery, Count IX for Assault, and Count X for Intentional Infliction of Emotional Distress. Therefore, even if Cimino cannot recover punitive damages pursuant to the PHRA, she seeks punitive damages pursuant to a variety of alternative theories. Therefore, we will not grant summary judgment on Cimino's claim for punitive damages, and we will deny Dee's Motion in its entirety.

### VI. Conclusion

For the reasons expressed above we will grant the Borough Defendants' Joint Motion for Summary Judgment in part and deny it in part. We will grant summary judgment for the Borough on Count I, IV, and V because it was not Cimino's employer for the purposes of Title VII and the PHRA. We will deny the Motion as to the remaining claims. Furthermore, we will deny Dee's Motion in its entirety, although we will dismiss the PHRA and intentional infliction of emotional distress claims as withdrawn.

Therefore, having resolved the defendants' motions to dismiss and motions for summary judgment, the following claims remain for trial: Count I, Title VII retaliation, against Dustbusters; Count II, 42 U.S.C. § 1983, against the Borough, Dee, Mecca, and Rice; Count III, 42 U.S.C. § 1985(3) conspiracy, against the Borough, Dustbusters, Dee, Mecca, and Rice; Count V, PRHA retaliation against Dustbusters; Count VI, negligent supervision against Mecca and Rice; Count VII, negligent supervision against Mecca and Rice; Count VIII, battery against Dee; and Count IX, assault against Dee. An appropriate order follows.

### ORDER

AND NOW, to wit, this 21st day of December 2005, it is hereby ORDERED that:

1. The Borough Defendants Renewed Motion for Summary Judgment (Doc.105) is GRANTED in part and DENIED in part. Summary judgment is granted on Counts I, IV, and V, but denied in all other respects.

*14 2. Defendant Robert Dee's Renewed Motion for Summary Judgment (Doc. 100) is DENIED.

Not Reported in F.Supp.2d, 2005 WL 3488419 (M.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 403345 (Trial Motion, Memorandum and Affidavit) Plaintiff's Pre-Trial Memorandum (Jan. 24, 2006)Original Image of this Document (PDF)

• 2006 WL 403343 (Trial Motion, Memorandum and Affidavit) Motion in Limine of the Defendants, Borough of Dunmore, Mary Rice and Salvatore Mecca, to Preclude from Introduction Into Evidence By the Plaintiff or Any Other Defendant the Eeoc's Finding of Probable Cause Discrimination (Jan. 17, 2006)Original Image of this Document (PDF)

• 2006 WL 403344 (Trial Motion, Memorandum and Affidavit) Brief of the Defendants, Borough of Dunmore, et al, in Support of Their Motion in Limine (Jan. 17, 2006)Original Image of this Document (PDF)

• 2005 WL 2233680 (Trial Motion, Memorandum and Affidavit) Plaintiff's Brief in Opposition to Defendants', Borough/Mecca/Rice, Renewed Motion for Summary Judgment (Jul. 14, 2005)Original Image of this Document (PDF)

• 3:02cv01137 (Docket) (Jul. 02, 2002)

• 2002 WL 32882087 (Trial Motion, Memorandum and Affidavit) Brief in Opposition to Defendant Dee's Motion for Summary Judgment%n1%n%n2%n%n3%n (2002)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 6

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Cynthia F. ZARNOSKI
v.
HEARST BUSINESS COMMUNICATIONS, INC.,
Bernard Gittelman and the Gittelman
Company.
**No. CIV. A. 95-3854.**

Jan. 11, 1996.

MEMORANDUM

DALZELL, Judge.

I. *Factual and Procedural Background*

*1 Cynthia Zarnoski, a district sales manager at The Gittelman Company ("TGC") from March of 1990 until her discharge on June 28, 1992, alleges that TGC's president, Bernard Gittelman, sexually harassed her throughout her tenure. Cmplt. ¶¶ 12, 14-15. Zarnoski filed suit under Title VII [FN1] against TGC, Gittelman and Hearst Business Communications, Inc. ("HBCI"), a wholly-owned subsidiary of Hearst Corporation that publishes technical periodicals. Chacana Aff. ¶ 3. Until it ceased operations, TGC had been a commissioned independent representative that sold advertising exclusively in HBCI publications and, according to Zarnoski, constituted HBCI's "alter ego". Cmplt. ¶ 5.

FN1. Zarnoski also brought three state law claims pursuant to our supplemental jurisdiction, 28 U.S.C. § 1367:(1) a claim against all defendants under the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. Ann. § § 953, 955(a); (2) a claim against Gittelman for intentional infliction of emotional distress; and (3) a claim against all defendants for unpaid wages under the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons.Stat. Ann. § § 260.3, 260.5(a). Since Zarnoski and Gittelman appear to be Pennsylvania citizens, and TGC's principal office would seem to be in Conshohocken,

Pennsylvania, we have no basis upon which to infer diversity jurisdiction, which in any event has not been invoked.

When we learned that the defendants raised our lack of jurisdiction over the subject matter as an affirmative defense, we on September 22, 1995 ordered the parties to conduct discovery on jurisdiction-related issues. After discovery was completed, the two corporate defendants each moved for summary judgment, alleging that we do not have subject matter jurisdiction under Title VII because TGC never employed fifteen or more employees during the relevant period. Gittelman also moved for summary judgment claiming that Title VII, as a matter of law, does not impose individual liability.

Zarnoski argues that we must aggregate TGC's and HBCI's employees to satisfy Title VII's fifteen employee jurisdictional requirement because TGC and HBCI constituted a single "employer", or, alternatively, because they jointly employed her. We hold that TGC and HBCI were neither a single "employer" nor "joint employers", and thus conclude that we have no jurisdiction over plaintiff's Title VII claim. [FN2]

FN2. We will treat these motions as motions to dismiss for lack of jurisdiction rather than for summary judgment. The distinction is important, for two reasons. First, a grant of summary judgment is a judgment on the merits of a case, but a jurisdictional inquiry is unrelated to the merits. *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 898 n. 6 (3d Cir.1987). Moreover, while defendants would bear the burden of persuading this Court that summary judgment is appropriate, plaintiff bears the burden of persuading us that we have jurisdiction over the subject matter. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991). Of course, we may consider defendants' jurisdictional inquiry even at this late date. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

## II. *Legal Analysis*

We have had occasion recently to discuss Title VII's fifteen employee requirement in *Powell-Ross v. All Star Radio, Inc.,* 68 FEP Cases 1148, 1995 WL 491291 (E.D.Pa. Aug. 16, 1995), a sexual harassment suit brought by a disc jockey against her former radio station and its program director. As we explained in *Powell-Ross,* Title VII creates a cause of action for anyone aggrieved by an unlawful employment practice, including sexual harassment. *Id., 1995 WL 491291 at *3.* The station moved to dismiss the complaint for lack of subject matter jurisdiction, successfully claiming that it did not employ the requisite number of employees to invoke jurisdiction under Title VII. *Id.* at *1.

Under Title VII's statutory definitions,

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....

42 U.S.C. § 2000e(b). An "employee" is, in turn, defined as "an individual employed by an employer...." 42 U.S.C. § 2000e(f). Because of the perfect circularity in the statute, we in *Powell-Ross* relied upon the common law factors set forth in *Nationwide Mutual Insurance Co. v. Darden,* 112 S.Ct. 1344, 1348-49 (1992), to determine whether certain individuals were "employees", who are protected under Title VII, or independent contractors, who are not. [FN3] *Powell-Ross, 1995 WL 491291, *6.* Having ascertained the employment status of these people, we examined the station's payroll records and determined that the station had not employed fifteen employees for twenty or more weeks per year during the relevant period, and, accordingly, dismissed the action for lack of subject matter jurisdiction. *Id.* at *12.

FN3. After we decided *Powell-Ross,* the Supreme Court reaffirmed *Darden 's* use of the common law for help in defining "employee" in a National Labor Relations Act case. *NLRB v. Town & Country Elec., Inc.,* 116 S.Ct. 450, 455-56 (1995).

**\*2** Zarnoski admits that TGC, by itself, never employed fifteen employees at any time from 1989 to 1992. [FN4] Rsp. at 16. Indeed, according to TGC's W-2 and W-3 Internal Revenue forms and UC-2A Pennsylvania forms, TGC employed only seven employees in 1989, six in 1990 and 1991, and five in 1992. [FN5] Instead, Zarnoski relies on two exceptions to Title VII's fifteen-employee jurisdictional requirement, contending that we must aggregate TGC's and HBCI's employees because TGC and HBCI constituted a "single employer" or, alternatively, a "joint employer."

FN4. Zarnoski alleges harassment throughout her tenure at TGC from 1990 until 1992. Thus, our focus is on 1989, 1990, 1991 and 1992, the current and preceding years of the allegedly offensive conduct. *Powell-Ross,* 1995 WL 491291, *3.

FN5. *See* Gittelman Mot. Exhs. C-F. Of course, tax treatment of the hired party is only one of the many *Darden* factors that determine whether someone qualifies as an "employee". *Powell-Ross,* 1995 WL 491291, *7. Unlike in *Powell-Ross,* however, Zarnoski does not claim that other individuals must be considered TGC "employees", as opposed to independent contractors.

A. *Nature of relationship between TGC and HBCI*
Since 1980, HBCI has published technical periodicals such as *EEM/Electronic Engineers Master, IC Master* and *Electronic Products* that appeal to the electronics industries throughout the United States, Canada, Europe, Japan and Korea. Chacana Aff. ¶¶ 6, 12; Villiger Tr. at 8. HBCI has a total work force of approximately one hundred employees, most located in Garden City, New York. Chacana Aff. ¶ 4; Villiger Tr. at 10.

HBCI obtains advertising in its publications using a sales force of both direct HBCI employees and independent representatives, such as TGC. Chacana Aff. ¶ 7. HBCI pays its direct employees a salary plus commissions on the advertising they sell. *Id.* ¶ 8. The direct employees each receive paid holidays, vacation and sick days, are eligible for HBCI's health insurance, pension and 401K plans, life insurance, salary continuation and tuition reimbursement benefits, and are issued IRS W-2 forms. *Id.* HBCI also provides workers' compensation and unemployment compensation coverage for all of its direct employees. *Id.* HBCI controls the manner and means of employment of its direct sales force by setting their hours, supervising their day-to-day activities, conducting performance appraisals and providing them with office space, clerical support, equipment and supplies. *Id.* ¶ 9. HBCI also pays all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 3
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

of its employees' business travel and entertainment expense. *Id.*

In contrast, HBCI only paid TGC commissions and not a salary, although TGC was entitled to a draw against those commissions. *Id.* ¶ ¶ 10, 18; Agreements between HBCI and TGC, appended to HBCI's Mot. Exh. 1-6, ¶ 10. [FN6] HBCI never paid Zarnoski directly, but always paid TGC who, in turn, paid Zarnoski. Chacana Aff. ¶ 18. HBCI also never withheld tax or social security deductions for Zarnoski, and provided her with no paid holidays, vacation or sick days. *Id.* ¶ 19. In addition, Zarnoski, like all employees of the independent representatives, was not eligible to participate in HBCI's medical benefits program and HBCI did not provide her with workers' compensation or unemployment compensation. *Id.* HBCI also did not provide Zarnoski with office space, clerical support, equipment or supplies. *Id.* ¶ 20. Indeed, TGC was required to "maintain an office separate from the Publisher and bear, for its own account, all expenses and obligations incurred in connection with the solicitation and sale of advertising space in the Periodical, including taxes, travel, entertainment, hotel, automobile, secretarial, administration, telephone, insurance, legal and other costs associated with the operation of Representative's business activities." Agr. ¶ 14A. HBCI did agree, however, to reimburse TGC for "[t]ravel, room and meal costs incurred in connection with attendance" at its sales meetings and trade shows. *Id.* ¶ 14B.

> FN6. All of the contracts between HBCI and TGC are identical except for the publication involved, the effective dates of the agreements, the territories covered, and the commission levels. We shall collectively cite these agreements as "Agr.", unless there is a material difference among them.

**\*3** Each contract between HBCI and TGC also makes clear that TGC "accepts such appointment as an independent contractor". *Id.* ¶ 3. TGC's status as an independent contractor was apparently important enough to the parties that the reference appears a second time: "Representative agrees that he is an independent contractor and will not in any way bind or attempt to bind the Periodical nor in any way render the Periodical liable". *Id.* ¶ 16D.

Recognizing the need for a "steady stream of information concerning the market and competitive conditions prevailing" in each sales territory, HBCI required TGC to submit written reports of all in-

person or other significant contacts with prospective and current advertisers on a regular basis, and quarterly reports "assessing problems, achievements, competitive conditions, and outlook." *Id.* ¶ 15. Gittelman testified, however, that he objected to providing this information in the manner in which HBCI requested it and insisted on using TGC's own form. Gittelman Tr. at 40-46. Gittelman further stated that TGC was not "required" to provide this information but did so as a matter of company policy. *Id.* Zarnoski answers that TGC, in fact, was required to provide HBCI with weekly itineraries of its employees' sales calls and, while Gittelman often expressed his annoyance in doing so, he nonetheless complied with this requirement. Pl.'s Aff. ¶ 34. Gittelman's objections to HBCI's reporting policies are documented in a memorandum to Armand Villiger, HBCI's group publisher vice-president. Rsp. Exh. 3.

HBCI had the right to terminate each contract with TGC in the event that it found TGC's employees lacking: "It is further understood that the quality of Representative's sales personnel is a critical element in the efforts to be undertaken by the parties hereto. The Periodical reserves the right in the event it unilaterally determines that Representative's personnel is deficient, to terminate this Agreement." Agr. ¶ 16B. It is undisputed, however, that HBCI played no role in TGC's decision to hire Zarnoski as its district sales manager or in any decisions concerning what her compensation would be or the terms and conditions of her employment, even though Gittelman mentioned Zarnoski "in passing" to several HBCI officers before her hiring. Chacana Aff. ¶ 17; Gittelman Tr. at 89.

HBCI management sometimes accompanied Zarnoski on her sales trips and directly critiqued her performance. Pl.'s Aff. ¶ ¶ 32-33. Zarnoski's business cards display TGC's name and full address, but also include HBCI's name and logo. Rsp. Exh. 9. Zarnoski also occasionally received HBCI inter-office memoranda concerning the sale force. Rsp. Exhs. 6, 10.

In July of 1990, Gittelman suffered a heart attack and decided to get out "of the business." Gittelman Tr. at 64. By July of the following year, Gittelman informed HBCI of his intention to sell "an equity interest" in TGC to Zarnoski and "if we (she and I) and HBC determined she qualified [*sic* ], I would work out a mutually agreeable arrangement." Rsp. Exh. 3. HBCI apparently opposed the sale of TGC to Zarnoski. [FN7] Because TGC did not have the right

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 4
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

to assign its contracts with HBCI absent prior written consent, Agr. ¶ 20, HBCI's refusal to deal with Zarnoski meant that TGC, as an entity, ceased to exist since its only assets, apart from office furniture, were its contracts with HBCI.

> FN7. Gittelman's testimony on this point was:
> Q. Now, did you sell the business when you closed?
> A. No. I had proposed to, I proposed to sell it to Cynthia.  As a matter of fact, from the time she was interviewed through this 1991 memo, that was something certainly I would have liked to have done.  Hearst didn't see it that way.
> Q. What would you have liked to have done?
> A. Sell it to her.
> Q. And what would Hearst--did Hearst have some objection to selling it to Cynthia?
> A. They never expressed an objection, but the fact that they didn't--the fact that they didn't sell it to Cynthia.
> ....
> A. They were not interested in my selling it to Cynthia and I had no other prospects.
> Q. Did you actually discuss with anyone from Hearst the sale of your business to Cynthia?
> A. Yes, as a matter of fact, I state it right in here.  I think the second to last paragraph.
> Q. I see it is made reference to.
> ...
> Q. Who did you discuss it with?
> A. Villager [sic ].
> Q. In this memo or other discussions?
> A. Prior to as well.
> Q. And what was the substance of your discussions?
> A. You know when the time comes.
> Gittelman Tr. at 64-65.  Zarnoski recalls that Michael Bernstein, a national sales manager for *Electronics Products,* told her that he wanted to "force Gittleman [sic ] out of his position as an independent sales representative for Hearst and replace him with Zarnoski."  Pl.'s Aff. ¶ 18.  Unfortunately for Zarnoski, this decision apparently was not Bernstein's to make. *Id.* ¶¶ 25, 30.

*4 HBCI then established a direct sales force in TGC's former territories, Gittelman Tr. at 67-68; Villiger Tr. at 114, effectively replacing TGC with its own employees, and retained Gittelman as a consultant for one year "to effect a smooth transition from the change in representation from the Gittelman Company to direct representation by Hearst Business Communications, Inc." Villiger Tr. Exh. 12. Gittelman's duties under this consulting agreement included "providing background on accounts, assisting in forecasting, assisting in writing proposals, traveling to and meeting with customers to assist the new salesman in learning and selling the accounts." *Id.* After TGC shut down operations, HBCI negotiated with the landlord to lease space, albeit for a lesser amount, in TGC's former offices. Gittelman Tr. at 98-101; Villiger Tr. at 115.

B. *"Single Employer" versus "Joint Employer"*
As a preliminary matter, it will be helpful to distinguish between the theories upon which Zarnoski relies.  Our Court of Appeals has explained at length the conceptual differences between a "single employer" and a "joint employer" in a case arising under the National Labor Relations Act:

> A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer."  The question in the "single employer" situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise ....*
> In answering questions of this type, the Board considers the four factors ...:(1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership.  Thus, the "single employer" standard is relevant to the determination that separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise.  "Single employer" status ultimately depends on all the circumstances of the case and is characterized as an absence of an arm's length relationship found among unintegrated companies.
> In contrast, the "joint employer" concept does not depend upon the existence of a single integrated enterprise and therefore the above-mentioned four factor standard is inapposite.  Rather, a finding that companies are "joint employers" assumes in the first instance that companies are what they appear to be--independent legal entities that have merely historically chosen to handle jointly important aspects of their employer-employee relationship.
> In "joint employer" situations no finding of a lack of arm's length transaction or unity of control or

Not Reported in F.Supp.    Page 5
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

ownership is required, as in "single employer" cases. As this Circuit has maintained since 1942, it is rather a matter of determining which of two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers. The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment.

**\*5** *NLRB v. Browning-Ferris Indus. Inc., 691 F.2d 1117, 1122-23 [3d Cir.1982]* (citations and internal punctuation omitted) (emphasis in original). Although developed under a wholly different statutory regime, the single employer and joint employer tests, as characterized in *Browning-Ferris,* have often been applied to employment discrimination actions. [FN8] Our Court of Appeals has never explicitly endorsed use of either NLRB test in a Title VII case, *Switalski,* 881 F.Supp. at 207, but we find this long line of authority persuasive. The courts occasionally have interchanged the terms "single employer" and "joint employer", especially in the Title VII area, *Rivas,* 929 F.2d at 820 n. 16, yet the Third Circuit made clear in *Browning-Ferris* that these concepts are doctrinally discrete.

FN8. *See, e.g., Virgo v. Riviera Beach Assocs. Ltd., 30 F.3d 1350, 1359 & n. 6 (11th Cir.1994)* (citing *Browning-Ferris* ); *Rivas v. Federacion De Asociaciones Pecurias, 929 F.2d 814, 820 nn. 16 & 17 (1st Cir.1991)* (citing *Browning-Ferris* ); *Childs v. Local 18, Int'l Brotherhood of Elec. Workers, 719 F.2d 1379, 1382 (9th Cir.1983)* (collecting cases); *Armbruster v. Quinn, 711 F.2d 1332, 1336- 37 nn. 3 & 5 (6th Cir.1983)* (collecting cases); *Astrowsky v. First Portland Mortgage Corp., 887 F.Supp. 332, 336 (D.Me.1995)* (citing *Browning-Ferris* ); *Switalski v. Local Union No. 3 of Int'l Assoc. of Bridge Structural and Ornamental Ironworkers, 881 F.Supp. 205, 207-08 (W.D.Pa.1995)* (ADA case); *Doe v. William Shapiro, Esq., P.C., 852 F.Supp. 1246, 1249 (E.D.Pa.1994)* (ADA case); *Shepherdson v. Local Union No. 401 of Int'l Assoc. of Bridge Structural and Ornamental Ironworkers, 823 F.Supp. 1245, 1250*

(E.D.Pa.1993).

### C. *Single Employer Theory*

The NLRB single employer test was initially used in *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256 (1965).* As noted, when determining whether two firms constitute a single employer, we must consider the (1) functional integration or interrelation of the operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership. *Browning-Ferris,* 691 F.2d at 1122. We may not mechanically employ these factors, but must examine the "totality of the circumstances". *Doe,* 852 F.Supp. at 1249.

Plaintiff regards the first factor--the interrelatedness of the operations-- as "[t]he most telling aspect of the test as applied in this case", Rsp. at 17, which in her view compels the conclusion that TGC and HBCI constituted a single employer. Zarnoski places great significance on the fact that TGC's only client was HBCI. As a consequence of the exclusive affiliation, TGC dedicated all of its efforts to selling advertising for HBCI publications and had no other source of income.

The financial reliance of one entity on another, however, does not by itself mean that their operations are, in any sense, interrelated. For example, HBCI and TGC did not share office space, equipment or supplies, did not develop joint employment policies, did not aggregate payrolls, tax accounts and other financial information. Furthermore, although TGC had only one client, it was not precluded from entering into contracts with any other periodicals, except for HBCI's competitors in the geographic areas where TGC represented HBCI. Chacana Aff. ¶ 16; Gittelman Tr. at 89; Villiger Tr. at 110. It was solely Gittelman's decision, and not HBCI's, that TGC not represent other publications. Gittelman Tr. at 88-89. At one point, TGC represented between twenty to twenty-five publications from thirteen to fifteen different publishers, but Gittelman got "a little tired of the whole thing" and "began to trim down" TGC's operations by closing offices in Boston and New York. *Id.* at 61-62. TGC's switch to an exclusive relationship with HBCI therefore does not demonstrate any interrelatedness of operations that support a finding that defendants constituted a single employer.

**\*6** Zarnoski also points to the manner in which TGC ceased doing business as evidence of the alleged interrelationship of TGC's and HBCI's operations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

TGC's cessation of business and HBCI's subsequent hiring of Gittleman as a consultant, *after* TGC discontinued operations, does not, contrary to plaintiff's suggestion, make TGC "merely an arm of [HBCI] with no independent existence." Rsp. at 18. Gittleman had worked in publishing since 1960 and been the president of TGC since 1974. Gittleman Tr. at 5. Given his history of dealings with TGC's former customers, it made business sense for HBCI to retain Gittleman as a consultant to provide continuity to advertisers and convey an image of stability. *See* Rsp. Exh. 11. Gittleman's consulting contract with HBCI does not, however, after the fact transform TGC and HBCI into a single employer. If anything, the consulting contract is evidence that HBCI and TGC were *not* a single employer because if HBCI truly had the degree of control over TGC and Gittleman that Zarnoski suggests, the parties would not feel it necessary to enter into a separate consulting contract. Rather, as the consulting contract notes, Gittleman and HBCI bargained at arm's length with one another: "It is understood between the parties that Mr. Gittleman is an independent contractor and not an agent or employee of Hearst for any purpose." Villiger Tr. Exh. 12. "Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an arm's length relationship found among unintegrated companies." *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir.1983) (citation and internal quotation marks omitted), *cert. denied*, 464 U.S. 1039 (1984).

With respect to the second element--centralized control of labor relations-- Zarnoski relies on the defendants' contractual provision that permitted HBCI to terminate its relationship with TGC should it find TGC's personnel unsatisfactory. To the extent that this provision somehow evinces HBCI's control over TGC's employees, it is, at best, tenuous. HBCI played no role in TGC's decision to hire Zarnoski, nor did it set the conditions of her employment. Chacana Aff. ¶ 17.

If HBCI were displeased with Zarnoski's performance, it could *suggest* that Gittleman fire her, but HBCI had no legal control over TGC personnel. The contracts merely provide that HBCI could terminate its relationship with TGC if it found that TGC personnel were "deficient". Agr. ¶ 16B. This scenario is no different than independent contractor relationships that prevail in many industries. For example, assume Xerox contracts with an independent representative to service this Court. If Xerox were to receive complaints from the Clerk about poor service from a particular salesman, Xerox could threaten to cancel the contract with the independent representative unless the salesman were reassigned or even fired. For obvious reasons, the independent representative might be under some pressure to comply with Xerox's wishes (in order to continue the contractual relationship), but nothing would prevent the independent representative from refusing to reassign or fire its employee and then offering its services to, say, Canon. In other words, one entity does not control another entity's employees merely because business reality gives it power to exert financial pressures. [FN9]

> FN9. Our conclusion drawn from this hypothetical is fortified here by the fact that HBCI never exercised its power unilaterally to terminate its agreement with TGC. Villiger Tr. at 69.

*7 Third, with regard to the management common to both corporations, this factor, too, weighs against a finding of single employer relationship. Zarnoski contends that HBCI had virtual managerial control over TGC. Zarnoski's own documentation, however, shows that Gittleman, and not HBCI, controlled TGC's employees, including Zarnoski. In May of 1992, Zarnoski wanted to attend a trade show, but complained to Villiger that "Bernie Gittleman advised me that under no circumstances was I to attend this year's Electro Show in Boston". Gittleman Tr. Exh. 4. As further evidence of the lack of common management, HBCI and TGC did not share any common employees or officers. *Compare Doe*, 852 F.Supp. at 1251 (two individuals were top officers in six different corporate defendants). Indeed, according to their contract, HBCI could not have hired any TGC employees without TGC's prior written consent. Agr. ¶ 16A. We again emphasize that a working relationship between entities does not mean that the companies share the same management. Gittleman managed TGC and its employees and Villiger managed (some of) HBCI's employees. That Gittleman discussed strategies with HBCI, or that Zarnoski received memos from HBCI, does not mean that HBCI and TGC shared management in the sense our inquiry requires.

Finally, concerning the fourth prong, Zarnoski concedes, as she must, that TGC and HBCI do not share common ownership because Bernard Gittleman was TGC's sole shareholder. Gittleman Tr. at 86-87. HBCI has never had a financial interest in TGC and no HBCI agent has ever been an officer, director or shareholder of TGC. Chacana Aff. ¶ 13. Although

Not Reported in F.Supp.                                                    Page 7
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

Zarnoski alleges that TGC's dependence on HBCI for revenues meant that HBCI somehow "owned" TGC, this argument ignores the business and legal reality that the stockholders are the owners of a business corporation and Bernard Gittelman held 100% of the shares of TGC. Accordingly, this factor also weighs against Zarnoski.

Considering the totality of the circumstances, we conclude that TGC and HBCI did not constitute a "single employer" because HBCI and TGC did not integrate their operations, there was no centralized control of labor relations, and no common management or ownership existed.

D. *Joint Employer Theory*

In the labor relations context, the Supreme Court, in *Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964), recognized as an issue of fact whether an entity "possesse[s] sufficient control over the work of the employees to qualify as a joint employer with" another entity.    The determination of joint employment status is essentially a factual inquiry. *Rivera-Vega,* 70 F.3d at 163.   To ascertain whether one entity "possessed sufficient control", lower courts have applied a variety of seemingly inconsistent tests whose factors, at least superficially, vary. [FN10]

> FN10. *Compare Warehouse Employees Union Local No. 169 v. Michelin Tire Corp.,* No. 95-764, 1995 WL 541814, *2 (E.D.Pa.1995) ("To determine whether alleged joint employers co-determine matters governing essential terms and conditions of employment, the courts and the National Labor Relations Board focus on the following: 1) hiring and firing; 2) employee discipline; 3) wages, insurance and records; 4) day-to-day supervision; and 5) participation in collective bargaining.") (citing *Local 773 v. Cotter & Co.,* 691 F.Supp. 875, 880-81 (E.D.Pa.1988) and *Clinton's Ditch Coop. Co. v. NLRB,* 778 F.2d 132, 138-39 (2d Cir.1985), cert. denied sub nom. *Teamsters Local 317 v. Clinton's Ditch Coop. Co.,* 479 U.S. 814 (1986)) and *AT & T v. NLRB,* 67 F.3d 446, 451 (2d Cir.1995) (same standard) *with Bonilla v. Liquilix Gas Corp.,* 812 F.Supp. 286, 288-89 (D.P.R.1993) ("Two employers may be considered 'joint employers,' if they share such things as 'the supervision of the employee's day to day activities, authority to hire or fire employees, promulgation of

work rules and conditions of employment, work assignments, and issuance of operating instructions.' ") (quoting *Rivas v. Federacion De Asociaciones Pecurias,* 929 F.2d 814, 820 (1st Cir.1991)) *and DiMucci Constr. Co. v. NLRB,* 24 F.3d 949, 952 (7th Cir.1994) (same standard) *and Rivera-Vega v. Conagra, Inc.,* 70 F.3d 153, 163 (1st Cir.1995) ("factors include: supervision of the employees' day-to-day activities; authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employer compensation, benefits and overtime;   and authority over the number of employees.") *and Ricketts v. Vann,* 32 F.3d 71, 74 (4th Cir.1994) (adopting nine-part test set forth in *Haywood v. Barnes,* 109 F.R.D. 568, 587 (E.D.N.C.1986): "(1) ownership of the property and facilities where the work occurred;   (2) degree of skill required to perform the job;    (3) investment in equipment and facilities;   (4) permanency and exclusivity of employment;   (5) nature and degree of control of the workers;   (6) degree of supervision, direct and indirect, of the work;   (7) power to determine the pay rates or the methods of payment of the workers; (8) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;   and (9) preparation of payroll and payment of wages.").   *See generally Holyoke Visiting Nurses Ass'n v. NLRB,* 11 F.3d 302, 306 (1st Cir.1993) (Rosenn, J., sitting by designation) (setting forth tests that various Circuits have used in evaluating whether joint employer relationship exists).

Our Court of Appeals has not addressed the joint employer issue since *Browning-Ferris,* and did not set out a precise test in that case.    We thus must apply our Court of Appeals's generalized holding that two entities constitute joint employers only where "they share or co-determine those matters governing essential terms and conditions of employment". *Browning-Ferris,* 691 F.2d at 1124.

*8 Judged from a totality of the circumstances, three factors seem to determine whether two entities should be considered joint employers under Title VII:(1) authority to hire and fire employees, promulgate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

work rules and assignments, and set conditions of employment, including compensation, benefits and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like. These factors seem to us most faithful to *Browning-Ferris* 's holding. We are mindful that the joint employment analysis was developed in other statutory contexts, and thus we exclude elements that are irrelevant to a finding of joint employment under Title VII, *e.g.,* participation in collective bargaining, ownership of the property and facilities where the work occurred, degree of skill required to perform the job. Equally important, the factors we employ are, for the most part, those the parties urge upon us. *See* HBCI Mtn. at 13 (citing *Bonilla v. Liquilix Gas Corp., 812 F.Supp. 286, 288-89 (D.P.R.1993); Virgo v. Riviera Beach Assocs. Ltd., 30 F.3d 1350, 1359-61 (11th Cir.1994)*); Rsp. at 14 (citing *Bonilla* ).

As to the first prong--the authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits and hours--as we have already discussed, HBCI did not possess the authority to hire or fire Zarnoski. HBCI played no role in TGC's decision to hire Zarnoski, and it did not participate in any decisions concerning what her compensation, and the terms and conditions of her employment, would be. Chacana Aff. ¶ 17; Gittelman Tr. at 89-90. Gittelman alone decided which territories and existing accounts to assign to Zarnoski, without any direction from HBCI. Gittelman Tr. at 91, 96-97. Gittelman alone set Zarnoski's hours of work. *Id.* at 98. Zarnoski's standard employment contract with TGC (which she, like all TGC employees, was required to execute as a condition of employment), does not mention HBCI. Gittelman Tr. at 85 & Exh. 3. TGC also supplied Zarnoski with a secretary and office supplies paid for out of TGC accounts. Gittelman Tr. at 95. As far as compensation is concerned, HBCI contracted to pay commissions to TGC as a percentage of net income received, Agr. ¶ 7, and Gittelman, in turn, negotiated separately with Zarnoski over her commissions, again without HBCI intrusion. Gittelman Tr. at 91. TGC, and not HBCI, also provided Zarnoski with benefits, including paid holidays, vacations, sick days and hospitalization plan. *Id.* at 93; Chacana Aff. ¶ 19.

With respect to the second element, the day-to-day supervision and discipline of employees, Zarnoski claims that HBCI management "regularly" critiqued and praised her work and "often" accompanied her on sales trips. Pl.'s Aff. ¶¶ 32-33. Villiger confirmed that HBCI management "from time to time" accompanied Zarnoski on her sales calls because "[s]everal of our customers like to see people from the publication itself and it enhances our position with them for them to know that the publication itself takes enough interest in them to have somebody from the home office come out and visit with them." Villiger Tr. at 69. Kathy Chacana, on the other hand, states in her affidavit that HBCI "never made work assignments to Cynthia Zarnoski, never reviewed her expense reports, never set her hours of work, never performed performance appraisals of her work and never participated in the supervision of her day-to-day activities." Chacana Aff. ¶ 21.

\*9 This dispute is not material. We have no doubt that HBCI to some degree supervised Zarnoski given its significant interest in ensuring that she was adequately servicing its customers. Yet the record is clear that Gittelman, and by extension TGC, was primarily responsible for Zarnoski's supervision on a day-to-day basis. As Villiger testified, "[t]hose people employed by rep firms [such as Zarnoski] have somebody who is managing them. So [HBCI] needed less managerial involvement than we do with our own employees." Villiger Tr. at 74. Even if a problem developed with one of TGC's customers, HBCI would only "advise", and not "tell", TGC how to "[t]ry to ameliorate the situation." Villiger Tr. at 120-22. Gittelman himself also made joint sales calls with Zarnoski, reviewed her call reports to prospects, and appraised her performance. Gittelman Tr. at 98. Because of plaintiff's lack of previous sales experience, Gittelman gave "significant sales training", *id.* at 95, and reviewed all of Zarnoski's call reports before forwarding them to HBCI. Villiger Tr. at 65.

The physical locations of the parties confirm that TGC had daily supervision over Zarnoski. TGC's office, out of which Zarnoski worked, was located in Conshohocken, Pennsylvania, while HBCI did not have an office anywhere in Pennsylvania during this time. Gittelman Tr. at 94; Chacana Aff. ¶ 22.

Moreover, HBCI never set the schedules of the independent representatives' employees. *Id.* at 125. In the event of an emergency, Gittelman, and not HBCI, would be the one who might order Zarnoski to drop everything and fly somewhere at a moment's notice. *Id.* at 125.

The totality of this record convinces us that TGC and not HBCI, maintained daily supervision over Zarnoski.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 9
Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514
**(Cite as: 1996 WL 11301 (E.D.Pa.))**

Finally, TGC alone controlled the employee records, including payroll, insurance and taxes. Gittelman Tr. at 93. TGC had its own payroll account, hospitalization plan, workers' compensation coverage and company policy booklet. *Id.* More importantly, HBCI did not influence TGC's practices in this area in any way. *Id.*

We therefore hold that HBCI did not maintain "sufficient control of the terms and conditions of employment of" TGC's employees, *Browning-Ferris, 691 F.2d at 1123,* and therefore TCG and HBCI were not joint employers.

III. *Conclusion*

On this record, it is clear that TGC was an independent contractor of HBCI and Zarnoski was TGC's, and not HBCI's, employee. Weighing all of the factors, we hold that TGC and HBCI do not constitute either a "single employer" or a "joint employer" and thus we shall not aggregate their numbers of employees for jurisdictional purposes.

Because TGC did not, by itself, employ the requisite number of employees to come within Title VII's scope, we must therefore dismiss plaintiff's claims for lack of subject matter jurisdiction. Since the Title VII claims involve the only federal question in the case, we shall decline to exercise supplemental jurisdiction over the state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

**\*10** Finally, because Gittelman's individual liability, if any, is derivative upon a finding that TGC and HBCI are a single entity, [FN11] we shall not unnecessarily reach this issue, especially in light of the split of authority among the Courts of Appeals and the judges of this district. *Caplan v. Fellheimer, Eichen, Braverman & Kaskey,* 882 F.Supp. 1529, 1531-32 (E.D.Pa.1995) (collecting cases).

> FN11. "The resolution of this issue [of Gittelman's individual liability under Title VII] necessarily relies upon a finding in favor of the Plaintiff on the issue of whether TGC and Hearst are a single employer under Title VII." Rsp. at 20.

An appropriate Order and Judgment follows.

ORDER & JUDGMENT
AND NOW, this 11th day of January, 1996, upon consideration of defendant Hearst Business

Communications, Inc.'s motion for summary judgment, and defendants Bernard Gittelman's and The Gittelman Company's motion for summary judgment, and plaintiff's response and defendants' replies thereto, and treating the motions as ones to dismiss for lack of jurisdiction, and for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. Defendant Hearst Business Communications, Inc.'s motion for summary judgment is GRANTED;

2. Defendant The Gittelman Company's motion for summary judgment is GRANTED;

3. Plaintiff's Title VII claims against all defendants are DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION;

4. Defendant Bernard Gittelman's motion for summary judgment is DENIED AS MOOT;

5. Plaintiff's supplemental state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3);

6. The Gittelman defendants' request for attorney's fees, see Mtn. at 9 & n. 5, is DENIED; and

7. The Clerk of the Court shall CLOSE this case statistically.

Not Reported in F.Supp., 1996 WL 11301 (E.D.Pa.), 69 Fair Empl.Prac.Cas. (BNA) 1514

**Motions, Pleadings and Filings (Back to top)**

• 2:95cv03854 (Docket) (Jun. 20, 1995)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.